T.C. Memo. 2021-88

UNITED STATES TAX COURT

ERNEST S. RYDER & ASSOCIATES, INC., APLC, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14619-10, 14687-10,     Filed July 14, 2021.
7527-12,   9921-12,
9922-12,   9977-12,
30196-14, 31483-15.

Ernest S. Ryder and Richard V. Vermazen, for petitioners.

Kevin W. Coy, Hans Famularo, Blake J. Corry, and Christopher J.

Richmond, for respondent.

_____

[1] We consolidated many cases for discovery and other pretrial practice. The parties settled quite a few, but we continued the consolidation through trial and briefing for Ernest S. Ryder & Associates, Inc., APLC, docket numbers 14619-10 and 9977-12; Ernest S. Ryder and Patricia A. Ryder, docket numbers 14687-10, 9921-12, 30196-14, and 31483-15; Ryder Ranches, LLC, Ernest S. Ryder, Tax Matters Partner, docket number 7527-12; and First Counsel Capital, Inc., docket number 9922-12.

**[*2]**                                   CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    Ryder & Associates, APLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      A.    How R&A Made Money . . . . . . . . . . . . . . . . . . . . . . . 9
      B.    What R&A Did With the Money . . . . . . . . . . . . . . . . . 28
            1.    Practice Funding Agreement With BFA . . . . . . . . . . 28
            2.    Establishment of Ryder Law Corp. . . . . . . . . . . . . . 29

II.   Ryder Goes Ranching . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      A.    Sources of Money for Ranches . . . . . . . . . . . . . . . . . . 36
            1.    Counselor Capital as Blocker Entity for
                  Ranches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
            2.    First Counsel Capital as Blocker Entity
                  for Ranches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            3.    Use of Four Additional Blocker Entities . . . . . . . . . 39
            4.    RLC and Its Stock Subscription Agreement . . . . . . . 41
      B.    Ryder Ranch Co., LLC Properties . . . . . . . . . . . . . . . . 42
      C.    Pattern Farms, LLC . . . . . . . . . . . . . . . . . . . . . . . . . . 43
      D.    Canyon View Ranch, LLC . . . . . . . . . . . . . . . . . . . . . 44
      E.    Ryder Red Rock Ranch, LLC . . . . . . . . . . . . . . . . . . . 44
      F.    Rodeo Holdings, LLC . . . . . . . . . . . . . . . . . . . . . . . . . 45

III.  Audit, Cashflow, and Trial . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      A.    Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
      B.    Cashflow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
            1.    Following the Money . . . . . . . . . . . . . . . . . . . . . . . 48
            2.    Gross Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
            3.    "Other Deductions" for 2005-06 . . . . . . . . . . . . . . . 68
            4.    Dividend Treatment . . . . . . . . . . . . . . . . . . . . . . . . 68
                  i.    From R&A Through RLC . . . . . . . . . . . . . . . . 69
                  ii.   From Tax Products to Ranch Entities . . . . . . . . 69
                  iii.  From R&A's Bank Accounts to Third
                        Parties for the Ryders' Benefit . . . . . . . . . . . 70
            5.    The Commissioner's Alternative Arguments . . . . . . . 72

**[\*3]**                6.     Disallowed Deductions . . . . . . . . . . . . . . . . . . . . . . . 73
                                i.     Substantiation of R&A Expenses . . . . . . . . . . 73
                                ii.    Ryder Ranch Co., LLC Losses . . . . . . . . . . . . 76
                        7.     California Pasteleria . . . . . . . . . . . . . . . . . . . . . . . . 79
                        8.     Other Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
        C.     Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
        D.     Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

    I.     Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

    II.    R&A's Unreported Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
        A.     Assignment of Income by Ryder & Associates . . . . . . . . . 87
                        1.     What R&A Looked Like to Clients . . . . . . . . . . . . . 92
                        2.     What Services R&A Provided . . . . . . . . . . . . . . . . . 93
                        3.     Income Produced Through These Services . . . . . . . . 95
                                i.     Group Tax Products Income . . . . . . . . . . . . . . 96
                                ii.    Stand-Alone Products Income . . . . . . . . . . . . 112
        B.     Additional Attempted Assignments of Income . . . . . . . . . . 119
                        1.     Assignment of Fee Income to BFA Through
                               the PFA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
                        2.     Assignment of Staffing Income to ESOP
                               Legal Consultants . . . . . . . . . . . . . . . . . . . . . . . . . 125
                        3.     Assignment of GCO Product Income to
                               Individual General Counsel Offices . . . . . . . . . . . . 128
        C.     "Other Deductions" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
                        1.     RLC and the Employee Leasing Agreement . . . . . . 129
                        2.     Remaining Deductions . . . . . . . . . . . . . . . . . . . . . . 132

    III.   Dividend Adjustment:  The Ryders' Liability for Tax on
           Unreported Constructive Dividend Income . . . . . . . . . . . . . . . . 134
        A.     Dividends From R&A Through RLC . . . . . . . . . . . . . . . . . 137
        B.     Dividend Income From Payments Made To Acquire
               and Operate the Ranch Properties . . . . . . . . . . . . . . . . . . . . 141
                        1.     Ryder Ranch Co., LLC . . . . . . . . . . . . . . . . . . . . . . 143
                        2.     Pattern Farms, LLC . . . . . . . . . . . . . . . . . . . . . . . . 154

**[\*4]**　　　　3.　　Canyon View Ranch, LLC . . . . . . . . . . . . . . . . . . . . 156
　　　　　　　4.　　Ryder Red Rock Ranch, LLC . . . . . . . . . . . . . . . . 157
　　　　　　　5.　　Rodeo Holdings, LLC . . . . . . . . . . . . . . . . . . . . . . . 158
　　　C.　　Dividend Income From Payments to American
　　　　　　Express and Ben Leland Construction, Inc. . . . . . . . . . . . 161
　　　D.　　Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

IV.　　Remaining Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
　　　A.　　Ryder Ranch Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164
　　　　　　　1.　　Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165
　　　　　　　2.　　Material Participation . . . . . . . . . . . . . . . . . . . . . 169
　　　　　　　3.　　Substantiation . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
　　　B.　　Ordinary Losses From California Pasteleria for
　　　　　　2003 and 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174
　　　C.　　Investment Interest Expense for 2005 and
　　　　　　Unreimbursed Employee Expenses for 2006
　　　　　　Through 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

V.　　Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176
　　　A.　　Mrs. Ryder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
　　　B.　　Ryder and R&A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>: Ryder & Associates, Inc., APLC (R&A), marketed six tax-reduction strategies that produced over $31 million in revenue between 2003 and 2011. The firm's fixed costs were low, and its out-of-pocket expenses not very large. Yet year after year it paid no income tax. Its revenue flowed instead

**[*5]** into 560 accounts and into Ryder Law Corporation, a related S corporation.[2]

It flowed into more than 1,100 ESOPs,[3] other S corporations, LLCs, and other

passthroughs.  It flowed into ranches in Arizona, and it flowed into other ranches

in New Mexico.  And then it mostly seemed to pool in places where it would

benefit Ernest S. Ryder and his wife Patricia, who received more than $15 million

in distributions between 2002 and 2011 but paid only $31,000 in income tax

during the years at issue.

Or so the Commissioner says.

## FINDINGS OF FACT

Ernest Ryder is the owner of R&A.  He and his wife Patricia live in Poway,

California, and they are longtime Californians.  After graduating from San Diego

State College in 1968 with a degree in accounting, Ryder started law school at the

University of California, Hastings.  While in law school he put his accounting

---

[2] If a business meets the requirements of section 1361, it may elect to become an "S corporation" and pay no corporate tax.  Secs. 1362(a), 1363(a); sec. 1.1361-1(b)(1), Income Tax Regs.  An S corporation's income and losses, like a partnership's, flow through to its owners, who then pay income tax.  See sec. 1363(b); see also Gitlitz v. Commissioner, 531 U.S. 206, 209 (2001).  (Unless we say otherwise, section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.)

[3] See infra note 48.

**[*6]** degree to use at Touche Ross & Co. There he learned about agricultural cooperatives and "how cooperatives work." Three years later he had a law degree and was admitted to practice in California. He went to work at Price Waterhouse & Co. in San Diego, California. Within a year, he moved back to Touche Ross, but this time in San Diego.[4]

He then moved to New York and enrolled at NYU for his master's degree in taxation, all the while continuing to work for Touche Ross in its Manhattan office. His time on the east coast was short lived, and he returned to California to join Ralph Gano Miller on a temporary job to help prepare and present a paper at the NYU Institute on Federal Taxation. When this was done, he began his career as a practicing tax lawyer at Hewitt & Shaw, a tax and business law firm also in San Diego. His timing was fortunate--he was at the stem-cell stage of his career the year that Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA). When there's an avulsive change in the law like ERISA, young lawyers can develop valuable expertise in an environment uncluttered with more senior competitors.

---

[4] Ryder was already a CPA at this time, though the record doesn't tell us when he became one. His license was canceled in 1996 when he failed to pay his dues.

**[\*7]** Knowledgeable associates in a fast-growing field are a hot commodity, and in 1975 Ryder was hired away by Harrigan, Ruff & Osborne to help that firm's clients get their retirement plans qualified under the new law. "[T]hat's when my career really took a turn," Ryder explained, and he was well on his way to becoming an expert in qualified retirement plans. He stayed at the Harrigan firm; and when he rose to become a shareholder, the name of the firm changed to Harrigan, Ruff, Ryder & Sbardellati.[5] He ran the firm's pension department for many years, and that is where he started working on many of the aggressive tax-reduction strategies that led to these cases.

The Ryders have been married for more than a quarter century. Unlike her husband, Mrs. Ryder is neither a tax attorney nor a CPA, but she does think she has "a better understanding of tax th[a]n most people walking around on the street." She completed four years of college classes--two at the University of California, Riverside, and two at San Diego State--but never obtained a bachelor's degree. After college and up until the time of trial she had an assortment of jobs that included work at a jewelry store and Brooks Brothers; and she owned her own businesses that included a bridal salon and some cookie stores--stores that are at

_____

[5] California is part of the West in some sense, and the firm referred to itself as "Ruff Ryder."

**[\*8]** issue in these cases.  She claims to work at the many different ranches she owns with her husband, where she says her tasks include "tak[ing] inventory * * * of the animals" and being "involved in their health."  She also helped ensure the cattle got the necessary shots, ear tags, and brands; and "kept track of the breeding program" for them.

I.     Ryder & Associates, APLC

The aggressiveness of Ryder's tax-reduction strategies seems to have caused some tension with his partners at Ruff Ryder, and he was asked to leave the firm sometime in 1995.  Ruff Ryder's entire pension department and its profit-sharing clients left with him.[6]  With ample experience and a fully staffed pension practice, Ryder decided to open up his own firm in early 1996.

And here begins the Ryders' tax problems.  R&A is a professional law corporation[7] and has always been taxed as a C corporation.[8]  Ryder has owned

---

[6] Ryder was careful to note that he remained cordial with his former partners, and even shared clients with them for different types of work in later years.

[7] Professional corporations are businesses organized as corporations under the laws of a specific state, typically consisting of licensed professionals working in fields like accounting, architecture, engineering, health, law, or science.

[8] This means that R&A itself is taxed separately from its owners under subchapter C of the Code.  So Ryder's income from the firm would face two layers

(continued...)

**[*9]** 100%, and has acted as president, of R&A since its creation. We find that Ryder also provided 100% of his legal services to clients through R&A during the years at issue.

Despite its success and longevity, R&A reported zero taxable income from 2002 through 2011. The Ryders also reported minimal taxable income on their individual returns for those years.

A.    How R&A Made Money

Although R&A wasn't clientless when it opened its doors, it "started fresh" with no money in the bank or cashflow from work done by Ryder and his team at Ruff Ryder. Ryder began a quiet but substantial marketing campaign for the new firm. R&A pitched its tax-saving products as "next generation tax management services" to prosperous professionals and entrepreneurs who wanted to save for retirement using "unique" plans that would "defer a much greater portion of their income than they ever dreamed possible, and, as a result, substantially reduce their tax liability." After meeting with Ryder in person and receiving a followup letter laying out the tax benefits of R&A's services, many took the bait, and R&A began reeling in the clients. R&A did everything its clients needed to fulfill what it had

---

[8](...continued)
of tax:  one at the corporate level, and the other when the firm distributes profits in the form of dividends to him.

**[*10]** promised: It set up the necessary entities, handled all filings with the IRS and any state agencies, created retirement plans, drafted agreements to link its clients to the companies that held the retirement accounts, helped clients move money from one account to another as needed, and reviewed tax returns to make everything look as proper as could be.

R&A earned some of its fees by setting up traditional employee savings plans and doing certain noncontroversial corporate work. Most of its fees, however, were earned through the sale of the several "unique" tax plans. This entire clade of six plans throughout their entire evolution is traceable to Ryder himself. But to make our discussion of them even minimally understandable we will first describe some sister clades and their species, then dissect each species in some detail.

The first division is between group-tax and stand-alone products. The group-tax products are

- a form of insurance called ASIG,

- factoring, and

- employee leasing.

The stand-alone products are

- individual staffing,

[*11] ● general counsel offices, and

● a Son-of-Boss variation.[9]

The key distinction between the group and stand-alone products is that buyers of the group product had contracts with a third entity that R&A would set up. Buyers of stand-alone products each had a contract with R&A itself.

We start with the group products.

*ASIG*. R&A sold this product through American Specialty Insurance Group, Ltd. (ASIG), a captive insurance[10] company that was itself owned by another company named Capital Mexicana. ASIG was organized under the laws of the Turks and Caicos and, like Capital Mexicana, was created during Ryder's time at Ruff Ryder. Both ASIG and Capital Mexicana had been in business since at least 1991.[11] When Ryder learned of captive insurance, he wanted to sell the

---

[9] See infra note 19.

[10] As we explained in Hosp. Corp. of Am. & Subs. v. Commissioner, T.C. Memo. 1997-482, slip op. at 8:

> The insurance laws of some States provide for a category of limited purpose insurance companies, popularly called captive insurance companies or captive insurers. Captive insurance company statutes generally apply to companies that insure on a direct basis only the risks of companies related by ownership to the insurer.

[11] Ryder organized Capital Mexicana as an Irish nonresident company in
(continued...)

[*12] product to his clients. To do this, Ruff Ryder had hired the Turks and Caicos accounting firm Morris Cottingham for the purpose of creating a Turks and Caicos company--ASIG. ASIG's main office was located at Morris Cottingham's Corporate Services, but Ryder also rented a post office box for ASIG in Las Vegas. Any mail sent to the P.O. box was forwarded to Ruff Ryder (c/o Ernest Ryder).

Once ASIG was in place, R&A could provide its clients with what it called "Disability and Professional Liability Income Insurance" policies. These policies required that the clients pay premiums to ASIG for the insurance, with the premiums to be physically mailed to R&A. On top of this, the policyholder was required to pay an annual 2% policy fee, which was deposited in ASIG's Charles Schwab bank account ending in 5337 during the years at issue. In return for all of

---

[11](...continued)
Dublin. Irish nonresident companies were companies established in Ireland whose management was located elsewhere. Under Irish tax law at the time, such a company would be subject to income tax only in the country of the management's residence. And if that management was located in a tax haven like the Turks and Caicos, it would not owe tax to the Turks and Caicos government either. This meant that a corporation set up in Ireland whose management was in the Turks and Caicos would not owe income tax anywhere in the world. Ryder made sure Capital Mexicana was such a company. Ireland later changed its law to eliminate nonresident companies (with a few exceptions). See Brian McDonald & John Homan, "Finance Act Targets Irish Nonresident Companies," 1999 J. of Int'l Tax'n 42.

**[*13]** this, the policyholder was entitled to 98% of the cash value of the policy when certain events occurred (i.e., disability, separation from employment, turning 60, or the insured's termination of the policy).

We've already analyzed these policies in Estate of Barnhorst v. Commissioner, T.C. Memo. 2016-177. Like other ASIG policies, Barnhorst's policy was titled "Disability Income Insurance Policy" and ostensibly provided benefits to him if he became totally or partially disabled, which would make any payout excludable under section 105 as being from an employer-funded accident or health plan. See id. at *3.

What makes such policies stand out was that they would *also* pay out when the policyholder reached age 60 or died or was no longer employed. See id. at *3-*6. A close look at the policy in Estate of Barnhorst showed that payouts weren't correlated with actual medical expenses or "computed with reference to the nature of the injury." See id. at *14, *18 (quoting section 105(c)(2)). We found it quite telling that although the policy said it would terminate once Barnhorst turned 60, ASIG renewed the policy each year. See id. at *6-*7. No new premiums were ever paid despite these renewals, and only three premium payments were ever made. These were mailed to R&A and then placed in a segregated account that Ryder maintained. Id. at *6. Ryder then "invested the premiums in a diversified

[*14] portfolio of mutual stock and bond funds where they could build value over the years until benefits had to be paid." Id. We found that the policy was really a deferred-compensation plan, despite its stated title. Id. at *16.

These cases do not require us to revisit our analysis in Estate of Barnhorst. They do require us to find here that from start to finish R&A did everything it could to make ASIG work. And there were several of these ASIG policies that produced money for R&A during the years at issue. We summarize the numbers:

| Year | Number of policies paying fees into account 5337 | Total revenue[12] |
|------|------|------|
| 2003 | 20 | $138,322.28 |
| 2004 | 14 | 268,477.29 |
| 2005 | 15 | 311,585.34 |
| 2006 | 11 | 101,619.03 |
| 2007 | 10 | 114,917.84 |
| 2008 | 8 | 86,654.33 |
| 2009 | 11 | 181,513.41 |

---

[12] We note that included in some of these amounts is interest on deposits in the form of "Schwab Money Market Fund-Dividends." These dividends are different from the other, nontaxable dividends that the Commissioner excluded from his bank-deposit analysis. (See infra pp. 86-87 for our discussion of how the Commissioner conducted this analysis.)

[*15]

| 2010 | 5 | 63,172.76 |
|---|---|---|
| 2011 | 1 | 14,297.78 |
| Total | 28 | $1,280,560.06 |

*Group Factoring.* The second group product was something we'll call "group factoring." We analyzed this transaction in <u>Pacific Management Group v. Commissioner</u>, T.C. Memo. 2018-131. As we explained there,

> "Factoring" is a financial transaction by which one party (the factor) provides services to another party (the client) and is compensated by payment of factoring fees. The services that the factor provides typically include: (1) purchasing the client's accounts receivable for cash, (2) collecting on the accounts receivable from the account debtors, and (3) assuming the downside risk if an account debtor becomes insolvent. Factoring benefits the client by enabling it to monetize an illiquid asset immediately. In exchange for its services the factor receives a fee, typically computed as a discount from the face amount of the receivables.

<u>Id.</u> at *17. In an arm's-length relationship, factoring is perfectly legitimate. Factors provide working capital and liquidity to their clients and do the work needed to collect the accounts that have been assigned to them. They also perform the sometimes very important job of moving the credit risk of the account debtor from their clients to themselves. <u>See</u> <u>id.</u> at *46-*48.

As with ASIG's "disability" policies, however, "group factoring" used the words associated with a legitimate practice and made it into something different--a circular flow of funds from R&A's clients back to those clients, with some leaking

**[\*16]** out to R&A itself.  See id. at \*46.  Instead of factors that paid for these accounts and then collected them, the clients themselves continued to bill and collect these accounts as if they'd never sold them.  The factors were straw men who received no meaningful economic benefit in return for the money they paid out to the clients.  See id. at \*49.

If a client was interested,  R&A would create the needed entities.  The evolution of these entities is quite complex and went through four different generations, with some overlap between them.  Here's the list:

- Benefactor Funding Association (BFA) (1996-2002);

- United States Factoring Association, LLC (USFA) (2002-04);

- Western Funding Group, Inc. (Western Funding) (2004-07); and

- WFG, Inc. (WFG) (2008-11)

Each of these four shared many elements in both their setup and execution.  One of these similarities was the way they collected fees paid by clients into a general account owned by the entity, but which R&A controlled.

Here's a summary of the gross receipts R&A received in the form of fees from these products into those accounts:

| [*17]<br>Account(s)<br>ending in | 8497 (BFA) | 4564 & 2653<br>(USFA)[13] | 2935<br>(Western<br>Funding) | 6874 (WFG) |
|---|---|---|---|---|
| Total number of<br>fee payments[14] | 58 | 347 | --- | --- |
| Gross receipts | $376,465.10 | $849,519.83 | $549,351.97 | $70,440.70 |

The Commissioner was unable to identify any specific deposit into the Western Funding and WFG, Inc. operating accounts as gross receipts to R&A, because many of the deposits belonged to R&A's clients. He therefore included as income only those funds that left the accounts and ended up in R&A's own bank account ending in 9815, BFA's Division 101's bank account ending in 0449, or the Ryders' personal bank account ending in 4461. This means we can't tell how many other clients used Western Funding and WFG or how many fee payments

---

[13] The Commissioner also identified a bank account for U.S. Factoring Managers, Inc., ending in 8620 that deposited $19,950.03 into the R&A bank account ending in 9815 in 2003. U.S. Factoring Managers, Inc., was a corporation owned by Ryder's brother-in-law, Robert Pancheri. We agree with the Commissioner that this $19,950.03 is part of the factoring companies' gross receipts for that year, and we include it in USFA's gross receipts.

[14] Note that these numbers are not the numbers of clients paying fees, but the numbers of deposits that we find were fee payments to R&A. The gross values of the deposits were quite large. In one employee's estimation, there were about "60 requests to have accounts receivable factored" each month, and possibly more because "some customers factored twice a month."

[*18] they made, which makes our findings about R&A's income from this product conservative.

The account ending in 8497 was used by R&A's clients at least from 2004-10. The account ending in 2653 appears to have been used only in 2003, while the other account for the USFA product and ending in 4564 was used from 2003-10. The Western Funding account ending in 2935 was used from 2004-08, and finally, the WFG, Inc., account ending in 6874 opened in 2008 and was used by R&A's clients until 2011.

*Employee Leasing.* The third group product was employee leasing, and this one was (to make the record still more complicated) often combined with the factoring product. As is true of factoring, employee leasing is perfectly legitimate when done the proper way. In a legitimate employee-lease deal, one business contracts with another to supply it with workers. The leasing company generally assumes responsibility for paying the workers' wages and employment taxes, while the operating-business owner keeps control over how the workers perform their jobs and pays the leasing company for payroll, taxes, benefits, and any administrative fees. See, e.g., Garavaglia v. Commissioner, T.C. Memo. 2011-228, 2011 WL 4448913, at *3, aff'd, 521 F. App'x 476 (6th Cir. 2013).

**[*19]** This isn't how R&A's employee-leasing deals worked. In its deals clients signed what Ryder labeled "Agreements of Employment" with one of multiple entities that R&A created. The clients would then lease themselves back to their real businesses--either directly or through an intermediary--with the difference between the lease payment and the wages received becoming a form of compensation that was supposedly immune from current taxation. R&A used five entities:

- Worldwide Career Management, Ltd. (Irish).;

- Worldwide Career Management, Inc. (U.S.);

- Executive Placement, Inc.;

- Westra Capital Management, Inc.; and

- ExecuPro Specialty Services, Inc.

Each of these companies had a number of bank accounts that R&A and its clients would use:

[*20]

| Account type | Number of accounts |
|---|---|
| Worldwide Career Management accounts | 2 |
| Westra Capital Management accounts | 3 |
| WCM QSub accounts | 45 |
| Executive Placement accounts | 16 |
| ExecuPro accounts | 4 |
| ExecuPro Specialty Services accounts | 27 |
| WCM QSub & ExecuPro Client accounts | 62 |
| ESOP Client accounts | 21 |

And here are R&A's gross receipts from this group-leasing product for each tax year:

[*21]

| Year | Gross receipts[15] |
|---|---|
| 2003 | $409,176.11 |
| 2004 | 358,868.75 |
| 2005 | 1,188,470.00 |
| 2006 | 404,288.07 |
| 2007 | 684,663.39 |
| 2008 | 60,375.35 |
| 2009 | 51,450.00 |
| 2010 | 1,487,835.00 |
| 2011 | 524,865.19 |
| Total | $5,169,991.86 |

*Staffing Product.* For the three remaining types of deals we don't have to work as hard to find it more likely than not that R&A was involved. They are all deals where R&A signed agreements with its clients in its own name. Each client in these deals received more specifically tailored services. And with these stand-alone deals it was the clients themselves who acted as officers of the entities involved.

---

[15] We note that deposits in these accounts do not equal R&A's fees, but only its gross receipts. These accounts and products were up and running before 2003 and may have accumulated money that was not debited until a later year. We find that the best way to track the flow of funds into R&A is to trace money as it left these entities' accounts and moved into other accounts more directly linked to R&A, such as the law firm's main accounts.

[*22] The stand-alone staffing product is the first we'll look at. It closely resembles the employee-leasing deals we've already described--indeed, there appears to be some overlap in the clients that used them. R&A's staffing services generally looked something like this:

- R&A would create a corporation and file an S corporation election on its behalf;

- R&A would establish an ESOP to own the S corporation; and

- R&A's clients would somehow transfer funds from their businesses to the ESOP-owned corporation.

R&A sold these deals until 2011.

Here's a breakdown of the gross receipts stemming from the stand-alone staffing services:

[*23]

| Account ending in (and years used) | 0449 (2003) | 3149 (2004-11) |
|---|---|---|
| Gross receipts[16] | $2,378,539.05 | $4,315,880.30 |
| Number of fee payments | 57 | 190 |

*General Counsel Office (GCO)*. Ryder's GCO deals were unusually creative. He created hundreds of new corporations, none of which had any existence except on paper, with the plan to draft them into a reserve army awaiting deployment in his clients' battle against taxation. He came up with a uniform pattern--he had each S corporation's board (of which he himself was the sole director) appoint him as vice president/general counsel, and R&A employee DeAun Castro as vice president/ESOP administration. Ryder then filed 2001 federal income tax returns as of December 31, 2001 for the corporations not yet assigned to a client. Every return reported gross receipts of $100 and expenses of $97. None reported owing any tax on the resulting $3 in taxable income.

---

[16] We stress again that gross receipts do not equal R&A's taxable income from these accounts, but merely show the money coming in from the product. R&A's taxable income depends on when money left these accounts and where it ended up. Our work was hindered because deposit descriptions were missing for the account ending in 0449, so we could not be sure which deposits were specifically related to the staffing product. And this account has deposits from the factoring product as well. Still, the amount of money flowing into the account for just one year shows how much money was made from just two of R&A's products. See infra pp. 53-64 for analysis of just what R&A's income was from this product.

**[\*24]** Any R&A client who wanted in on this type of deal could learn about it once they bought into a GCO arrangement and signed an "Access Agreement." The Access Agreement was basically the same as the letters of representation used for the staffing-company clients, but with different nomenclature. This agreement granted the clients access to one of R&A's corporations and its related ESOP that R&A had sitting in its inventory. A client agreed in return to pay a percentage of his operating business's revenue as a fee. This fee first flowed through the employee-leasing product into his assigned S corporation and then was pumped into his assigned ESOP. Each client also had to pay a $25,000 documentation fee to yet another Wyoming corporation, Prescient Planning, which Ryder had also formed not long after his incorporation-palooza in early 2001. In the original Access Agreements, GCO clients promised to pay all the fees that they owed directly to Prescient Planning.

This product was fairly short lived because the IRS learned about such deals and made them a listed transaction.[17] See Rev. Rul. 2003-6, 2003-1 C.B. 286.

---

[17] A listed transaction is one that has been identified as a "tax avoidance transaction." See sec. 6707A(c)(2). Taxpayers are required to disclose these transactions on their returns, and promoters of these transactions must register them with the IRS. Schwab v. Commissioner, 136 T.C. 120, 123 (2011), aff'd, 715 F.3d 1169 (9th Cir. 2013).

**[*25]** Ryder and R&A responded with a revised Access Agreement. The changes

weren't small:

- Inclusion of a new section dealing with the creation of the general counsel office;

- A new section requiring the client's S corporation to enter into an Agreement of Employment with Ryder for his services as the vice president/general counsel of the corporation;

- A new section requiring the client corporation to pay an annual budget for the general counsel office in the same percentage as the fee in the original agreement;

- A retitled section that revises "The Payment of Percentage Fees" to say "Funding of Annual Budget;"

- A retitled section that revises the "No Reduction of Percentage Fees" to say "No Reduction of Annual Budget;" and

- A new section dealing with the determination and negotiation of legal fees owed to Prescient Planning or R&A.

Ryder summarized the changes best in his letter to a client:

> Please note that the Access Agreement has been revised to provide that the amount that otherwise would have been paid as Percentage Fees to Prescient will instead be budgeted to the Corporation's new General Counsel's Office. In this regard, I am designated as the Vice President/General Counsel of the corporation, and DeAun Castro is designated as Vice President/ESOP Administration.

Ryder made one especially notable change--he backdated these new agreements,

which he asked his clients to sign. These new agreements changed the way the

[*26] GCO product received its gross receipts, with the torrents of cash flowing into either Prescient Planning or First Counsel Capital's[18] bank accounts, now relabeled "budget allotments." The Commissioner determined, and we find, that these deals generated a total of more than $3.5 million.

*Short-Sale Strategy*. The final product is one that is no stranger to our Court--the Son-of-Boss deal.[19] See, e.g., BLAK Invs. v. Commissioner, 133 T.C. 431 (2009). Between 1998 and 2002, R&A sold its own Son-of-BOSS variation. Son-of-BOSS deals are infinitely flexible in the tax savings they promise. For taxpayers who have large capital gains on which they wish to pay no tax, such deals can be customized to produce offsetting capital losses in any amount. See 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49, at *11.

The fees R&A charged its clients for this product were held in two accounts--accounts ending in 9156 and 9214--titled "Ernest S. Rider, APLC,

---

[18] See infra pp. 37-39.

[19] Son-of-BOSS deals were generally used to artificially inflate someone's basis in a partnership interest by contributing assets with large contingent liabilities (which were ignored in computing basis) and then selling this interest at fair market value for a huge tax (but no economic) loss. See, e.g., RJT Invs. X v. Commissioner, 491 F.3d 732 (8th Cir. 2007) (involving typical Son-of-BOSS transaction); Kligfeld Holdings v. Commissioner, 128 T.C. 192 (2007). There are other variations. See, e.g., Home Concrete & Supply, LLC v. United States, 634 F.3d 249 (4th Cir. 2011), aff'd, 566 U.S. 478 (2012). We've never found a Son-of-BOSS transaction that worked.

[*27] Attorney Trust Account," and "Ernest S. Ryder & Assoc., Inc. Attorney

Client Trust Account." The total amount of fees from the product into each

account is as follows:

| Method of determining gross income | 9156 | 9214 |
|---|---|---|
| Total fees deposited from 2003-2011[20] | $698,696.58 | $861,478.38 |
| Commissioner's determination of taxable withdrawals during 2003-2011[21] | $1,140,959.76 | $498,680.91 |

*Summary of Fees*. After going through each of the products sold by R&A,

it's useful to see the fee structure used for each one. The documentation fee was

charged for the organizational paperwork and setting up clients with the

appropriate bank accounts. The annual percentage fee was for use of the products,

---

[20] These amounts reflect the deposits going into the accounts, and exclude nontaxable deposits.

[21] The Commissioner determined income from the client trust fund accounts to R&A and the Ryders based on the final destination of debits and checks drawn on the accounts. He determined that the total amount of taxable income that left the account ending in 9156 was $1,140,959.76. The taxable income that left the account ending in 9214 was $498,680.91. We suspect that most of the money in these accounts was deposited before 2003.

[*28] clients' access to funds in certain accounts, and the ultimate tax benefit they gained. The percentage varied from product to product:

| Product | Annual fee | Fee classification |
|---|---|---|
| ASIG | 2% | Characterized as "policy fee" and deposited into ASIG general account |
| Group factoring | 9% | Characterized as "legal fee" and deposited into factoring company general or operating account |
| Group leasing | 6-8% | Characterized as "retention fee" and deposited into leasing company general account |
| Staffing | 6-8% | Percentage paid from staffing company to other R&A accounts and entities, such as ESOP Legal Consultants |
| GCO | 6-8% | Characterized as a "budget" and deposited into 18 separate general counsel office accounts |
| Short-sale strategy | 6-2/3% | Characterized as a contingent fee and deposited into designated attorney-client trust account |

B.    What R&A Did With the Money

1.    Practice Funding Agreement With BFA

As difficult as it is to trace revenues from clients to R&A, it is even harder to follow the cash as it flowed to the Ryders themselves. Our difficulty begins with R&A's own money management. Although R&A had no resources other than its "time, energy, and skill" when it opened, Ryder ensured this was not the

[*29] case for long.  He quickly entered into a "practice funding agreement" (PFA) with BFA, one of R&A's own factoring companies, to get the startup cash it needed.  This PFA took the form of a factoring agreement, in which R&A "sold" its accounts receivable and other contracts from the law practice in exchange for BFA's agreement to provide funding as needed to R&A.  R&A and BFA entered into these PFAs each year between 1996 and 2003.

### 2.    Establishment of Ryder Law Corp.

In 2002 R&A's money management became even more convoluted.  Ryder incorporated Ryder Law Corp. (RLC) as an S corporation in January of that year.  The original articles of incorporation for RLC authorized the issuance of 100,000 shares of common stock and restricted ownership of any outstanding shares to employees of RLC or an ESOP.  On the same day Ryder incorporated RLC, it executed a stock-subscription agreement with the "Ryder Law Corporation Employee Stock Ownership Plan and Trust" (RLC ESOP).  Under this agreement, RLC ESOP bought 10,000 shares of RLC common stock for $1 a share, which made it the 100% owner of RLC.  RLC ESOP then transferred these shares to something called the "Ryder Law Corporation Profit Sharing Plan and Trust" on October 16, 2003.  That same day, Ryder and Bradley Ammon, another attorney at R&A, themselves bought stock in RLC through their own stock-subscription

[*30] agreements.  Ammon dropped out sometime later and by 2005, Ryder

himself owned nearly all the shares.  We tabulate all the twists and turns of RLC's

ownership from 2002-09:

| Shareholder | 2002 | 2003 | 2004 | 2005-09 |
|---|---|---|---|---|
| Ernest Ryder | --- | 10.38% | 66.98% | 98.59% |
| RLC ESOP | 100% | 79.17% | --- | --- |
| Bradley J. Ammon | --- | 10.38% | 30.96% | --- |
| RLC Profit Sharing Plan and Trust | --- | 0.07% | 2.06% | 1.41% |

Ryder claimed that his intent in all this was for RLC to become the

employee-staffing corporation for R&A.  He testified that all of R&A's employees

moved from R&A to RLC, and that RLC then leased them back to R&A

throughout all these years.  But his testimony is the only evidence we have of this.

Multiple employees credibly testified that they were employees of R&A.  Neither

they nor any other R&A employees had written employment agreements to show

they were now RLC's employees.  All these employees still logged their time

using R&A timeslips.  The record does show that these employees received their

W-2's from RLC every year; but as far as the rest of the world could tell, nothing

else changed for these employees.

[*31] Ryder was trying to solve the same problem many owners of a profitable C corporation have--one layer of income tax at the corporate level, followed by another if it pays out its profits in the form of dividends. Ryder set himself to figuring out some way of moving R&A's profits to RLC so he could take them as distributions from an S corporation.[22] His solution was an unorthodox one--he told R&A's bookkeeper, Amy Herauf, to make multiple adjusting journal entries[23] to shift income from R&A to RLC.

These adjusting journal entries would show R&A's money going to Ryder in what he labeled "loans"--"loans" from one of the financial accounts of a group tax product or "loans" from R&A itself (and he would include in these "loans" money that went from R&A to pay Ryder's or one of Ryder's ranch's credit-card

---

[22] Ryder explained that distributions from S corporations aren't considered income--and are therefore tax free--so long as the shareholder has basis and the distributions do not exceed that basis. (He's right about this--section 1368 says so.)

[23] An adjusting journal entry is "[a]n accounting entry made into a subsidiary ledger called the General journal to account for a period['s] changes, omissions or other financial data required to be reported 'in the books' but not usually posted to the journals used for typical period transactions." Accounting Terminology Guide, New York State Society of CPAs, https://www.nysscpa.org/professional-resources/accounting-terminology-guide#sthash.OMJATGaN.BomMsjPI.dpbs (last visited June 21, 2021).

[*32] bills).[24]  At the end of the year, Ryder would meet with Herauf and R&A's return preparer Don Lang to tell them on which accounts he wanted them to make these adjusting journal entries.

If he wanted money earned from sales of a group product, then Herauf or Lang would record an asset in the form of a note receivable from Ryder himself on the books of whichever entity had cash that he wanted.  They would also enter on that entity's books an offsetting obligation to pay R&A for Ryder's services as their attorney.  The entity would transfer the note receivable due from Ryder to R&A to pay R&A's attorney's fees.

The note on which Ryder was liable would be entered as an asset on R&A's books.  Remember though that Ryder had papered RLC to appear to sell employment services to R&A.  R&A would pay for those services that it had supposedly bought by transferring the note to RLC.  Ryder would distribute the note to himself from RLC.  As the note was now in the hands of its putative maker, it went "poof" as a matter of tax law with no more tax consequence to Ryder than to someone who writes a check to himself on one account to deposit into another.

---

[24] See infra pp. 161-63.

[*33] At least that's the position Ryder took--he did not report these notes as income on his individual returns. He explained that he did so because distributions from S corporations are not income unless they exceeded their owner's basis, see supra note 22, and he treated each transfer from RLC as a nontaxable return of basis. Where did this basis come from? The basis Ryder claimed was from the series of stock-subscription notes that he had contributed. The initial stock-subscription agreement between Ryder and RLC for 150,000 shares at $10.105 per share was financed with promissory notes to RLC from Ryder in which he promised to pay more than $8,000 a month over 360 months. He signed a second stock-subscription agreement with RLC in May 2004 for 300,000 shares at the same price per share. He also financed that subscription with a promissory note. The same month he signed a third subscription agreement with RLC for another 100,000 shares at the same price and financed with a third promissory note. And finally in 2005 Ryder claims he bought Ammon's 150,000 shares in RLC for $10,000 in cash and another note for almost $1.5 million.

Here is a summary:

| Date | RLC shares | Amount | Payment method |
|---|---|---|---|
| 10/16/03 | 150,000 | $1,515,750 | Note |
| 5/10/04 | 300,000 | 3,031,500 | Note |

| [*34] 5/12/04 | 100,000 | 1,010,500 | Note |
|---|---|---|---|
| 1/1/05 | 150,000 | 10,000<br>1,490,063 | Cash<br>Note |

Ryder claims that he made payments on these notes, but the Commissioner says that he did not and that what looked like payments were actually distributions from RLC that Ryder would lend back to RLC. There were more than 60 of these payments that volleyed back and forth between Ryder and RLC and totaled almost $2.6 million.

## II.   Ryder Goes Ranching

The revenues and cashflow of R&A and RLC may be baroque in their complexity. When we approach the Ryders' ranches, they become rococo. Ryder himself views the country life as a welcome respite from the daily grind of his office life. He grew up on a ranch where he learned how to butcher, how to herd cattle, and how to farm. So we do find that the ranch life always appealed to him. During a road trip with his wife through southeast Arizona and southwest New Mexico, Ryder noticed for-sale signs on ranch properties and commented to Mrs. Ryder that "they were giving * * * the real estate away."

This led them to start buying ranches. On January 10, 2003, Ryder Ranch Co., LLC, filed its articles of organization, and the Ryders' ranch life began. The

[*35] ranches' history includes a long list of filings, amendments, and amendments to amendments of LLC articles all done in an attempt to alter--or at least give the appearance of altering--their ownership.

By the time we tried these cases, the Ryders had ended up with nine properties:

| Ranch LLC | Properties purchased | Date purchased | Cost |
|---|---|---|---|
| Ryder Ranch Company, LLC | Lazy BK Ranch | 1/16/03 | $355,000 |
| | Varnum property | 10/8/08 | 325,000 |
| Pattern Farms, LLC | Shumaker Farms | 4/18/03 | 420,000 |
| | Boggs property | 6/10/03 | 162,000 |
| | Moore property | 2/16/05 | 537,500 |
| Canyon View Ranch, LLC | Rivers property | 5/19/03 | 150,000 |
| Ryder Red Rock Ranch, LLC | Coon Ranch | 4/28/03 | 650,000 |
| Rodeo Holdings, LLC | Gallery Building | 3/15/06 | 70,000 |
| | Escarcega House | 8/31/06 | 180,000 |

**[*36]** A.    <u>Sources of Money for Ranches</u>

        1.     <u>Counselor Capital as Blocker Entity for Ranches</u>

One of R&A's "services provided" was to help its clients retrieve the money that they had put into one of the products. By "helping them retrieve their money," we do not mean filling out withdrawal slips. We mean the more sophisticated service of shunting money through different accounts held by these entities, from which money could flow back to the clients as what looked like loans. Ryder called this type of account a "blocker entity"--Ryder's term for an entity between a payor and payee that disguised the true flow of money, or that he used to "isolate the tax-exempt entity from being engaged [with] an unrelated trader." Counselor Capital, for example, was a blocker entity used mainly by USFA clients. Money from clients would find its way into Counselor Capital's bank account, and the clients would then "borrow" their own money from Counselor Capital. Ryder had access to these accounts, and used them to fund the ranch entities. Ryder booked this as an investment by Counselor Capital in another company called First Counsel Capital, which Ryder at least occasionally papered to look like it was part owner of Ryder Ranch Co., LLC.

[*37]      2.      <u>First Counsel Capital as Blocker Entity for Ranches</u>

To use First Counsel Capital as a blocker, Ryder had to adjust a number of different entities.  He had, for example, filed articles of organization for Executive Placement Services - 106, LLC, with the Wyoming secretary of state in November 2002.  These articles identified Executive Placement Services, Inc. (a Utah corporation) as the LLC's manager.  In September 2003 Ryder filed an amendment to substitute First Counsel Capital, LLC, a California LLC, as manager.  Wyoming then dissolved Executive Placement Services - 106, LLC, for failure to file its annual report and pay tax, and the company stayed dissolved until April 2006.  Notwithstanding this dissolution, Ryder filed a 2003 income-tax return for Executive Placement Services - 106, LLC, in October 2004.  But that return listed the partnership as First Counsel Capital, LLC, with a Wyoming address.  This seems to have anticipated another name change, because in April 2006 Ryder filed paperwork with the Wyoming secretary of state to change the name of Executive Placement Services - 106, LLC, to First Counsel Capital, LLC.  This amendment also changed the managing member for the LLC to himself in his capacity as an attorney for R&A.[25]  Ryder had already opened a bank account for First Counsel

---

[25] We note that this change to the managing member avoided First Counsel Capital, LLC, of Wyoming having as its managing member First Counsel Capital,

(continued...)

**[\*38]** Capital, LLC (Wyoming), on October 20, 2003, almost three years before an LLC with that name existed. (Ryder Ranch Co., LLC, also filed its 2005 return showing one of its members as First Counsel Capital, LLC (Wyoming), before any LLC had that name.) That same month--April 2006--Ryder converted the Wyoming LLC to a C corporation: First Counsel Capital, Inc.

With First Counsel Capital, Inc., incorporated and at least on paper sometimes owning an interest in Ryder Ranch, Ryder began to use it as a "blocker entity" to funnel money out into the ranches. This meant that he again decided to make adjusting journal entries to record money whose real origin lay in 18 GCO accounts, ESOP Legal Consultants, Inc., Counselor Capital, and group-leasing products as money that came from First Counsel Capital, Inc. These transfers were all opaque, and Ryder made them either through the "adjusting journal entry" process already described or through a slightly different "loan payable" method. In this second method, the initial journal entries would list as an asset on the group product's balance sheet a receivable due for the amount of a loan from the ranch entity, and list as a liability on the ranch entity's balance sheet a loan payable for the same amount. Ryder would adjust these entries at the end of the year. He

---

[25](...continued)
LLC, of California.

[*39] would adjust the group product's books to show the loan receivable due from the ranch entity as an equity investment in First Counsel Capital, Inc. On the books for the ranch entity, he would reclassify the loan payable as a contribution by First Counsel Capital, Inc. On First Counsel Capital, Inc.'s books, the investment from the group product was recorded as a liability and the loan receivable due from the ranch entity was recorded as an asset. Then the loan receivable due from the ranch entity was canceled by reclassifying it as an investment in the ranch entity.

### 3. Use of Four Additional Blocker Entities

Ryder expanded his use of "blocker entities" with four additional investment companies that he used to get money from R&A's attorney-client trust account ending in 9156--the account he created to hold fees from clients who had bought the Son-of-BOSS short-sale product we've already described--out to the ranch entities. These four companies were:

- Turnour Investments, Inc.;

- Alster Investments, Inc.;

- MBSP Investments, Inc.; and

- Spanky Investments, Inc.

**[*40]** Ryder filed the articles of incorporation for Turnour Investments, Inc., with Wyoming in November 2002; and for Alster Investments, Inc., MBSP Investments, Inc., and Spanky Investments, Inc., in December 2002. He listed R&A as the mailing address for each in the annual reports that each company filed.

Once these companies were set up, Ryder made a series of transfers on December 24, 2002, from R&A's attorney-client trust account ending in 9156 to accounts titled to these new companies. The first transfer was to a bank account titled "Spanky Investments, Inc." for $75,000. The second was to a bank account titled "MBSP Investments, Inc." for $900,000. The third was to a bank account titled "Alster Investments, Inc." for $175,000. And the fourth was to a bank account titled "Turnour Investments, Inc." for $205,000. Ryder produced stock certificates dated December 30, 2002, a week before trial that showed BFA as the registered holder of shares in each of these four companies. Here are the number of shares held by BFA in each:

| Investment company | Shares issued |
|---|---|
| Spanky Investments, Inc. | 75,000 |
| MBSP Investments, Inc. | 900,000 |
| Alster Investments, Inc. | 175,000 |
| Turnour Investments, Inc. | 205,000 |

[*41] So for each dollar transferred into the accounts for the investment companies, BFA received one share.

Ryder claims that the transfer of funds from the trust account to these investment companies reflected payments under the practice funding agreement between R&A and BFA that we've already described. The trust account held the fees earned by R&A through the short-sale strategy products. Under the funding agreement, BFA supposedly had the right to these fees, which made it the beneficial owner of the funds in the trust account. When Ryder moved the funds from this account to the companies, it was therefore BFA that received shares in each of them. Ryder claimed these were payments under the practice funding agreement.

Once Ryder transferred these funds into the companies' accounts, these four companies would send the money to the ranch entities and to Ryder Ranch Co., LLC, to fund the ranch activities.

### 4. RLC and Its Stock Subscription Agreement

R&A used RLC and RLC's ESOP as another way to get money out of the group products. Remember that when Ryder organized RLC he had RLC's ESOP sign a stock subscription agreement to buy 10,000 shares of common stock and RLC ESOP nominally held 100% of the RLC shares. When Ryder and Ammon

[*42] bought their interests in RLC, the 10,000 shares of RLC stock that RLC's ESOP held were nominally transferred to the "RLC Profit Sharing Plan." Ryder eventually went on to acquire nearly all of the shares of RLC. Distributions from RLC to Ryder were made through the adjusting journal entries already described. And once again, Ryder treated these payments from RLC as a nontaxable return of basis in an S corporation by claiming basis from the subscription notes he contributed to RLC.

B.    Ryder Ranch Co., LLC Properties

On January 16, 2003, the Ryders bought the Lazy BK Ranch in Cochise County, Arizona. The price was $355,000, with a $100,000 downpayment and the remaining $255,000 financed by a loan. The Ryders put the property in the name of Ryder Ranch Co., LLC.

Ryder Ranch Co., LLC, bought more Cochise County land from Terryl Varnum in October 2008. The price was $325,000, and a downpayment and closing costs of more than $126,000 went from Counselor Capital, Inc.'s bank account to Pioneer Title Agency. Ryder Ranch Co., LLC, used seller financing for the rest.

**[*43]** C.  <u>Pattern Farms, LLC</u>

Ryder also organized Pattern Farms, LLC.[26]  He filed its articles of organization in January 2003 with the Arizona Corporation Commission and then, as with Ryder Ranch Co., LLC, drove it through a whirlwind of amendments and refilings.

In April 2003 Pattern Farms, LLC, purchased two parcels of land in Cochise County from Weldon and Marjorie Shumaker.  The price was $420,000, and the downpayment came from the Ryders' personal account.  Pattern Farms, LLC, got financing from the Shumakers and gave them a promissory note in which it promised to pay them $210,000 in two annual installments of $105,000 plus interest.  When time came to send these payments, almost all the money went to the Shumakers from bank accounts titled "Alster Investments, Inc." and "MBSP Investments, Inc."

In June 2003 Pattern bought two more parcels of land in Cochise County. The downpayment came from the Ryders' personal account.  The record shows at least one payment on the note came from an account titled MBSP Investments, Inc.

---

[26] The name "Pattern Farms" is a portmanteau of the Ryders' first names, Patricia and Ernest.

[*44] In February 2005 Pattern bought four more properties in Cochise County. This purchase was also mostly seller-financed, and the money for it again did not come from the Ryders directly. This time the money came from an account for First Counsel Capital, LLC (Wyoming).

D.      Canyon View Ranch, LLC

Ryder next formed Canyon View Ranch, LLC. He filed its articles of organization with the Arizona Corporation Commission on April 24, 2003, and followed up with the usual amendment shenanigans.

On May 19, 2003, Canyon View Ranch, LLC, completed the purchase of two parcels of land in Cochise County, Arizona, from Edward Rivers. The contract price was $150,000, with additional closing costs of $421.50. Canyon View Ranch, LLC, gave Rivers a promissory note for $120,000 with an annual interest rate of 6%. A bank account titled "Turnour Investments, Inc." also supplied $31,000 for this purchase.

E.      Ryder Red Rock Ranch, LLC

Ryder also wanted to buy ranch land in New Mexico. He first organized a new entity, Ryder Red Rock Ranch, LLC, in April 2003, and then followed the same pattern as before.

**[*45]** On April 28, 2003, Ryder Red Rock Ranch, LLC, completed its purchase of four parcels of land (property formerly known as Coon Ranch) in New Mexico's Grant and Hidalgo Counties. The contract price was $650,000, with additional closing costs and state taxes of $1,811.55. Ten thousand dollars came from a bank account titled "MBSP Investments, Inc." This same "MBSP Investments, Inc." bank account also transferred $645,000 that we find more likely than not went to the Coons. Since these payments totaled more than the contract-plus-closing costs, Ryder Red Rock Ranch received a refund from the Hidalgo County Abstract Escrow Trust.

### F. Rodeo Holdings, LLC

The last of Ryder's real-estate LLCs is Rodeo Holdings, LLC. He didn't organize Rodeo Holdings until February 2006.

It bought two buildings in Hidalgo County, New Mexico. The first was the "Gallery Building." The downpayment came from the Ryders' personal bank account with the remainder from an account titled to ExecuPro. The second was the "Escarcega House." A small part of the price came from the Ryders' personal checking account with the rest from accounts titled ExecuPro and Westra Capital Management.

**[*46]** III.    Audit, Cashflow, and Trial

A.    Audit

The IRS began a section 6700 investigation[27] into R&A's use of ESOPs on August 26, 2003, after someone noticed that the firm had applied to have more than 800 ESOPs qualified at the same time.  Then, like antibodies swarming to an infection, two more investigations latched onto the promotional activities of Robert Pancheri and Karen Baker--former R&A employees whom Ryder had used to "manage" many of the different entities.  These converged into a full-blown audit of the Ryders and his law firm.  This überaudit spanned nearly a decade and expanded backward and forward to the Ryders' 2002-11 and R&A's 2005-09 tax years.

When questioned by IRS agents, Ryder pleaded the Fifth and refused to answer any questions regarding the tax structures sold by his law firm.  Ryder's silence left the Commissioner with no choice but to use subpoenas and third-party interviews.  Revenue Agent Huong Phan--the first revenue agent on this case--

---

[27] Section 6700 imposes a civil penalty for the promotion of abusive tax shelters.  A section 6700 investigation "is conducted independently of, and without regard to, the determination on [an] income tax case," see Internal Revenue Manual pt. 20.1.6.1.2(3) (July 8, 1999), and focuses only on whether the promoter/preparer is subject to penalties or an injunction for his involvement in abusive activities.

[*47] issued over 30 summonses to various financial institutions and third parties--essentially any party that he was able to recognize.

More investigations broke out. The California Franchise Tax Board executed a search warrant of R&A's office in April 2010. The IRS then expanded its audit team to add Revenue Agent Joseph Haynes. He focused on identifying what payments and deposits had moved through all these entities and accounts. It was a staggering job--RA Haynes himself issued over 300 summonses to financial institutions and other third parties during the course of his investigation. He even had a summons served on the Franchise Tax Board to get access to the records that it had seized in its investigation. The Commissioner found a tangle of 560 financial accounts used by hundreds of entities created by Ryder through R&A. Ryder himself had signature authority over approximately two-thirds of these accounts; the fraction rises to nearly 95% if one includes accounts where Ryder's employees had signature authority. RA Haynes also traced the flow of funds through R&A's accounts to identify which were for the Ryders' benefit. After this work was completed, RAs Haynes and Phan both analyzed the items going through the accounts to identify which accounts were used to collect R&A's fees. And, finally, Revenue Agent Nistha Boyer--who took over the work of RA Phan after RA Phan changed roles within the IRS--completed a bank-deposit analysis

**[*48]** (BDA) to identify R&A's gross receipts. RA Boyer also determined that the Ryders were taking funds out of these accounts to pay personal expenses and linked these funds to R&A's gross receipts.

B.   Cashflow

1.   Following the Money

We can begin with a general explanation of this complex analysis by the Commissioner's revenue agents. Their work uncovered 41 of R&A's financial accounts and 10 of the Ryders'. They identified and sorted the specific items of income deposited into these accounts, and then sorted the accounts into two "boxes".

The first contained the 41 R&A accounts. This is the law-firm box, and the agents determined that any money coming into that box was income of R&A. But if money just sloshed around from one account to another inside this box the agents didn't count it as R&A income. We find that this is a generally reasonable way for us to identify R&A's income.

The second box held the Ryders' personal accounts. When money came into this "personal box" from the law-firm box, or left the law-firm box to go to a third party for the benefit of Ryder or his family, the agents treated it as a distribution to Ryder, unless the money was already included in their reported

**[*49]** income.  Just as with the law-firm box, the Commissioner did not add to the Ryders' income any deposits and withdrawals between accounts within the personal box.  We also find this to be a generally reasonable way for us to identify the Ryders' possibly taxable distributions.

> 2.  Gross Income

This bank-deposit analysis is the heart of these cases.  And given the astonishing complexity of the cashflows in and out of the accounts, we next describe in some detail the links between R&A's tax products and these accounts.

*ASIG*.  The ASIG product was the one that mocked up deferred compensation to look like disability-insurance policies.  R&A would assign each client who bought these policies a policy number, draft a policy, and open a dedicated bank account for the client's use.  We find from the records we have that whenever a client filed for benefits under an ASIG policy, he would complete a claim package and pay a termination fee.  This termination fee would show up as a deposit into the ASIG bank account ending in 5337.  More money would leave these dedicated accounts twice a year and end up in the same account ending in 5337.  Clients agreed that these transfers were Ryder's legal fees for the services provided.  R&A generated a total of more than $1.28 million in revenue through these ASIG deals.  See supra pp. 14-15.

**[*50]** This is not all the income that R&A earned from sales of ASIG policies. From 1998 through 2002, most of the money from ASIG deals bypassed R&A's books and went to Ryder as "loans" whose repayment he owed to R&A. These "loans" would move from R&A to RLC and back to Ryder himself in 2005 through the adjusting journal entries already described. See supra pp. 31-34.

From 2004 through 2010 R&A's income from ASIG polices that went into the 5337 account totaled more than $1 million. A large share, $188,514, left the account by check to Morris Cottingham Corporate Services, Ltd., of the Turks and Caicos, and two checks went to Capital Mexicana, Ltd. Nearly all the remaining funds in the 5337 account were transferred in October 2010 to a bank account entitled "Execupro Specialty Services, Inc., ESOP Designated Roth Contribution Account." This repaid two of R&A's clients for advances they had made to Counselor Capital, Inc., from 2007 through 2010 that Ryder had used to fund the ranch entities. The next year, in September 2011, the 5337 account was drained of $61,000 that went to Counselor Capital, Inc., again as funds for Ryder's use in his ranch entities.

In total, the Commissioner traced $1,027,811.49 of the asserted $1,280,560 of ASIG income received from 2003 to 2011 directly to R&A, or indirectly to pay off the Counselor Capital, Inc.'s loan for the benefit of Ryder as stated above. We

[*51] agree and find that this $1,027,811.49 is includable in R&A's gross income for the years in which it was deposited.

*Group Factoring Products*. R&A commingled the money it earned selling the group factoring product with its clients' own funds within each of the product's bank accounts. We can trace R&A's earnings, however, because it labeled its fees for two of the companies it used--BFA and USFA--either dividends or fees. These "dividends" or fees moved out of the individual clients' "collection accounts" each quarter into the products' general bank accounts. From there, the funds moved--either directly or through BFA's Division 101 bank account ending in 0449--into accounts owned by R&A or Ryder, or in some cases to third parties for their benefit. The Commissioner also mapped the fee flow to R&A from the other group-factoring entities that R&A created--Western Funding Group and WFG. This meant he included amounts from those products that ended up in R&A's bank account or the BFA Division 101 account.[28]

The Commissioner determined the following amounts as income to R&A through the group factoring products:

---

[28] WFG had an account of its own ending in 6874, but the Commissioner does not argue that deposits into that account became gross receipts of R&A until they were deposited into R&A's own bank account.

| [*52] | R&A gross income | | | |
|---|---|---|---|---|
| Year | BFA (8497) | USFA (4564 & 2653) | Western Funding (2935) | WFG (6874) |
| 2003 | -0- | $626,740.57 | -0- | -0- |
| 2004 | $108,671.38 | 202,765.11 | $29,176.18 | -0- |
| 2005 | 84,714.22 | 9,029.18 | 155,238.73 | -0- |
| 2006 | 61,286.74 | 7,512.98 | 136,721.37 | -0- |
| 2007 | 23,003.82 | 2,646.63 | 217,454.72 | -0- |
| 2008 | 19,910.03 | 825.36 | 10,760.97 | $70,440.70 |
| 2009 | -0- | -0- | -0- | -0- |
| 2010 | 78,878.91 | -0- | -0- | -0- |
| 2011 | -0- | -0- | -0- | -0- |
| Total | 376,465.10 | 849,519.83 | 549,351.97 | 70,440.70 |

*Group Leasing Products.* The commingling of R&A's fees with clients'

money was an even bigger problem within the group leasing products. In the end,

the problem was so severe that instead of figuring out R&A's income from the

money that *entered* the bank accounts of the leasing products,[29] the Commissioner

---

[29] These accounts were ExecuPro ESOP's bank account ending in 8166; ExecuPro Specialty Services, Inc.'s bank accounts ending in 6170, 4604, 0517, and 7257; Executive Placement, Inc.'s bank account ending in 6670; Worldwide Career Management's bank account ending in 4870; and Westra Capital Management's bank account ending in 3209. There was also an account ending in 0392 in the name of ExecuPro Specialty Services, LP, that paid one check for $85 to BFA's Division 101's bank account ending in 0449 in 2008. Neither party

(continued...)

[*53] found income to R&A only when money *left* the leasing-product bank accounts and moved into one of R&A's own bank accounts or a third-party bank account for the benefit of Ryder or R&A.[30] The Commissioner determined that this product generated more than $5 million in revenue that should be included in R&A's gross income. See supra p. 21. We agree with his determination.

*Stand-Alone Staffing Products.* After the Commissioner began his section 6700 investigation, Ryder drew up an "Agreement of Assignment and Assumption" dated January 1, 2004, with which he tried to assign all of the income from R&A's staffing product to ESOP Legal Consultants, Inc. The agreement says it was an assignment of R&A's rights to income only for tax years 2004-06, but Ryder kept using ESOP Legal Consultants' bank account ending in 3149 all the way up until 2011. In 2004 alone R&A moved more than $600,000

---

[29](...continued)
explains the origin or function of ExecuPro Specialty Services, LP, or its relation to ExecuPro Specialty Services, Inc. With nothing else in the record to guide us, we will treat ExecuPro Specialty Services, LP, as part of ExecuPro Specialty Services, Inc.

[30] We include as R&A's income checks and direct transfers from the group-leasing product accounts into Ryder's entities, to Ryder's children, or for Ryder's personal benefit. These include checks and transfers into the Ryders' personal bank account ending in 4461; R&A's bank account ending in 9815; BFA's Division 101's bank account ending in 0449; RLC's bank account ending in 8168; Ryder Ranch Co., LLC's bank account ending in 5695; and Pattern Farms, LLC's bank account ending in 9446.

[*54] into it.  Deposits came from businesses such as "Pacific Management Company," "McMahon Staffing, Inc.," and "Sentry Funding, Inc."  R&A would then move this money from ESOP Legal Consultants' bank account to accounts of RLC, R&A, the Ryders' ranch entities, the Ryders themselves, and third parties likely for the benefit of R&A.[31]  Ryder did not object to any of the specific numbers in this part of the Commissioner's analysis, and we find that they are more likely than not true.  Here is a summary:

---

[31] For example, payments were made to Seaside Accounting Solutions (f.k.a. Accounting by the Sea, Inc.), where Herauf, R&A's bookkeeper, worked at the time.

[*55]

| Year | Deposits | Debits | Paid to whom |
|------|----------|--------|--------------|
| 2004 | $638,331.88 | $623,218.70 | RLC<br>R&A<br>Ernest Ryder<br>Ryder Ranch Co., LLC<br>Pattern Farms, LLC<br>Canyon View Ranch, LLC<br>Accounting by the Sea, Inc.<br>Lippa Associates, Inc.<br>Capital Analysts of San Diego, LLC<br>Wyoming secretary of state<br>Adams Wilshire Engraving Inc.<br>Sungard Corbel, Inc. |
| 2005 | 1,232,528.55 | 1,247,428.68 | RLC<br>R&A<br>First Counsel Capital<br>Accounting by the Sea, Inc./Seaside Accounting Solutions<br>Osmundo Bernake<br>Enhanced Accounting Software, Inc.<br>ESOP to R&A<br>ESOP to RLC<br>State Bar of California |

| [*56] | | | |
|---|---|---|---|
| 2006 | 1,178,622.52 | 1,178,169.85 | ESOP to RLC<br>ESOP to R&A<br>Clear Visual Ink<br>Lippa Associates, Inc.<br>Capital Analysts of San Diego, LLC<br>Canyon View Ranch, LLC<br>Pattern Farms, LLC<br>Ryder Ranch Co., LLC<br>Ryder Red Rock Ranch, LLC<br>Wachovia Bank<br>State Bar of California<br>Clear Verse, Inc. |
| 2007 | 543,983.30 | 544,440.94 | ESOP to RLC<br>ESOP to R&A<br>Capital Analysts of San Diego, LLC<br>Clear Verse, Inc.<br>State Bar of California |
| 2008 | 78,660.56 | 78,741.90 | Clear Verse, Inc.<br>R&A |
| 2009 | 376,993.02 | 377,054.30 | Clear Verse, Inc.<br>R&A<br>RLC<br>Westra Capital Management, Inc.<br>State Bar of California |
| 2010 | 306,958.29 | 364,680.47 | R&A<br>RLC<br>Lang & Associates, Inc.<br>Clear Verse, Inc.<br>California secretary of state |

| [*57] | | | |
|---|---|---|---|
| 2011 | 57,781.72 | 125.00 | Unknown |
| Total | 4,413,859.84 | 4,413,859.84 | |

*General Counsel Office.* The Commissioner's BDA for the general counsel office deals reviewed the 18 GCO accounts and looked at the flow of money into and out of them during each of the years at issue. Each GCO client corporation had two accounts: one for an ESOP S corporation that the client controlled and a separate GCO account at Charles Schwab that R&A controlled. A client would move money from his operating business into his ESOP S corporation's account. About once a year, he would make a transfer from the S corporation's account into the GCO account at Charles Schwab. This made tracing revenue much easier, and the amounts transferred were tied to the sum of the documentation fee and annual percentage fee (computed as a percentage of the money the client moved into the ESOP S corporation) that R&A charged for its services. The amounts in these GCO accounts were eventually disbursed to one of Ryder's "blocker" entities-- either First Counsel Capital, LLC (Wyoming), or First Counsel Capital, Inc.--as described earlier. See supra pp. 36-38. The breakdown for each GCO client:

[*58]

| Goldstein Law Corporation | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $105,758.80 |
| 2004 | 27,422.77 |
| 2005 | -0- |
| 2006 | 32,721.90 |
| 2007 | 64,123.14 |
| 2008 | -0- |
| 2009 | -0- |
| Total | 230,026.61 |

| Grampa's Programming, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $40,023.68 |
| 2004 | 30.00 |
| 2005 | 129,857.47 |
| 2006 | -0- |
| 2007 | 832.24 |
| 2008 | 4,514.73 |
| 2009 | 2,755.00 |
| Total | 178,013.12 |

[*59]

| Borrego Management Services, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $100,000.00 |
| 2004 | -0- |
| 2005 | 254,696.11 |
| 2006 | -0- |
| 2007 | 150,000.00 |
| 2008 | 125,000.00 |
| 2009 | 125,064.35 |
| Total | 754,760.46 |

| Vantage 1, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $182,463.55 |
| 2004 | -0- |
| 2005 | 57,644.06 |
| 2006 | 23,617.13 |
| 2007 | 565.18 |
| 2008 | 4,452.25 |
| 2009 | -0- |
| Total | 268,742.17 |

[*60]

| Western Head Investments, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | -0- |
| 2004 | -0- |
| 2005 | $57,644.06 |
| 2006 | -0- |
| 2007 | 5,450.00 |
| 2008 | 4,122.56 |
| 2009 | 738.99 |
| Total | 67,955.61 |

| Bighorn 2, Inc. General Counsel | |
|---|---|
| Year | R&A gross receipts |
| 2003 | -0- |
| 2004 | $47,363.68 |
| 2005 | 1,344.72 |
| 2006 | 1,752.47 |
| 2007 | -0- |
| 2008 | 100.22 |
| 2009 | -0- |
| Total | 50,561.09 |

[*61]

| Orion 1, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $29,444.87 |
| 2004 | 124,141.00 |
| 2005 | -0- |
| 2006 | 312,781.85 |
| 2007 | -0- |
| 2008 | 5,304.23 |
| 2009 | -0- |
| Total | 471,671.95 |

| Consultants 1, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | -0- |
| 2004 | $39,324.80 |
| 2005 | 37,116.84 |
| 2006 | 63,998.42 |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | -0- |
| Total | 140,440.06 |

[*62]

| Relativity, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | -0- |
| 2004 | $109,527.92 |
| 2005 | -0- |
| 2006 | -0- |
| 2007 | -0- |
| 2008 | 1,158.85 |
| 2009 | -0- |
| Total | 110,686.77 |

| Pacific Star 5, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | -0- |
| 2004 | -0- |
| 2005 | $22,047.12 |
| 2006 | -0- |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | -0- |
| Total | 22,047.12 |

[*63]

| Buena Ventura 1, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $74,247.20 |
| 2004 | 3,767.51 |
| 2005 | -0- |
| 2006 | -0- |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | -0- |
| Total | 78,014.71 |

| American Passion, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | -0- |
| 2004 | -0- |
| 2005 | -0- |
| 2006 | -0- |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | -0- |
| Total | -0- |

[*64]

| Tornado Consulting, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | -0- |
| 2004 | -0- |
| 2005 | -0- |
| 2006 | -0- |
| 2007 | -0- |
| 2008 | $14,000.00 |
| 2009 | 5,500.00 |
| Total | 19,500.00 |

| Edgewood Distributors & Management, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $150,000.00 |
| 2004 | 70,000.00 |
| 2005 | -0- |
| 2006 | 1,642.28 |
| 2007 | -0- |
| 2008 | 240.00 |
| 2009 | -0- |
| Total | 221,882.28 |

[*65]

| Regent 1, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | -0- |
| 2004 | -0- |
| 2005 | -0- |
| 2006 | $118,302.31 |
| 2007 | 50,000.00 |
| 2008 | 91,583.00 |
| 2009 | 25,000.00 |
| Total | 284,885.31 |

| L.I.P. Investments, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $36,094.69 |
| 2004 | 56,805.18 |
| 2005 | 82,665.29 |
| 2006 | 119,881.77 |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | -0- |
| Total | 295,446.93 |

[*66]

| Mani Padme Corporation | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $26,185.03 |
| 2004 | 25,021.81 |
| 2005 | 90,160.40 |
| 2006 | 89,669.00 |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | -0- |
| Total | 231,036.24 |

| Carlsbad Components, Inc. | |
|---|---|
| Year | R&A gross receipts |
| 2003 | $34,738.96 |
| 2004 | 49,031.84 |
| 2005 | -0- |
| 2006 | 39,312.23 |
| 2007 | -0- |
| 2008 | -0- |
| 2009 | -0- |
| Total | 123,083.03 |

**[\*67]** *Son-of-BOSS.* R&A used QuickBooks to keep track of the income from its short-sale strategy. Tracing the flow of money from these sales was difficult because R&A wasn't entitled to its fee until its client had escaped IRS scrutiny long enough for the statute of limitations to have run, see infra p. 117-18. Much of R&A's work on these deals was done before the years at issue, and the Commissioner says he can't trace all the money that R&A earned from their sales. But he did manage to track a little over $2.8 million, which we find is includable in R&A's income for the years at issue.

We make findings on these flows of funds knowing that any navigation of the labyrinth of entities and accounts that Ryder built will necessarily be imperfect. Detecting, dissecting, and determining the links between these deposits and debits and their correct sources is complex. But the complexity, and hence any imperfection, was not only created by Ryder himself, but also aggravated by his lack of cooperation in organizing his firm's records and his producing them sometimes only a very short time before trial. See Lawson v. Commissioner, T.C. Memo. 2015-211, at \*25 ("In the light of the utter lack of cooperation from petitioners during the audit, RA Enriquez and respondent showed substantial and reasonable efforts in compiling the BDA and making sure the findings are correct"); see also Gleason v. Commissioner, T.C. Memo. 2011-154

**[\*68]** (Commissioner entitled to any reasonable method to reconstruct income where taxpayer files no returns and refuses to cooperate).

3.    "Other Deductions" for 2005-06

The Commissioner determined not only to increase R&A's income but to disallow a very large number of deductions on R&A's 2005 and 2006 tax returns. Ryder called these "client administrative services," "legal and professional," and "meals and entertainment." The Commissioner claimed that R&A failed to establish its entitlement to the deductions. He also claimed that to the extent the deductions were for payments to RLC under the employee-leasing agreement, we should disallow them because that agreement was a sham.

4.    Dividend Treatment

Any determination about R&A's gross income is only one part of the story. The Commissioner also wants us to decide how much income the Ryders themselves derived from the firm. He asserts that Ryder received almost $16 million in constructive dividends from R&A for 2003-11. These funds, he says, flowed to Ryder in three different ways:

- from R&A through RLC from 2003-09,

- from R&A's several tax products to the ranch entities, and

**[\*69]**        ●        from R&A's bank accounts to third parties for the Ryders' benefit.

###### i.        From R&A Through RLC

The Commissioner determined that the Ryders received nearly $8.3 million in dividend income from R&A through RLC.  He reached this conclusion by poring through the K-1s that RLC issued to Ryder.  He added up the money that RLC distributed, and excluded any circular flow of these funds.[32]  He included the "in-kind" distributions that RLC made to Ryder when Ryder liquidated ESR of Counsel, LLC, in 2004.[33]

###### ii.        From Tax Products to Ranch Entities

The Commissioner also traced the money that went from R&A into the various ranch entities that Ryder set up to buy land in Arizona and New Mexico.  His first stab at the problem was RA Boyer's analysis in which he added up the deposits from the accounts of the various tax products that went into the Ryders'

---

[32] Excluding the "circular flow of funds" was important because Ryder used adjusting journal entries to make it seem he was making payments on the notes that he gave to RLC to "pay" for the stock in RLC that he had signed subscription agreements for in 2003-05.  See supra pp. 29-34.

[33] ESR of Counsel, LLC, was a wholly owned subsidiary of RLC that Ryder created in 2002.  Some of the revenue generated from the Son-of-BOSS product was diverted to ESR of Counsel and then passed on to R&A and the Ryders.  When ESR of Counsel dissolved, its assets (primarily in the form of notes receivable) were assumed by RLC, which then distributed them to the Ryders.

[*70] personal accounts, into accounts for the ranch entities, or to third parties

(e.g., credit-card companies) to pay the Ryders' personal bills. But then--only a

week before the Phoenix part of the trial--Ryder finally produced the financials for

Ryder Ranch Co., LLC. This information included records of contributions and

loans that went into Ryder Ranch accounts. These were particularly helpful, says

the Commissioner, because they showed the exact amounts that went into the

different ranch entities, and so eliminated what might have been double-counting.

Using these new financials and Ryder's own testimony, the Commissioner

adjusted his analysis of this form of dividend income. This new information

helped him tweak the timing of transfers to Ryder Ranch to make sure that he

counted it as income when it entered Ryder Ranch's accounts. It also helped him

avoid double counting income as money flowed from one account to another

within the "personal box."

      iii.    <u>From R&A's Bank Accounts to Third Parties for the
Ryders' Benefit</u>

The Commissioner also treated as dividends those payments that R&A made

to third parties for the benefit of the Ryders. For years before 2010, these

payments were first run through RLC and recorded on its books and tax returns as

distributions or advances. But whether from R&A directly or from R&A through

**[*71]** RLC, these alleged dividends included payments to American Express for the Ryders' credit-card bills and to their personal contractor.

The specific bank accounts from which this money flowed were titled "Ernest S. Ryder A Professional Law Corporation," "ESOP Legal Consultants, Inc.," "Counselor Capital Inc.," and "Westra Capital Management Retirement Savings Plan." The Commissioner asserts that the nearly $400,000 that came from these accounts was traceable to R&A's gross receipts and had not been booked as loans on Ryder Ranch Company's financials.

The Commissioner also asserts that Ryder used money from R&A to pay Ben Leland Construction, Inc., for work done on the Ryders' home. He traced this money by matching amounts charged on invoices from the construction company with check numbers and amounts from various Ryder accounts. The accounts used to pay these invoices were "Counselor Capital, Inc.," "Westra Capital Management, Inc. Retirement Savings Plan," "Benefactor Funding Assoc., Inc.--General Account," "ExecuPro Specialty Services, Inc.--General Account," "Ryder Law Corp.," and "Ernest S. Ryder & Associates, Inc., APLC." And for tax years 2010 and 2011 the Commissioner found more than $400,000 in R&A fee income that went to pay Ben Leland Construction.

These credit-card and contractor payments totaled $849,547.49.

**[*72]**     5.     The Commissioner's Alternative Arguments

The Commissioner also asserted in the alternative that even if we don't find that income flowed to Ryder from R&A, it certainly flowed from RLC to Ryder. The Commissioner then added up transfers from RLC that he said were income to Ryder:

- unreported distributions from RLC computed from the increase in Ryder's distributive share for tax years 2005-09;

- unreported distributions from Westra Capital Management computed from the increase in Ryder's distributive share for tax years 2005-07;

- an unreported short-term capital gain distribution from Westra Capital Management for 2005;

- unreported wages for 2009;

- unreported other income for 2004, 2010 and 2011; and

- unreported interest income from RLC.[34]

---

[34] The Commissioner acknowledges that many of these alternative positions are already the subject of settlements or prior assessments. The Commissioner will have to abate any assessments as required to avoid double taxation.

**[*73]**      6.      <u>Disallowed Deductions</u>

                  i.      <u>Substantiation of R&A Expenses</u>

Although much of the fight between Ryder and the Commissioner was about unreported income, the Commissioner also disallowed many of the deductions that Ryder and his various entities had claimed. These include:

| Year | Disallowed deductions |
|------|----------------------|
| 2004 | $579,330 |
| 2005 | 4,154,085 |
| 2006 | 167,243 |
| 2007 | 363,215 |
| 2008 | 661,361 |
| 2010 | 113,307 |
| Total | 6,038,541 |

*2005 Investment Interest Expense.* Ryder claimed a deduction for investment interest of nearly $350,000 on his Schedule A for 2005. The Commissioner disallowed this expense because Ryder reported it as a flowthrough expense from RLC, but RLC's K-1 to him included no such amount. Ryder argues this was a mistake--he says the deduction was legit, but that he should have reported it on his Schedule E as "business interest" instead.

[*74] *2006-08 Unreimbursed Employee Expenses.* Ryder claimed "unreimbursed expenses" on his Forms 1040 for 2006 through 2008 of:

| Year | Amount |
|-------|-----------|
| 2006 | $167,133 |
| 2007 | 357,313 |
| 2008 | 588,836 |
| Total | 1,113,282 |

The Commissioner disallowed these for the same reason as the interest expense-- Ryder claimed them as flowthrough expenses from RLC, but they were nowhere to be found on RLC's own returns. Ryder now claims that these "unreimbursed employee expenses" were also really "business interest" that he should have reported on his Schedule E.

*2004, 2005, and 2010 Ordinary Losses From RLC.* The Commissioner disallowed large amounts of ordinary losses that Ryder claimed flowed through from RLC:

| Year | Amount |
|-------|-----------|
| 2004 | $579,330 |
| 2005 | 143,253 |
| 2010 | 113,307 |
| Total | 835,890 |

[*75] The Commissioner's primary position is that Ryder failed to prove that he had enough basis in RLC to deduct these as ordinary losses.  His backup argument is that RLC itself didn't adequately prove that it suffered the losses that it passed through to Ryder.

*2008 Prior-Year Adjustment Basis Carryover.*  Ryder claimed on his 2008 tax return that he had sufficient basis in RLC to claim a loss of more than $70,000 that he couldn't claim earlier for failure to have enough basis.  See supra note 22; see also sec. 1366(d).

*Uncontested Westra Capital Management Items*.  The Commissioner also asserted that Ryder had misreported several items from another of his passthrough entities, Westra Capital Management:

- a long-term capital loss of nearly $49 million for Westra Capital Management in 2005;

- a consequent long-term capital loss of $13 million for Ryder in 2005;

- long-term capital losses for Ryder of $108 in 2006 and $5,806 in 2007; and

- small ordinary losses for Ryder in 2005 through 2007 that totaled $2,778.

[*76] Because Ryder did not contest any of these in his posttrial brief, we deem them conceded. See Mendes v. Commissioner, 121 T.C. 308, 312-13 (2003); Rybak v. Commissioner, 91 T.C. 524, 566 (1988).

### ii. Ryder Ranch Co., LLC Losses

The Commissioner also disallowed losses claimed by the Ryders for Ryder Ranch Co., LLC. He questions whether the Ryders materially participated in the ranch business and whether that business substantiated certain expenses. Here is a summary of these contested losses:

| | | Reason for disallowance | |
|---|---|---|---|
| Year | Adjustment | Sec. 162 (Lack of substantiation) | Sec. 469 (Passive loss) |
| 2003 | $531,583 | | X |
| 2004 | 927,497 | | X |
| 2005 | 1,054,725 | X | X |
| 2006 | 979,454 | X | X |
| 2007 | 575,878 | | X |

*Material Participation.* The Commissioner argues that any loss sustained by Ryder Ranch is passive because the Ryders failed to materially participate in its

[*77] activities for the tax years.[35] The ranches are in southeast Arizona and southwest New Mexico, and the Commissioner finds it hard to believe that the Ryders could be very active ranchers when they lived in Poway, California, and Ryder would drive out from R&A's office in San Diego. He bolsters his argument with the observation that the Ryders employed an onsite manager to run them. That was Jacob Ward, who was the onsite manager from September 2004 to October 2009 and who oversaw the ranch operation. Ward credibly testified that he would see Ryder out at the ranches at least once a month while he was working there.

Ryder claimed to keep an activity log that he produced a week before the Phoenix part of this trial. There was no testimony about how it was created, who created it, or when it was created.

---

[35] The Commissioner's presentation of this argument has been inconsistent over the lives of these cases. His notices of deficiency for the Ryders allege that they failed to materially participate in Ryder Ranch Co., LLC, only for tax years 2003, 2004, and 2007. His notice of final partnership administrative adjustment (FPAA) for Ryder Ranch Co., LLC, also makes this argument for 2005 and 2006. He maintains this argument for 2003, 2004, and 2007 in his opening brief, and raises it for the first time as to 2008-11, but makes no mention of 2005 or 2006. He also filed a motion to conform his pleadings so that we might consider the section 469 issue for 2008-11. While we denied that motion, we will consider the 469 issue for 2005 and 2006, as Ryder specifically responded to it in his answering brief, making it tried by consent. See Rule 41(b).

[*78] *Substantiation.* The Commissioner issued an FPAA[36] to Ryder as tax matters partner of Ryder Ranch Co., LLC, on December 20, 2011, for Ryder Ranch's 2005 and 2006 tax years.[37] In it he disallowed all farm losses. The Ryders argue that they can substantiate these deductions as ordinary and necessary. The dispute arises from two Schedules F, Profit or Loss From Farming, Ryder Ranch Co., LLC, attached to its 2005 Form 1065, U.S. Return of Partnership Income. One of these Schedules F reported a net loss of $967,551; the other a loss of $87,174. The first allocated to Ryder Ranch Co., LLC, the depreciation of Pattern Farms, LLC's Boggs, Moore, and Shumaker properties; Canyon View Ranch, LLC's Rivers property; and Ryder Ranch Co., LLC's Lazy BK Ranch property. The second Schedule F allocated the deprecation related to

---

[36] If the IRS decides to adjust any partnership items on a partnership return, it must notify the individual partners of the adjustments by issuing an FPAA. See sec. 6231(a). An FPAA generally includes: (1) a notice of final partnership administrative adjustment; (2) Form 870-PT, Agreement for Partnership Items and Partnership Level Determinations as to Penalties, Additions to Tax, and Additional Amounts, including a Schedule of Adjustments; and (3) a Form 886-A, Explanation of Items, listing the Commissioner's other adjustments or determinations.

[37] He also issued an FPAA for Ryder Ranch's 2007 tax year in December, 2018, after the completion of the trial for these cases. That FPAA is not at issue here.

[*79] Ryder Red Rock Ranch, LLC's Coon Ranch property. The Schedules F also include depreciation expenses for multiple trailers and a portable chuckwagon.

For the tax years 2005 and 2006, the Commissioner argues that Ryder Ranch Co., LLC, claimed expenses that were actually incurred by Ryder's other ranch entities. He also argues that Ryder Ranch inflated the bases in many of the assets for which it claimed depreciation.

### 7. California Pasteleria

The Ryders also claimed losses on Mrs. Ryder's cookie business. During the years at issue she owned and operated California Pasteleria, Inc. She held all the stock of the company and all the officer positions in the business, except that Ryder himself was its counsel.

The Commissioner disallowed deductions at the S corporation level for tax years 2003, 2004, and 2006. Only the first two years are still at issue, and all the trouble comes from California Pasteleria's failure to substantiate many of its claimed deductions for items such as legal fees, automobile expenses, travel expenses, and telephone expenses.[38]

---

[38] The Commissioner also determined that in the 2006 tax year, Mrs. Ryder received a $36,300 distribution in excess of her basis in the company. The Ryders did report on their 2006 Schedule D a $2,777 gain on repayment of a loan from California Pasteleria, so the Commissioner asserted the difference of $33,523 as

(continued...)

**[\*80]**      8.      <u>Other Losses</u>

There are also numerous other miscellaneous loss issues.  The

Commissioner disallowed them in full:

| Year | Alpha Dog Management losses | Ryder Investment Partners losses | Net operating losses | Coventry Motors losses | Total |
|------|------|------|------|------|------|
| 2002 | -0- | -0- | $272,644 | -0- | $272,644 |
| 2003 | -0- | -0- | 134,400 | -0- | 134,400 |
| 2005 | -0- | -0- | -0- | $2,819 | 2,819 |
| 2006 | $15,995 | -0- | -0- | 3,402 | 19,397 |
| 2007 | 39,221 | $3,597 | -0- | 7,138 | 49,956 |
| 2008 | 3,726 | -0- | -0- | -0- | 3,726 |
| 2010 | -0- | -0- | 148,368 | -0- | 148,368 |
| 2011 | -0- | -0- | 311,917 | -0- | 311,917 |

*Alpha Dog Management Losses.*  Alpha Dog Management, LLC, is a limited

liability company that Ryder organized in Wyoming.  He reported nonpassive

losses from the company for the tax years 2006 through 2008.  The Commissioner

disallowed all of these because Ryder didn't explain how he computed his basis.

---

[38](...continued)
unreported income.  The Ryders agree that they are liable for tax on the
distributions from California Pasteleria to the extent that they exceed their basis,
but then they failed to defend that basis.  We deem this a concession.  <u>See</u> <u>Mendes</u>,
121 T.C. at 312-13; <u>Rybak</u>, 91 T.C. at 566.

[*81] *Ryder Investment Partners Losses.*  Ryder claimed a carryforward loss from Ryder Investment Partners, Ltd., on his 2007 return that the Commissioner disallowed because Ryder hadn't substantiated his basis.

*Net Operating Losses for 2002, 2003, 2010, and 2011.*  These losses depended on proof of losses from other tax years:  The Ryders' claimed loss for 2002 depended on a carryforward loss from 1997 and a carryback loss from 2004.  This 2003 loss depended on the carryback loss from 2004 as well.  And their 2010 and 2011 losses depended on carryforward losses as well.  The Commissioner disallowed them all for lack of substantiation.

*Coventry Motors Losses.*  Ryder claimed passthrough losses from Coventry Motors, Ltd., a partnership that he created to own his collection of classic cars.  These were relatively small.  The Commissioner disallowed them for three reasons:

- lack of profit motive under section 183,

- lack of substantiation of his basis in the partnership, and

- absence of enough passive income to claim them under section 469.

This meticulousness just earned the Commissioner a pretrial motion to dismiss for lack of jurisdiction because Ryder argued that TEFRA applied to any examination of Coventry Motors.  He argued that the Commissioner needed to

[*82] challenge its reporting in a separate partnership-level proceeding.[39]

Precedent forced us (and the Commissioner conceded that it was appropriate) to grant Ryder's motion as to whether Coventry Motors lacked a profit motive, see GAF Corp. & Subs. v. Commissioner, 114 T.C. 519, 527-28 (2000); cf. Ginsburg v. Commissioner, 127 T.C. 75, 83 (2006), but we kept the other two issues for trial in these cases.

Ryder put all of these disallowed deductions at issue, but then failed to address them in his posttrial brief. We deem this a concession. See Mendes, 121 T.C. at 312-13; Rybak, 91 T.C. at 566.

C.    Penalties

Also still at issue in these cases is the liability of R&A and the Ryders for numerous penalties and additions to tax. These are:

- section 6651(a)(1) additions to tax for failure to timely file,

---

[39] Before its repeal, see Bipartisan Budget Act of 2015, Pub. L. No. 114-74, sec. 1101(a), 129 Stat. at 625, part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, secs. 401-407, 96 Stat. at 648-671, governed the tax treatment and audit procedures for many partnerships. TEFRA partnerships are subject to special tax and audit rules. See secs. 6221-6234. TEFRA requires the uniform treatment of all "partnership item[s]"--a term defined by section 6231(a)(3)--and its general goal is to have a single point of adjustment for the IRS rather than having it make separate partnership-item adjustments on each partner's individual return. See H.R. Conf. Rept. No. 97-760, at 599-601 (1982), 1982-2 C.B. 600, 662-63.

**[\*83]**    ●    section 6651(a)(2) additions to tax for failure to timely pay,

●    section 6651(f) penalties for fraudulent failure to file,

●    section 6655 penalties for failure to pay estimated corporate income tax, and

●    section 6662 accuracy-related penalties.

The Commissioner asserted some of these against only R&A, and some against only the Ryders; he asserted some only for some years and not others; and some he asserted only in the alternative.  And, as is common, some we have to discuss on their merits and some we do not because of procedural flubs.

D.    Trial

The Ryders filed timely petitions, and we tried the cases in two sessions over two months.[40]  The record sprawled over 8 million pages.

At trial the Commissioner introduced two BDAs by RA Boyer. These BDAs are what the Commissioner relies on for his positions on his adjustments to gross receipts and unreported dividends.  As we have mentioned, the Commissioner did tweak these analyses a bit as Ryder produced more information.

---

[40] At all relevant times, petitioners either resided or had their principal places of business in California or Arizona, which makes the decisions in these cases presumptively appealable to the Ninth Circuit.  See sec. 7482(b)(1)(A), (B), (E).

**[\*84]** The parties conceded a number of issues, but two very large adjustments remain: unreported gross receipts from R&A for 2005 through 2009 and unreported dividend income to the Ryders for 2003 through 2011.  We'll tackle those first and then run through a number of the unsettled miscellaneous issues.

OPINION

I.    Burden of Proof

The parties bicker about the burden of proof, but with more than 8 million pages of evidence and 2,300 pages of transcript we can decide almost all the issues on the preponderance of the evidence.  One exception is the issue of fraud--section 7454 and Rule 142(b) require the Commissioner to prove fraud by clear and convincing evidence.

We note Ryder's attacks on the presumption of correctness that we've said attaches to the Commissioner's notices of deficiency and bank-deposit analyses. We don't need to rule on these objections--the profusion of evidence, which for the BDAs includes credible testimony from the revenue agents who compiled those analyses together with their source material--makes them moot.  We do note that these cases pose questions of unreported income, and the Ninth Circuit has held that in such cases the Commissioner must establish some connection between a taxpayer and income-producing activities.  See Weimerskirch v. Commissioner,

**[\*85]** 596 F.2d 358, 362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977). A "minimal evidentiary foundation" is all that is required. See id. at 361. The Commissioner's introduction of volumes of evidence--which he aptly referred to as "buckets"--and the extensive backup to his BDAs show much more than a minimal evidentiary foundation to link Ryder and R&A to this income.

We also note our ever more elaborate rules on the burden of production for penalties. Section 7491(c) places this burden on the Commissioner for penalties that he asserts against individuals. We held in Graev v. Commissioner (Graev III), 149 T.C. 485 (2017), supplementing and overruling in part 147 T.C. 460 (2016), that this means the Commissioner has to produce evidence that "the initial determination of such assessment [i.e., of the penalties] [wa]s personally approved (in writing) by the immediate supervisor of the individual making such determination." See id. at 492-93. Section 6751(b)(2) excepts certain penalties from this written supervisory approval requirement--including those under sections 6651, 6654, and 6655.

**[\*86]** II.    <u>R&A's Unreported Income</u>[41]

The Commissioner alleges that R&A massively underreported its income for tax years 2005-09 by assigning income to other entities[42] and taking very large and unsupportable deductions from what income it did report.

His key proof is the BDAs, which start by equating deposits with income, but then subtract any identifiable nontaxable items, deductible expenses, or income that was reported.  See <u>Clayton v. Commissioner</u>, 102 T.C. 632, 645-46 (1994).  The Commissioner also introduced evidence that some specific R&A deposits into R&A's accounts were taxable income.  That leaves us with a mix of specific-item and bank-deposit analyses--specific-items analyses on 5 accounts

---

[41] Some of the income that the Commissioner alleges is properly reportable by R&A has been attributed to certain entities by way of concessions, settlements, and prior assessments.  The Commissioner has agreed to abate assessments on conceding entities to the extent the Court finds the income in question to be R&A's.  See <u>supra</u> note 34.

[42] As we explain below, the Commissioner also argues that these entities were actually just tax products that R&A sold to its clients.  Whether the entities were "shams" or were in fact legitimate but simply did nothing to earn fees that were properly attributable to R&A is of little consequence, as "the effect would be to render [the entities] a nullity for Federal income tax purposes."  See <u>Keller v. Commissioner</u>, 77 T.C. 1014, 1031 (1981), <u>aff'd</u> 723 F.2d 58 (10th Cir. 1983).  Moreover, it isn't necessary to find that the entities were shams in order to find that they generated income for R&A.  See <u>Haag v. Commissioner</u>, 88 T.C. 604, 611 (1987), <u>aff'd without published opinion</u>, 855 F.2d 855 (8th Cir. 1988).

[*87] used by Ryder and R&A, and bank-deposit analyses on 46 accounts used by Ryder and R&A. Here's a summary of the combined results:

| Year | Per return | Per Commissioner | Adjustment |
|------|-----------|------------------|------------|
| 2005 | $1,571,286 | $4,511,331 | $2,940,045 |
| 2006 | 1,666,810 | 3,718,435 | 2,051,625 |
| 2007 | -0- | 2,635,675 | 2,635,675 |
| 2008 | -0- | 2,108,466 | 2,108,466 |
| 2009 | -0- | 1,823,833 | 1,823,833 |
| Total | 3,238,096 | 14,797,740 | 11,559,644 |

R&A failed to file returns for 2007 through 2009. The Commissioner prepared a substitute for return for each of these years under section 6020(b). Ryder later gave RA Phan returns for R&A's 2007 and 2008 tax years. These were very late, and we note that the gross receipts reported were not subtracted from the BDAs for those years. (They weren't added to them either.)

A.    Assignment of Income by Ryder & Associates

We ask first whether it is R&A that should be taxed on the money that went into these accounts. The problem is one of the oldest in tax law, and every last

**[\*88]** student in Intro Tax learns that it was solved long ago by Justice Holmes in

Lucas v. Earl, 281 U.S. 111, 114-15 (1930):[43]

> There is no doubt that the statute could tax salaries to those who
> earned them and provide that the tax could not be escaped by
> anticipatory arrangements and contracts however skilfully devised to
> prevent the salary when paid from vesting even for a second in the
> man who earned it. That seems to us the import of the statute before
> us and we think that no distinction can be taken according to the
> motives leading to the arrangement by which the fruits are attributed
> to a different tree from that on which they grew.

This "trees and fruits" metaphor has long since ripened into cliche, but it is still

generally thought to be an accurate statement of the law. Income should be taxed

---

[43] There is no evidence that the contract analyzed in Earl was motivated by
the income tax, since the Earls agreed to it twelve years before the adoption of the
Sixteenth Amendment. And, since they were Californians, Mrs. Earl would have
had an interest in any after-acquired property and income under that state's
community-property law. When the Earls came before our predecessor, the Board
of Tax Appeals, they argued that their only intent was to take all their income and
property out of the community-property rules. Earl v. Commissioner, 10 B.T.A.
723, 724 (1928), rev'd, 30 F.2d 898 (9th Cir. 1929), rev'd, 281 U.S. 111 (1930).
Then, as now, California makes the community-property rules a default, but one
that a married couple can agree between themselves to supplant to make their
future income and property separately owned or owned as joint tenants with the
right of survivorship. See In re Marriage of Valli, 324 P.3d 274, 276 (Cal. 2014).
Mr. Earl testified before us that back in 1901 he had taken ill, and the agreement
was a simple and elegant way of planning for his estate. Earl, 10 B.T.A. at 723.
Had Mr. Earl died, and courts respected their agreement, Mrs. Earl would have
had ownership of all their property without any need for probate. Nowadays that's
a result people achieve (in part) with revocable trusts. The story was unearthed
and described in detail in Patricia A. Cain, "The Story of Earl: How Echoes (and
Metaphors) from the Past Continue to Shape the Assignment of Income Doctrine,"
in Tax Stories 305 (Paul L. Caron ed., 2d ed. 2009).

**[\*89]** to him who earns it, see Commissioner v. Banks, 543 U.S. 426, 433 (2005), and one can't escape tax by assigning income to another in advance, see id.; see also United States v. Basye, 410 U.S. 441, 449-52 (1973) (partnership members cannot avoid taxation by diverting income to retirement trust fund); Commissioner v. Sunnen, 333 U.S. 591, 604 (1948); Trousdale v. Commissioner, 16 T.C. 1056, 1065 (1951) ("[I]t has long been held that a taxpayer may not avoid his tax liability on income which he has earned by the simple expedient of drawing up legal papers and assigning that income to others"), aff'd, 219 F.2d 563 (9th Cir. 1955).

Ryder agrees with this general statement of law, but argues that he carefully planted a great many trees in his orchard and that fruit actually grew on them. Or to dispense with the metaphor, that we should find that the many, many separate entities he created earned that income themselves. Ryder contends we must respect these separate entities under Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-39 (1943), in which the Supreme Court held:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

[*90] Ryder argues that it was these entities that earned and received the income found by the Commissioner's revenue agents, and that R&A was just their lawyer.

Although the Commissioner failed to do so himself, we must also acknowledge the statutory avenue generally available in certain situations to reallocate income among taxpayers. Section 482 provides in relevant part that:

> In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The common-law assignment-of-income doctrine and section 482 overlap considerably, as the latter was devised to provide a "detailed mechanism to deal with the tax-avoidance problems which spur the assignment of income doctrine." Keller v. Commissioner, 77 T.C. 1014, 1034 (1981), aff'd, 723 F.2d 58 (10th Cir. 1983); cf. Stewart v. Commissioner, 43 T.C.M. (CCH) 1119, 1124 n.10 (1982), aff'd, 714 F.2d 977 (9th Cir. 1983). Analysis under the two theories, therefore, should generally not lead to different results. Keller, 77 T.C. at 1034. Transactions vulnerable to attack under one theory are generally equally

[*91] vulnerable under the other, and both theories are typically invoked together.[44]  Cf. Boris I. Bittker, "Pervasive Judicial Doctrines in the Construction of the Internal Revenue Code," 21 How. L.J. 693, 709 (1978).  Despite these similarities, some courts have held that section 482 is the better tool to reallocate income among taxpayers, at least in circumstances not "heavily freighted with tax motives."  See Rubin v. Commissioner, 429 F.2d 650, 653 (2d Cir. 1970), rev'g and remanding 51 T.C. 251 (1968); see also Foglesong v. Commissioner, 621 F.2d 865, 872 (7th Cir. 1980), rev'g and remanding T.C. Memo. 1976-294.

But choosing between these two tools is not something we must do here, because the Commissioner left section 482 in the shed by failing to mention it in any of his relevant notices of deficiency, pleadings, memoranda, or briefs--and the Ryders did not object.  The Ninth Circuit has held that "no reliance may be placed on Section 482 to justify a decision [when] the Commissioner did not rely upon it and g[a]ve no notice of such issues in his Notice of Deficiency to [the taxpayer]."  Maxwell Hardware Co. v. Commissioner, 343 F.2d 713, 721 (9th Cir. 1965).

---

[44] There is one situation where section 482 cannot be invoked but the common-law method can, i.e., "where the transaction at issue was not between two or more 'organizations, trades, or businesses' within the meaning of the provision."  Stewart, 714 F.2d at 989 (citing Foglesong v. Commissioner, 691 F.2d 848 (7th Cir. 1982)).

[*92] Therefore our analysis has to stick to the common-law assignment-of-income doctrine.

This is a new battle in an old fight, and to referee it we must decide if R&A was the true earner of this income. To do so, we look at how R&A's clients perceived the services that R&A provided, what these services actually were, and how the income was produced.

### 1. What R&A Looked Like to Clients

From the time it opened its doors, R&A marketed tax-saving products to potential clients. R&A hired employees specifically to promote its products to high-income earners and their CPAs. It was R&A's name that was on the promotional materials and letters to prospective clients--brochures, videos, and written legal opinions about the tax benefits that they could obtain. Ryder himself would meet with clients to discuss these services, and he himself would follow up with letters to explain these plans and their proposed costs.

The clients all appeared on paper to be doing business with one of the different group products. There were, however, always side agreements between the clients and R&A that were almost all oral--at least for these group products. There were written fee agreements, but these were signed by a client and a group-product entity that R&A controlled and which R&A used to execute the unique tax

[*93] plan. We specifically find that the clients themselves thought they were hiring R&A to provide retirement plans. For example, Michael Goldstein, a GCO plan client of R&A, credibly testified that he went to see Ryder "for some advice as far as retirement planning" and Ryder ended up providing him "attorney services in that regard." Kevin Windham, an ASIG client of R&A, testified that the fees he paid to Ryder were part of his retirement plan. Ryder stated that these products were established to create alternative ways for clients to accumulate retirement savings. R&A itself invented these group products and made them run. R&A itself marketed the services to set them up. R&A employees billed clients, and R&A employees controlled the clients' accounts. As far as the clients knew, they were only ever working directly with R&A.

### 2. What Services R&A Provided

We also looked at these deals from R&A's perspective. And from this perspective, one sees R&A itself putting into place the "ancillary affiliated businesses" that it used to execute the different "unique tax plans." It was R&A that created the numerous corporations, partnerships, and limited liability companies that these tax plans required. It was R&A that filed the necessary paperwork with the IRS to elect how these entities would be taxed. Once the structures were in place, it was R&A that went out to find the clients to buy them.

[*94] Ryder argues that each of these ancillary affiliated businesses is an entity unto itself that we must respect. We think this confuses the concept of respect for the corporate form and the concept that income is taxed to the one who earns it. Ryder says that each of these corporations was actively engaged in a trade or business and earned its own income through this trade or business. In his view, R&A merely provided legal and administrative services to these ancillary businesses, but those businesses themselves got paid for services they provided. The Commissioner says that these ancillary businesses just mimicked legitimate business activities to create the illusion that the tax products R&A sold were real businesses.

And here we make a key finding and extend the usual metaphor a bit more: R&A was less like the orchardist who plants the seeds of trees and then steps back to watch them grow than it was like a set designer who built a papier-mâché forest and painted it to look like real trees. R&A never stopped tinkering with these entities. It continually filed paperwork with the IRS or state agencies as needed. It drafted additional documents for its clients to connect accounts and entities to justify the movement of funds into each account. It helped clients move money within the various accounts and entities. And it reviewed the clients' tax returns

[*95] for consistency with appearances and to handle any audit that arose regarding these accounts.

We find from this consistent practice that R&A was selling retirement-planning services. R&A directly advertised these special tax structures to set up these retirement plans. R&A employees at the office of R&A did the work necessary to operate and maintain them--which included acting as administrator of the entities and monitoring laws to ensure that the plans adhered to any requirements. Ryder and R&A employees held signature authority over the financial accounts of the retirement products. Ryder maintained authority over employees and agents that held positions with the tax structure entities.[45] The fingerprints of R&A can be found all over the services that were provided to the clients. We therefore find that R&A was the one actually providing the services.

### 3.    Income Produced Through These Services

Without once again going into great detail, we can say that clients that purchased tax products got access to bank accounts set up by R&A in the name of one of the tax products, while R&A made sure the paperwork was done and the cash flowed from the client's operating business into the entity's account with a

---

[45] Ryder, for example, hired and then fired Robert Pancheri--his own brother-in-law--who Ryder claimed was president of many of the factoring entities.

[*96] portion sent on to itself or one of the entities that it controlled. R&A strove to make the entities look real--to look like a group insurance company, a corporate factor, an executive-leasing company, or a staffing company. These entities would report income from their dealings, but then pass it on to tax-exempt entities that R&A also set up.

We can take a closer look at how R&A did this.

i.      Group Tax Products Income

R&A set up these products--ASIG insurance policies, factor companies, and employee-leasing firms--to run through master entities that controlled the financial accounts associated with them according to written agreements entered into with their clients. But these written fee agreements between clients and the master entities that R&A created and controlled to run the tax products were not in fact promises to pay for services provided by those entities. We instead find that, for each product, the real agreements were those entered into orally between R&A and its clients to provide what the clients understood to be tax or retirement-planning services.

We can hardly find otherwise. The first move for clients who bought these group products was to move money into an account held by the master entity for that particular group product. This wasn't an account for the entity's own use in

**[*97]** its own business. It was just a collection account for each product. It was R&A that kept these accounts and R&A employees who had signature authority over them.

*ASIG Product.* R&A's fingerprints were all over the ASIG product from the beginning. It was R&A that aggressively marketed these policies. As far as its clients knew, they were only ever working directly with R&A. But once a client agreed to buy an ASIG policy, R&A's staff faxed a copy of the paperwork to Morris Cottingham to sign, and one would search in vain to see any mention of R&A on the policy itself. Clients nevertheless knew that if any problems arose with the policies, they should call R&A to work it out.

It was also R&A's employees who billed the clients, controlled their ASIG accounts, and made sure fees were paid. These fees were "calculated twice a year [at] 1% of the total bank balance + the loan balances," and R&A would work with Morris Cottingham to make sure they were collected. Even this was done in a roundabout way: R&A sent form letters of authorization on its letterhead to Morris Cottingham for its signature. Morris Cottingham would send the letters back to R&A, which would fax the letters to Charles Schwab. Charles Schwab would then move money from the account nominally in ASIG's name (but segregated in an account for the client's benefit) to a different Schwab account

[*98] ending in 5337.[46]  This "ASIG" account was in Ryder's name.  The invoices sent to these clients were on ASIG letterhead but were prepared by R&A, which we know because we can trace the computer tagline found in the bottom left corner of the invoices back to R&A.  And someone at R&A kept a record of the policy fees from the ASIG clients, sometimes with a notation which read "pymt bypassed [R&A's] books."

The paperwork between client and ASIG stated that these "policy fees" were to reimburse ASIG for its costs and services, as well as to allow it to "profit thereon."  But we find that ASIG itself did nothing for this.  It was all for the work done by R&A and its employees.  See Roubik v. Commissioner, 53 T.C. 365, 379-81 (1969); Trousdale, 16 T.C. at 1065.  We therefore find that this was R&A fee income.

*Group Factoring Product*.  We found in Pacific Management Group v. Commissioner, at *17-*18, that the group-factoring entities didn't work for R&A's clients.  Now we have to see whether they produced income for R&A.  These deals on paper were between a separate factoring company and one of R&A's clients.  But let's look first at who marketed them.  It certainly wasn't a

---

[46] These segregated accounts held in the policies' names were in reality just tax-deferred and tax-deductible piggy banks for the clients.

[*99] factoring company. R&A itself hired Patrick Scott McKee to market group factoring to potential buyers through CPAs. McKee distributed informational materials on the products, including videos and an R&A tax opinion, and offered to arrange meetings with Ryder if any CPAs or their clients had unanswered questions.

For the group factoring product in all its different generations, R&A created the entities to use as general collection accounts. Again, these accounts were titled to BFA, USFA, Western Funding, and WFG. But R&A owned and controlled each of them.

A common element in all of these "generations" was a paper trail that made it look like there was a real factoring contract between an R&A client and one of these companies. Contracts between clients and BFA and USFA also aimed to circumvent contribution limits to Roth IRAs. Or, as R&A spun it, its factoring program was part of the "next generation of tax planning strategies" that was "designed to take advantage of the tax-free distribution rules afforded to Roth IRA's [sic]."

This is how BFA and USFA worked for R&A's clients. BFA or USFA would establish a separate "division" for each client. A client would also set up a Roth IRA to own that separate "division". The client would "sell" its accounts

[*100] receivable to this division. The client would then collect its invoices and deposit the funds into its division account using deposit slips that R&A gave it. The division would make payments back to the client's business at a discount. The difference between this amount and the amount that it actually collected would rest with the client's "division" within BFA or USFA. At the end of the year the "division" would transfer its funds to BFA's or USFA's general account. From there, the money deposited from each division would be paid out (minus a fee retained by R&A) as a dividend to the division's owner--the client's Roth IRA--which would supposedly make this "dividend" and its ultimate distribution to the client tax free. There was not too much to distinguish BFA from USFA in the way this worked. BFA was formed in the Turks and Caicos in 1996, and most of R&A's clients used it from that time until 2002. Because it was a Turks and Caicos corporation, it was not subject to U.S. tax. A few clients continued to use BFA until 2010. The creation of USFA became necessary in 2001 when Congress enacted the Patriot Act,[47] which made it more difficult for Americans to move money offshore. Unlike BFA, USFA used domestic financial accounts as well as a new "blocker entity" called Counselor Capital. Counselor Capital would return

---

[47] Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107-56, sec. 302, 115 Stat. at 296-98.

[*101] funds to clients--funds which the clients had already deposited in a domestic account--in the form of loans. A client of R&A would, for example, draft a letter to Ryder requesting that he (and the firm) "facilitate a loan * * * from my segregated investment account" to him. USFA was generally used by R&A's clients from 2002 to 2004, but just as with BFA, a handful of clients continued to use it until 2010.

The Commissioner spotted this as an abusive transaction back in 2004--it was, after all, little more than moving money from one pocket to another with some stuffed into an IRA along the way. He identified it in Notice 2004-8, 2004-1 C.B. 333, and Ryder recognized that this meant he could no longer sell it.

Enter Western Funding and WFG. These products operated in essentially the same manner as BFA and USFA, but with three notable differences. First, clients sold their accounts receivable directly to Western Funding or WFG, rather than a division or subsidiary of those firms. They still collected on those accounts, though, and deposited the funds into segregated accounts owned by Western Funding and WFG. Second, although their businesses were still responsible for collecting on the accounts, the clients themselves signed "Agreements of Employment" with Western Funding or WFG, which supposedly was enough to make them employees of one of those firms. And third, Western Funding and

[*102] WFG were each owned by employee stock ownership plans (ESOP), rather than Roth IRAs.[48] R&A employees managed these ESOPs and applied for determination letters from the IRS to get them recognized as qualified plans. They also filed with the IRS all necessary applications for separate employee identification numbers for Western Funding and WFG and caused them to be taxed as small business corporations.[49]

The collection on the accounts and the deposits then occurred in the same way as with BFA and USFA. The firm would keep part of the money for itself and pass the rest on to the ESOP, where again it could grow without paying tax until distributed back to the client. Western Funding and WFG elected to be S corporations, so that any income earned by them--after collecting on the clients'

---

[48] "An ESOP is an employee stock bonus retirement plan that primarily is invested in employer securities." Joseph G. De Angelis & Daniel L. Simmons, "ESOP-Owned Subchapter S Corporations: A Mistake in Need of a Fix," 82 Tax Notes 1325 (1999). ESOPs are useful devices for corporate finance as they can borrow from outside lenders to purchase an employer's stock and enable the corporation to deduct the contributions and dividends when they are repaid. Qualified ESOPs are also exempt from tax under section 501(a).

[49] A small business corporation is a corporation with no more than 100 shareholders, all of whom are individuals and none of whom are nonresident aliens, and which has only one class of stock. Sec. 1361(b)(1). Before January 1, 2005, while Western Funding Group was active, the statute capped the number of shareholders at 75. See American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 232, 118 Stat. at 1434. Sec. 1362(a)(1) allows a small business corporation to elect S corporation status for tax purposes.

[*103] businesses' accounts receivable, or receiving factoring fees--would flow through to the tax-exempt ESOPs. This allowed for the tax-free accumulation of cash within the S corporations. Western Funding was used by R&A's clients from 2004 to 2008, while WFG was used from 2008 to 2011. "WFG, Inc. [was] exactly the same as Western Funding Group. The only reason it was created was to allow for the people with money in the ESOP in Western Funding Group a vehicle to take their money out." Once Western Funding was ended, all the employees were technically terminated from Western Funding, triggering a "distributable event" that allowed for the ESOPs to pay out the accounts to the clients.[50]

As with the ASIG insurance policies, R&A's fingerprints were all over the transactions, even though its name was not on the paperwork. Ryder's brother-in-law Robert Pancheri claims he was technically an employee of his own consulting firm, Calvin J. Pancheri & Associates, but he worked closely with Ryder and other R&A employees to sell these factoring arrangements. His main job, however, was apparently to sign documents establishing the clients' links to the products.

Lisa Quintanar was also hired in 1999 to help with the day-to-day operations. Although she carefully testified that her initial employment was with

---

[50] Under section 409(d), all the funds allocated to an ESOP participant's account must remain in the account for 84 months, unless a distribution event occurs, such as death or severance from employment. See sec. 409(d)(1).

[*104] the factoring companies, we find that she was working on behalf of R&A all along. She used R&A's office space and equipment to perform her work, and she testified that if Pancheri was absent, she would go to Ryder for instruction. Ryder and Pancheri eventually had a falling out, but nothing changed for Quintanar--she continued to work in the same place on the same office equipment to sell and manage the same products for Ryder directly.

But how did this benefit R&A? All of these factoring agreements were substantially similar in that they memorialized a negotiated "administrative" fee to be paid by the client (or the client's "division") into the general account of BFA, USFA, Western Funding, or WFG. These accounts ended in 0449, 8497, 4564, 2653, 2935, and 6874--and it is these accounts that we specifically find were owned and controlled by R&A.[51] Both Pancheri and Ryder had signature authority over these operating accounts. "The typical fee was nine percent" of the net funds each client's business moved into that client's respective division during the year. And we see the same pattern of money coming out from these segregated accounts into a single account--money for what was papered to be the factors' "fee" but not in exchange for anything the factor itself did. And it was a fee computed as a

---

[51] Some of these fees were also rerouted elsewhere, including into accounts funding the multiple ranches owned by the Ryders.

[*105] percentage of the net funds that the clients moved into their segregated accounts during the year.  We find that these fees were in fact compensation to R&A for the work that it did in setting up this tax product.  See Roubik, 53 T.C. at 379-381.

We therefore find this was R&A's own fee income.

*Employee-Leasing Product.*  The story for the employee-leasing product is the same.  R&A used five entities: Worldwide Career Management, Ltd. (Irish); Worldwide Career Management, Inc. (U.S.); Executive Placement, Inc.; Westra Capital Management, Inc.; and ExecuPro Specialty Services, Inc.

Worldwide Career Management, Ltd. (Irish), was an Irish corporation. R&A's advertisements summarized for clients how employee leasing would work using a hypothetical client named Mark:

1.    Mark enters into an Agreement of Employment with Worldwide Career Management, Ltd. ("WCM") for his worldwide service on an exclusive basis.  The Agreement of Employment provides for Mark's W-2 compensation, and contributions to a non-qualified deferred compensation plan (the WCM Deferred Compensation Plan) on his behalf.

2.    WCM 'loans out' Mark's services to ExecuPro Management Services, Inc. * * * pursuant to an Employee Loan Out Agreement for the contracting, consulting, engineering and/or management services of Mark.  Under the Employee Loan Out Agreement,

[*106]        ExecuPro agrees to pay Mark's W-2 compensation and certain amounts to WCM.

     3.     ExecuPro provides Mark's services to [Mark's company] pursuant to a Consulting and Management Services Agreement.

     4.     ExecuPro pays Mark his W-2 compensation.

     5.     WCM makes contributions to the WCM Deferred Compensation Plan on Mark's behalf.

The pitch worked, and R&A sold the deal to many clients. The key was that clients' real businesses would deduct large "leasing" payments that ended up in a corporation that did not pay tax due to the Irish nonresident loophole. See supra note 11. A gusher of money started flowing to Ireland, and only some would trickle back to the United States. Clients would pay tax only on the amounts that were kept in their businesses or what was reported on their W-2s. The remaining funds in Ireland would accumulate tax free for the clients' benefit.

Worldwide Career Management, Inc. (U.S.), was a very similar variation started in 1999, but which used a corporation organized in Wyoming instead of Ireland. R&A set it up to be fully owned by an ESOP to make it more tax friendly, if not quite as tax friendly as an Irish nonresident corporation.

[*107] We also analyzed this deal in Pacific Management Group, T.C. Memo. 2018-131. In that case R&A had created a partnership[52] whose "primary purpose" was "to provide business, management, and financial services to clients of the Partnership." Id. at *15. This partnership contracted with R&A's clients through their separate S corporations to supply the partnership with their services. Id. at *15-*16. The partnership then leased the clients back to their own businesses through agreements for "management services." Id.

The contracts between the partnership and the clients' businesses required the businesses to pay monthly "management fees" to the partnership. Id. The clients' businesses would deduct these fees on their own returns, id. at *28, and the fees would then flow into the clients' ESOPs where they would become a reservoir of cash on which tax was deferred, see id. at *23. The employment agreements on paper allowed the partnership to provide services to other businesses, but this never happened. Id. at *16-*17.

In the beginning, only Ryder's family and R&A were involved in Worldwide Career Management, Inc. (U.S.) (Worldwide (U.S.). He and his wife and children were its only employees and were also the only participants in the

---

[52] This partnership was also the "factor" which "purportedly purchased from the [clients' companies] accounts receivable that they assigned to it." Id. at *18.

[*108] ESOP that owned it.  It wasn't until after September 11, 2001, that R&A made more use of Worldwide (U.S.), again because it became harder to move money offshore after the passage of the Patriot Act.  See supra p. 100.  It was at this point that Worldwide (U.S.) created a separate qualified subchapter S subsidiary corporation (QSUB) for each client.[53]  And each QSUB was ultimately owned by the Worldwide (U.S.) ESOP.  Corporations need an officer, so Ryder installed an R&A employee, Karen Baker, to be president of each of these QSUBs.

Executive Placement, Inc., emerged in November 2002 after Ryder had met with some fellow retirement-planning attorneys in Utah.  These same attorneys had been enjoined by the Justice Department from offering employee leasing to their own clients, but charitably referred them to R&A so they could continue in the tax-minimizing lifestyle to which they had become accustomed.  And R&A delivered on this, placing them under Executive Placement's planning umbrella.

---

[53] A QSUB is subsidiary corporation 100% owned by an S corporation that the S corporation elects to treat as a QSUB.  Sec. 1361(b)(3)(B).  A QSUB's separate existence is ignored, so all of its assets, liabilities, and items of income are considered those of its parent.  Its separate identity for federal income tax purposes is terminated upon its election, and "debt issued to its parent S corporation's shareholder is treated as the parent's debt to determine the amount of losses that may flow through to the parent's shareholders."  Messina v. Commissioner, T.C. Memo. 2017-213, at *26-*27, aff'd, 799 F. App'x 466 (9th Cir. 2019).

**[\*109]**  Westra Capital Management, Inc., was the same corporation as Worldwide (U.S.), but in 2003 Ryder thought a new name might be in order when one of R&A's clients was convicted of a criminal tax charge after he underreported his income--income that had been funneled through Worldwide (U.S). Ryder and R&A were deeply involved in Westra Capital. Starting in 2003, Ryder's daughter became its vice president--joining R&A employee Karen Baker who served as its president as well as president for all the QSUBs we mentioned above. Baker's son joined Westra Capital as its treasurer "or other fiscal agent," as he signed the QSUBs' annual reports. In 2009, however, Ryder himself became both the president and treasurer, replacing Baker. And by 2010, Ryder had assumed all the officer positions at Westra Capital.

R&A was not alone in selling these schemes. Early in 2004, the Commissioner issued Revenue Ruling 2004-4, 2004-1 C.B. 414, which identified Westra Capital's type of QSUB arrangement as an abusive tax-avoidance transaction. Ryder had a way around this, too. Each of R&A's clients' QSUBs had been authorized to issue 10,000 shares, but only 100 shares were actually issued to Westra Capital. Each client held an option to purchase the remaining 9,900 shares at $1 each. When it came time to unwind Westra Capital in 2005, the clients "bought" the 100 shares of stock of their QSUBs back from Westra Capital

[*110] for what Ryder claimed was their fair market value: 1% of the asset value in each QSUB. As the sole owner of their QSUB's 100 issued shares of stock and 9,900 unexercised stock options, each client then merged its QSUB's assets into a new entity created by R&A. Thus, R&A transferred a total of approximately $69 million tax free to about two dozen of its clients in exchange for a 1% fee to Westra Capital.

Finally, there was ExecuPro Specialty Services, Inc.--a Wyoming corporation[54] that R&A created in 2004. Its creation was prompted by the requirement in new section 409(p) that an ESOP sponsored by an S corporation have more than ten participants. Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, sec. 656(a), 115 Stat. at 131-33. This would have been less than optimal for R&A's clients who wanted only to avoid tax, not share their business income with their employees. Ryder's solution was to enlist R&A's own employees to receive small salaries and Forms W-2 from ExecuPro starting in 2005 to reach the participant number needed. With ExecuPro in place and the new section 409(p) requirements met, the show could go on. ExecuPro

---

[54] We note that the record also holds the articles of incorporation for a California-based ExecuPro Specialty Services, Inc., dated 2001 and stamped as received by the California secretary of state during that same year. This was the second iteration of an earlier version that is referred to in R&A's advertisements plugging Worldwide Career Management, Ltd. (Irish).

[*111] glommed onto the employee-leasing arrangements already in place, purporting to exclusively lease each client's services back to the client's business. Each of R&A's clients paid an annual "retention fee" of 8% of the net funds clients moved into each of these group leasing structures.

As with the other group products, these employee-leasing deals looked on paper as if R&A had little to do with them. But even a light sprinkling of the Commissioner's investigative dust again showed R&A's fingerprints. As we've already found, its employees managed many of the entities necessary for these deals. R&A also created, or caused the creation of, the entities used in the employee-leasing deals and the ESOPs that owned them. Ryder signed the articles of incorporation as the incorporator for these entities, and he was listed as the contact name. R&A also filed paperwork with the IRS concerning its retirement plans and sought letters of determination that they were qualified employment plans. But most important is the money trail: R&A opened and controlled the many bank accounts held in the names of these leasing entities. Clients who bought the leasing products would move their own money into these entities' accounts. Most of this money was invested on behalf of the client, but we specifically find that a portion was siphoned off to R&A as a fee for putting the arrangement into place and monitoring it to keep it going. Those fees were

[*112] calculated as a percentage of the net funds that the clients had moved into the group-leasing structure. Ryder rationalized this fee to the clients by stating that either they could pay high federal and state income tax, or they could pay 8% of the amounts that (he claimed) would not be subject to immediate taxation. We find that these were fees paid for services that R&A provided. See Roubik, 53 T.C. at 379-81. We therefore find it was R&A's fee income.

### ii. Stand-Alone Products Income

The R&A tax products that we call "stand-alone" are the staffing product, the general-counsel-office product, and the Son-of-BOSS product. For each of these products, R&A had written agreements with its clients, not the oral agreements that it had with clients who bought a group product. R&A tailored these products to a specific client, and a client would have its own direct connection to the product. A client would also control its own financial account that Ryder set up for each. But when we peek under the paper floating on the surface, we again find a different reality.

*Staffing Product.* Just as it had with all the "group" products, R&A did all the front-end work necessary for the stand-alone staffing product. It created the ESOPs that owned the S corporations that then acquired a client's employees and leased them back to the client. R&A also marketed these deals the same way it did

**[\*113]** all the others. As with all other Ryder deals, we also find money that flowed into the deal and a percentage that was sluiced to R&A.

There were a couple ways this happened. Money came to R&A through a "fair and reasonable" documentation fee of $12,500, as well as an annual fee computed as a percentage of a client's S corporation's annual K-1 income. Ryder's salesmen would sell prospects on this arrangement by alluding to his expertise in reducing their taxes to whatever they felt comfortable with paying: Without R&A's "planning and expertise, [the client's] federal and state income and payroll taxes could be as high as 45% or more." With R&A's services, a client's costs would only "be the agreed percentage, but in the form of fees [or, money to R&A] rather than taxes." The early versions of this deal make a finding that the deals produced income to R&A easy--R&A sent invoices directly to its clients on R&A letterhead.

But then things got complicated, as Ryder gooped it up with extra layers of paper. At the start of 2004, R&A "assigned" all of its staffing-product clients to ESOP Legal Consultants, Inc. Unsurprisingly, it was a Wyoming corporation, and a refashioned one at that. It was originally "Bikerider 2" and organized in January 2001 as one of 1,100 Wyoming corporations Ryder organized in a short time for use in the tax deal we describe in the next section. Bikerider 2 kept a low profile

**[*114]** with Ryder as its only director and just three years of tax filings on Forms 1120S, U.S. Income Tax Return for an S Corporation, from 2001 to 2003.

It wasn't until December 2003 that Ryder got Bikerider 2 into gear and renamed it ESOP Legal Consultants, Inc.  On that same day, however, Ryder also organized ESOP Legal Consultants, Inc., APLC, a California corporation, and then merged its Wyoming predecessor into it.  The California ESOP Legal Consultants, Inc., APLC, emerged as the surviving S corporation, and retained Bikerider 2's employee identification number (EIN).  It was solely owned by an ESOP during all years at issue and filed Forms 1120S for calendar year 2004 and for the short tax year of January 1 through November 30, 2005, before it converted to a C corporation after new section 409(p) took effect.  That section's enactment ended R&A's ability to sell the employee-staffing deal as it had been.

But ESOP Legal Consultants, Inc., APLC, (ESOP Legal Consultants) succeeded to many of R&A's existing clients.  And from this point forward, clients' payments made before R&A's "assignment" of rights to ESOP Legal Consultants were deposited into the BFA Division 101 bank account ending in 0449, and any payments that followed were deposited into the ESOP Legal Consultants account ending in 3149.

**[\*115]**  As the Commissioner points out, the record is devoid of evidence that

ESOP Legal Consultants had any capital when it started.  Following this alleged

"assignment," Ryder continued to provide services through R&A, as ESOP Legal

Consultants had no office space or employees of its own--more signs that R&A

itself earned this income.  See Roubik, 53 T.C. at 379 (holding that a corporation

that "did not own any equipment, incur any debts for rent, office or medical

supplies or services or for salaries" didn't earn income, but its owners--who

claimed to be employees--did).[55]  And ESOP Legal Consultants failed to conduct

business.  See id.  We therefore find that this was R&A's fee income.

*General Counsel Office Product.*  Remember that Congress enacted section

409(p) to prevent deals like R&A's employee-leasing deal by requiring ESOPs

sponsored by S corporations to have more than ten participants or face severe

sanctions.  But Congress delayed the new section's effective date until December

---

[55] In Keller, 77 T.C. at 1031, the Court chose not to attribute income of a pathology corporation to an individual when the individual was the only person performing the services for the corporation, even though the corporation "did not pay rent, purchase or own property, employ nurses, technicians or other clerical employees, incur any business indebtedness, pay interest, or loan any money."  In Keller, however, the corporation "clearly carried on the business of providing medical services," id., and the Court stated that "it is axiomatic that a corporation can only perform services through its agents," id. at 1032.  That is not the situation here.  R&A, not the S corporations, was  providing the services in question, and R&A was not an agent of these S corporations.

**[\*116]** 2004 to give S corporations that were owned by smaller ESOPs time to comply.  See Economic Growth and Tax Relief Reconciliation Act of 2001, sec. 656(d), 115 Stat. at 135.

Ryder is a canny tax lawyer and foresaw what Congress would do. He also foresaw that some grandfathering was likely, including the grandfathering of "any structures in existence before March 14, 2001," as "completely legal."  As R&A's advertising states:  "[It] anticipated the tax law changes and inventoried a limited number of the S-Corp+ structures before March 14, 2001.  Each is a properly documented and declared structure offered to clients who wish to defer an unlimited amount of income through 2005."  But Ryder was modest in calling his inventory "limited":  He had created roughly 1,100 Wyoming corporations and submitted S corporation elections and ESOP plan documents to the IRS on their behalf with the hope of obtaining approval of these employee savings plans.  R&A also set all the plan years to end on November 30.  This meant that the first date that newly enacted section 409(p) would be in effect for the ESOPs was the plan year beginning December 1, 2005.

A client who wanted in on one of these deals had to agree to divert income from his operating business to an S corporation that leased his services back to his operating business.  This created a spot to stash currently untaxed income, as in

[*117] the employee-leasing deals. But the GCO deals featured a couple additional steps: The client had to agree to pay a percentage of the S corporation's income to a general counsel office as its "budget", and agree that Ryder would be the S corporation's general counsel. This "budget" amount was calculated without applying the legal fees of Ryder and R&A. The net income used in calculating the "budget" amount couldn't be reduced by the expenses of the GCO--including fees owed to R&A--and the "budget" couldn't be reduced as long as R&A was willing to provide services to the GCO. We find that what Ryder calls a line item in a corporate "budget" was in reality a fee that R&A charged its clients for services R&A itself provided. See Trousdale, 16 T.C. at 1065.

We therefore find that this was R&A's fee income.

*Short-Sale Strategy Product*. And finally there are R&A's Son-of-BOSS deals. R&A opened two accounts to be used in this product--one titled "Ernest S. Ryder, APLC, Attorney Trust Account," and the other "Ernest S. Ryder & Assoc., Inc. Attorney Client Trust Account." R&A charged clients who bought into this deal a documentation fee and an annual percentage fee of 6-2/3% of the capital losses created in the transaction. The connection between these fees and R&A is much more plainly visible. In what may have been a unique concession, R&A's annual fee was contingent on the transaction's ultimate success in avoiding IRS

[*118] scrutiny past the statute of limitations, and remained contingent until the statute of limitations expired for the year that the client was claiming the tax benefit. These fees charged were for the work done by R&A. See Roubik, 53 T.C. at 379-81.

We find that this was also R&A's fee income.

*Summary*. All of these fees paid by the clients of the different tax products were compensation to R&A for its services in spinning webs of entities and squirting barrels of ink to hide the connection between itself and the fees it charged. We of course recognize that Ryder diverted these payments through contracts and entities, and the accounts and divisions within entities. We also recognize the invocation of Moline Properties that corporate forms must be respected. But the assignment-of-income doctrine does not immunize assignments of income to corporations or other entities. See Basye, 410 U.S. 441; Jones v. Commissioner, 64 T.C. 1066, 1076-77 (1975); Roubik, 53 T.C. at 379-81. The income that R&A produced from sales of these deals to its clients was income to R&A because it was R&A itself that did the work. See Roubik, 53 T.C. at 379-81; Trousdale, 16 T.C. at 1065. Ryder also cited a number of cases, including Achiro v. Commissioner, 77 T.C. 881 (1981); Davis v. Commissioner, 64 T.C. 1034 (1975); and Bell v. Commissioner, T.C. Memo. 1982-660, where the

[*119] Commissioner attempted to attribute income reported by legitimate corporations to other persons or entities. But in each of the cases cited by Ryder, there were questions about who was the true earner of the income in question. Here there is no reasonable dispute about who earned what--it was R&A's income, and hiding it in otherwise nonfunctioning entities doesn't make it any less an assignment of income.

Our finding here does not even rely on attributing to R&A income that was reported by different businesses--or determining the "true earner," as in the cases that Ryder cites. Rather, we are actually attributing to R&A deposits into bank accounts--deposits that were funneled through tax schemes but that were always payments for the services provided through R&A. The question of whether these structures were separate from R&A or were actually conducting legitimate business activities is irrelevant to this determination. All that matters is that the fees that went into these accounts were fees for services that R&A provided.

B.     Additional Attempted Assignments of Income

Ryder next argues that R&A also assigned its right to the fee income from the different tax products through various contractual agreements, including the "practice funding agreement" with BFA, the "assignment agreements" with ESOP

**[\*120]** Legal Consultants, and the "access agreements" with the individual general counsel offices.

The same doctrine applies: Taxpayers "cannot avoid taxation by entering into a contractual arrangement whereby that income is diverted to some other person or entity." Basye, 410 U.S. at 449. The Supreme Court in Sunnen, 333 U.S. at 604, held that when determining if an assignment of contractual rights renders a taxpayer immune from income tax liability, "[t]he crucial question remains whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes." See also CMA Consol., Inc. & Subs. v. Commissioner, T.C. Memo. 2005-16, 2005 WL 209951, at \*43 ("To shift the tax liability, the assignor must relinquish his control over the activity that generates the income; the income must be the fruit of the contract or the property itself, and not of his ongoing income-producing activity \* \* \* [and] the duty to produce the income [must be] assigned also, so that the assignor is out of the income-producing picture" (quoting United States v. Newell, 239 F.3d 917, 919-20 (7th Cir. 2001))). And in Wesenberg v. Commissioner, 69 T.C. 1005, 1010-11 (1978), we determined that a professor's conveyance of the use of his lifetime services--and the income resulting from it--to a trust was ineffective to shift the

[*121] tax burden associated with that compensation when, after looking at the facts and circumstances of the case, "the ultimate direction and control over the earning of the compensation rested in [the Petitioner] and not in the Trust."

## 1. Assignment of Fee Income to BFA Through the PFA

Ryder argues that R&A assigned its rights to any fees to BFA under the Practice Funding Agreements that Ryder drafted each year from 1996 to 2003. According to Ryder, the PFAs meant that R&A did not underreport its gross receipts since it did not have the rights to that income.

When R&A was created, Ryder looked for a means to obtain the capital necessary to run a business, and he settled on BFA as the source. Ryder created BFA in the Turks and Caicos in 1996, just after R&A's establishment. BFA did not have much capital itself, but luckily its parent company, the tax-free Irish nonresident company Capital Mexicana that Ryder had set up years before, did. Capital Mexicana owned 100% of BFA from BFA's creation until BFA wound down in 2011, and that company was the ultimate source of the funds that BFA passed on to R&A.

The PFAs entered into each year from 1996 through 2003 were no more standard factoring agreements than the ones BFA had with R&A's own clients. R&A initially purported to sell its accounts receivable and contract rights to BFA

[*122] for a fixed amount every year, which increased annually. But by 2003, Ryder stopped defining a fixed line of credit, instead having BFA promise to provide a "range of funding" for R&A. Ryder explained this as a consequence of R&A's inability to accurately forecast both the capital needs of a law firm and the amount of receivables that it would create. This agreement also provided R&A with protection from creditors by removing its most valuable assets--its accounts receivable--from its books.

Another unusual feature of the PFA is that R&A did not promise to generate a minimum value of accounts to transfer to BFA. Ryder did say that BFA would benefit from an implied covenant of good faith that R&A would generate these future accounts receivable and contract rights, but there were no express contractual protections for BFA. The result is what one might expect--BFA pumped in more money each year than it received back from R&A. It nevertheless renewed the deal from year to year.

The PFA also deviated from standard factoring contracts by failing to have any way for receivables to be transferred to BFA or for any notice to be sent to the debtors that BFA was the owner of the receivables. Factors usually require such a notice to the debtors to ensure that they receive what they are owed. The PFAs here, however, stated that R&A was not required to send any sort of notification to

[*123] any account debtor that BFA now owned these receivables. There are not even any notations in R&A's books that BFA owned the receivables.

Legitimate factors usually do what it takes to get a security interest in their debtor's accounts receivable. See Pac. Mgmt. Grp., at *44. BFA did not do so. Although a provision of the PFA stated that R&A granted BFA a continuing security interest in all of R&A's present and future receivables, we find that there is no evidence that BFA ever perfected that interest by executing any of the necessary UCC financing statements. Nor did R&A execute them on BFA's behalf, as it had promised in the PFA.

According to the PFAs--which in this regard tracked the arrangements R&A papered for its own clients who bought into factoring deals--R&A itself was required to act as BFA's collection agent and establish a collection account to hold any payments on any of the receivables. We do find that Pancheri and Ryder opened an account under the name "Benefactor Funding Assoc. Inc. Coll/Acct: Ernest S Ryder APLC." The signature card for the account permitted both to have access to the account's funds. Although Pancheri was in charge of the day-to-day operations of BFA and was technically a signer on the collection account, he did not actually oversee or have access to this collection account. As Ryder credibly stated, "it really wasn't [Bob Pancheri's] business, how well the law firm was

[*124] doing or not doing." Ryder further explained that Pancheri "never really had access to [R&A] financial information." This helps us find it more likely than not that Ryder and R&A were the ones truly in control of this BFA collection account.

On top of all these commercial irregularities with the PFA itself was R&A and BFA's failure to adhere to the terms of the PFA. For example, BFA provided $2,840,072.83 in funding to R&A during 2003, when the PFA supposedly capped the funding range at $2.25 million. The PFA was also clear that all receivables from R&A were due to BFA and were to be deposited into BFA's "Collection Account." With Ryder and R&A in control of the account, however, fees routinely ended up in R&A's bank accounts, R&A's attorney-client trust account, or RLC's account, or went to the Ryder Ranches. In 2003, for example, R&A deposited into its own Wells Fargo Bank account more than $130,000 from its clients that should have been deposited into the collections account under the PFA. We also find that it didn't matter whether those receipts had been deposited into BFA's account, for almost all the money that did get into BFA's collection account ultimately ended up in R&A's own bank account. Weekly account balance reports prepared for R&A and Ryder by DeAun Castro even went as far as referring to the BFA account as the "collection account for Ernest Ryder."

**[*125]**  Looking at these surrounding facts and circumstances, we find that this PFA was merely another one of R&A's unsuccessful attempts to assign its income. The ultimate direction and control of the fee income remained with R&A despite the PFA.  And since R&A itself produced that income, this income was R&A's.

### 2. Assignment of Staffing Income to ESOP Legal Consultants

Ryder did much the same with the income that R&A earned from its stand-alone staffing deals.  From 2004 through 2011, Ryder had the fees from these deals deposited into ESOP Legal Consultants' bank account ending in 3149.  He argues that this was done under an "assignment" agreement between ESOP Legal Consultants and R&A, in which R&A transferred all of its rights, duties, and obligations from the stand-alone staffing product to ESOP Legal Consultants, which was to take over from R&A any other chores needed to keep the deals going.

We have letters of representation that clients who bought into their deal signed.  They state that R&A was hired to set up the ESOP-owned S corporations that aimed to supercharge the clients' retirement savings.  R&A employees established these entities, drafted all the necessary paperwork, and continued to monitor the arrangements.  The actions of Ryder and R&A after the signing of this "assignment" agreement show that Ryder and R&A's employees continued to be

[*126] the ones providing services to the clients. Ryder argues that R&A assigned all of its obligations to its staffing-product clients to ESOP Legal Consultants. These obligations would have included handling all dealings with the IRS, representing clients with respect to any audit, and providing any legal support necessary, including litigation in the Tax Court. None of this actually occurred. R&A never left the "income producing picture" and maintained control over the staffing product. See Newell, 239 F.3d at 919-20.

There is nothing in the record to show that the clients and ESOP Legal Consultants signed new letters of representation after the "assignment" agreement was executed. We do note that after January 1, 2004, bills to clients who used the stand-alone staffing product were sent on ESOP Legal Consultants' letterhead, which included the names of six individuals and their supposed positions. But during trial, two of these employees testified but failed to mention ever having worked for ESOP Legal Consultants. One was unable even to describe the work that ESOP Legal Consultants supposedly did. An R&A paralegal was assigned to the taxpayers in Pacific Management Group. R&A itself continued to send letters about this product to the Pacific Management Group taxpayers. And an R&A attorney appeared for them in the case. ESOP Legal Consultants was nowhere to be found. Yet this all occurred even after R&A had allegedly assigned all rights

**[*127]** and burdens arising from the stand-alone staffing product to ESOP Legal Consultants. And, finally, if ESOP Legal Consultants had wanted to provide any services to these clients, it had no means to do so. It had no office, no employees, and no other resources.

Carlos Torres was a client who used the staffing product both before and after R&A's supposed assignment to ESOP Legal Consultants at the start of 2004. He got audited; R&A represented him. R&A signed a power of attorney in February 2006 to represent him for the 2003, 2004, and 2005 tax years. R&A's services were covered under R&A's fixed-percentage fee arrangement. Torres's payment, however, was deposited into ESOP Legal Consultants' bank account ending in 3149. And we find this to be entirely typical of what happened after the supposed assignment. R&A continued to represent its clients as it had promised in its letters of representation. R&A continued to provide all services to those clients. But R&A would divert the fees to ESOP Legal Consultants by depositing the fees it earned into ESOP Legal Consultants' bank account. We find that this was all just an attempt by R&A to assign its income. See Basye, 410 U.S. at 449; CMA Consol., 2005 WL 209951, at *43.

Even if the "assignment" agreement were valid or ESOP Legal Consultants did provide services to the clients involved, any services that ESOP Legal

[*128] Consultants provided would not have generated any new fees.  The letters of representation state that R&A's rights to the percentage fee was established once R&A created the tax structures and established the connection between the clients and the entities.  It was R&A that was entitled to this percentage fee as long as the clients using this product remained invested in it.  And this percentage was computed on the amount of money invested in the structure, not on the amount of work done by R&A.  We therefore find that all the fees that were deposited in ESOP Legal Consultants' bank account ending in 3149 are income to R&A.

        3.      Assignment of GCO Product Income to Individual General Counsel Offices

Another assignment of income arose from the "budget fees" paid by clients who signed up for the GCO product.  These "fees" went to the individual general counsel offices, as if those offices were providing services to the clients under an "access agreement."  Were these legit?  The test, as we've already said, is whether the assignor has relinquished control over the income-producing activities, which here would be the GCO product.  See CMA Consol., 2005 WL 209951, at *43.  The problem for Ryder here is that these GCO "offices" were nothing more than 18 separate bank accounts opened under the names of S corporations created by R&A.  These entities could not have provided the "in-house counsel" services for

[*129] each of these separate corporations. Ryder claims that the GCOs ended up paying RLC to use its employees to perform these services. But this argument fails as well, as we have found that the employee-leasing agreement between RLC and R&A did not make R&A employees anything other than R&A employees. So here again we find that R&A earned the fees attributable to the GCO product and must recognize those fees as its income.

C.     "Other Deductions"

| Year | Per return | Per exam | Adjustment |
|------|-----------|----------|------------|
| 2005 | $1,546,423 | -0- | $1,546,423 |
| 2006 | 1,499,544 | -0- | 1,499,544 |
| Total | 3,045,967 | -0- | 3,045,967 |

There still remains the issue of whether R&A was entitled to "other deductions" used to offset the income that it did report for 2005 and 2006. R&A claimed deductions for client administrative-services expenses, for legal and professional expenses, and for meals and entertainment. We look at each.

1.     RLC and the Employee Leasing Agreement

The client administrative-services expenses are payments made to RLC under the employee-leasing agreement entered into by R&A and RLC. The Commissioner argues that this agreement between RLC and R&A was a sham that

[*130] lacked substance. He believes that the employee-leasing agreement between R&A and RLC was just one cog in the machine built by Ryder to assign R&A's income to other entities.

RLC served multiple functions in Ryder's master plan of tax avoidance. He'd set up his law practice--R&A--as a C corporation. See supra note 8. It is entirely legitimate for a business owner to switch from C corporation status to S corporation status.[56] But Ryder rarely chose the well-trod path. He instead formed RLC as an S corporation. And then he started doing things with it to move income away from R&A to it.

---

[56] As long as the corporation meets section 1361's requirements for S corporation status, it can convert from a C corporation to an S corporation--and receive the tax benefits of doing so, see supra note 2--by filing a Form 2553, Election by a Small Business Corporation, no later than three months and 15 days after the beginning of the tax year the election is to take place, sec. 1.1362-6(a)(2), Income Tax Regs. But this conversion may have negative consequences. If within five years of the conversion, see sec. 1374(d)(7), the S corporation sells at a profit assets it acquired while a C corporation, it will have to pay a "built-in gains" tax in addition to the tax paid by the S corporation shareholders on the total gain from the sale. Sec. 1374. (An S corporation converted in 2002--the year of RLC's incorporation--would have had to wait seven years to sell its assets to avoid paying this tax. See American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, sec. 1251(a), 123 Stat. at 342.) A C corporation also cannot avoid double taxation on its built-up profits by converting to an S corporation. Instead it must track the S corporation and C corporation profits for distribution purposes. Sec. 1368. And if the S corporation has excessive amounts of passive income profit accumulated as a C corporation, there is the potential for the S corporation to be subject to taxes at the corporate level and have its S status terminated. Sec. 1362(d)(3).

[*131] One of the most important was the employee-leasing agreement that Ryder drafted. Under its terms, RLC would become a staffing corporation that provided support for R&A. R&A would pay RLC for the "staffing services" that it provided. These "payments" would then generate big deductions for R&A and move income to RLC which, as an S corporation, would not be taxed on it. But for this to work we'd have to believe Ryder when he testified that all of R&A's employees had become employees of RLC right before this agreement took effect. The Commissioner urges us to look to the evidence on the record showing that very little actually changed regarding these employees when the employee-leasing agreement was entered into. The Commissioner believes that this agreement lacked any substance and was merely a mechanism for transferring value and obtaining tax advantages. We generally agree.

Ryder is not the first to try this, and our rule is to look past the labels used by a taxpayer and focus on what was really going on. See CMA, 2005 WL 209951, at *43; see also Summa Holdings, Inc. v. Commissioner, 848 F.3d 779, 787-88 (6th Cir. 2017), rev'g T.C. Memo. 2015-119. In Repetto v. Commissioner, T.C. Memo. 2012-168, 2012 WL 2160440, at *9, for example, we held that "services agreements [between the taxpayers' construction company and their tax-free shell entities] and the resulting payments were nothing more than a

[*132] mechanism for transferring value." They did not change who actually did the work, and the original employees continued to do all the work as they had before the agreement. No written agreement was ever entered into between the parties and the parties failed to keep contemporaneous time records of the employees. Id.

In this instance, the only thing that changed after R&A signed the agreement with RLC is that RLC began sending the employees W-2s. R&A and RLC had no written agreement to show that the R&A employees were now RLC employees. The supposed RLC employees booked their time using R&A's Timeslips program. Several employees credibly testified that they were employees of R&A, not RLC, during the years at issue. And these employees sent letters to clients on R&A letterhead with R&A titles under the employees' signature lines. All of this leads us to find that this employee-leasing agreement was nothing more than a mechanism to produce deductions for R&A. We find that those deductions should be disallowed.

2.    Remaining Deductions

The Commissioner also disallowed deductions for professional services that R&A claimed for 2005 and 2006, and some for meals and entertainment expenses that it claimed for 2005. Section 162 allows a deduction for ordinary and

**[*133]** necessary business expenses, but taxpayers have the burden of proof to substantiate these deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83-84 (1992); see also sec. 1.6001-1(a), Income Tax Regs. Claiming deductions on a return is not substantiation. See, e.g., Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). When a taxpayer fails to substantiate his deductions with precision, we may estimate certain kinds of expenses but only if he provides at least some evidence to support an estimate. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Finney v. Commissioner, T.C. Memo. 1968-283, 27 T.C.M. (CCH) 1510, 1516 (1968); cf. Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930).

There are some expenses we cannot estimate, including those for meals and entertainment. A taxpayer who claims these must "substantiate[] by adequate records or by sufficient evidence" the amount, time and place, and business purpose of each expenditure. Sec. 274(d).

R&A's problem is that it failed to introduce any evidence about any of these expenses. In the answering brief it broadly claimed that we have the books and records and financial statements for all of the entities involved in these cases. It cites nothing in particular in support of these deductions, and we have found no evidence in the record that even mentions them.

**[\*134]**  We therefore find that R&A is not entitled to these "other deductions."

III.    Dividend Adjustment:  The Ryders' Liability for Tax on Unreported Constructive Dividend Income

The other major issue is whether Ryder received constructive dividends from R&A.  The Commissioner determined that Ryder had very large unreported dividend income from 2003 through 2011.  This income dropped into three different groups:

- money funneled from R&A through RLC by making year-end adjusting journal entries;

- money from R&A used for the ranch properties that did not pass through RLC; and

- money from R&A used to pay American Express and Ben Leland Construction.

Ryder disagrees on each point.  He disagrees with the Commissioner that the money that flowed into 41 different accounts were R&A's earnings and profits, and not investments and capital contributions made by other entities.  We have found that this money was income to R&A.  We now have to address whether it then became taxable dividend income to Ryder.

A *constructive* dividend occurs when "a corporation confers an economic benefit on a shareholder without the expectation of repayment."  Magnon v. Commissioner, 73 T.C. 980, 993-94 (1980); see also Noble v. Commissioner, 368

[*135] F.2d 439, 443 (9th Cir. 1966).  We look for the objective facts to figure out whether a benefit is a constructive benefit; what the parties might subjectively have intended doesn't control.  See Noble, 368 F.2d at 443; Clark v. Commissioner, 266 F.2d 698, 710-11 (9th Cir. 1959).

There is a two-part test:  The expense must be nondeductible to the corporation and it must be an economic gain or benefit to the shareholder.  Meridian Wood Prods. Co., Inc. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984) (citing Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388, 1391 (9th Cir. 1977)).  Taxpayers who control their own corporations do fairly often receive constructive dividends if they are not careful in keeping corporate assets separate from their own.  A common situation occurs when a corporation pays to construct or otherwise improve its shareholder's real property without the corporation's expecting ever to be repaid.  See, e.g., Magnon, 73 T.C. at 994; Estate of Clarke v. Commissioner, 54 T.C. 1149, 1161 (1970); Asher v. Commissioner, T.C. Memo. 1998-219, 1998 WL 328440, at *6.  We also routinely find constructive dividends when a shareholder's corporation pays his personal expenses.  See, e.g., Dobbe v. Commissioner, 61 F. App'x 348 (9th Cir. 2003), aff'g T.C. Memo. 2000-330.

- 136 -

[*136] There is one important obstacle that might not be apparent to a nontax lawyer: Dividends must come from a corporation's earnings and profits. If a corporation doesn't have enough earnings and profits, then these nondeductible uncompensated payments are a nontaxable return of capital to the extent of the shareholder's basis under sections 301(c) and 316(a). Goyak v. Commissioner, T.C. Memo. 2012-13, 2012 WL 86603, at *14. And if a taxpayer takes so much money from his corporation as to use up both all the earnings and profits, and all of his accumulated basis in his shares, that money can again become taxable as a capital gain. Truesdell, 89 T.C. at 1294-95. Our finding that R&A had very large amounts of unreported income enables us to find it more likely than not that R&A's accumulated earnings and profits were sufficient to support all of the distributions that the Commissioner alleges for each year at issue.

We'll look in turn at all three ways that the Commissioner says Ryder was collecting dividends from R&A.

[*137] A.   Dividends From R&A Through RLC

| Year | Taxable distribution amount |
|---|---|
| 2003 | $(32,775.00) |
| 2004 | 95,480.12 |
| 2005 | 6,348,667.59[57] |
| 2006 | 1,312,645.80 |
| 2007 | 585,205.40 |
| 2008 | (205,704.55) |
| 2009 | 151,583.70 |
| Total | 8,255,103.06 |

The least recognizable dividend stream was what the Commissioner argues flowed from RLC to Ryder. We've already found that the source of this money was R&A's income no matter where it pooled, in accounts nominally belonging to a GCO or ASIG or RLC or any of the other many cisterns that Ryder installed to collect it. The question now is whether it found its way a bit further to the Ryders themselves. As we have already described in detail--see supra pp. 31-34--Ryder undoubtedly moved this money from R&A to himself. It's just that he tried to make it nontaxable through the multiple year-end adjusting journal entries to the

---

[57] This is $10,000 less than the amount the Commissioner determined, which didn't account for the $10,000 Ryder paid Ammon for his 150,000 shares in RLC.

[*138] books of R&A, RLC, and the various other entities he'd set up to collect what we've now found to be R&A's income. He sent a large chunk of this income to RLC for what R&A claimed were deductible "services" that RLC supposedly provided to R&A under the terms of their staffing arrangement. Ryder was meanwhile "borrowing" money from R&A for which he would give R&A notes. R&A would pay RLC with these notes, and RLC would pass them on to Ryder as distributions which Ryder didn't report because in his view "distributions from S corps aren't income * * * unless they exceed basis."

This complicated adjusting-journal-entry method depended on the validity of each transaction involved. And this is where the wheels fall off this tax-avoidance vehicle. The "employee-leasing agreement" between RLC and R&A didn't actually lease any employees. All distributions made by RLC were just transfers from R&A to Ryder wearing a flimsy paper disguise.

If there's any doubt about this, we'll make an alternative finding too. Ryder claims that he had sufficient outside basis in his RLC shares to make these distributions a tax-free return of capital. Ryder claims that he got basis in RLC from the promissory notes that he signed and made payable to RLC for its stock. These notes are the only source of basis that Ryder has ever claimed.

[*139] The problem for Ryder is that paper promises not backed by cash don't create basis. Basis is the cost of property, sec. 1012, and a shareholder gets basis in his shares in a corporation when he purchases those shares or contributes capital to that corporation, secs. 351(a), 358(a)(1); see also Maguire v. Commissioner, T.C. Memo. 2012-160, 2012 WL 2036153, at *4. For a shareholder in an S corporation to increase his basis, he must make an actual economic outlay. Oren v. Commissioner, T.C. Memo. 2002-172, 2002 WL 1587216, at *8, aff'd, 357 F.3d 854 (8th Cir. 2004). He makes an "economic outlay" when he incurs a cost or contributes money or property or is otherwise left poorer in a material sense after his contribution. See Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Ruckriegel v. Commissioner, T.C. Memo. 2006-78, 2006 WL 1007628, at *7. Ryder clearly made an economic outlay to Ammon by paying $10,000 cash, giving him $10,000 basis in the stock thereby acquired. But whether he had any additional basis created through his promissory notes and subscription agreements is a different question.

Ryder relies on Peracchi v. Commissioner, 143 F.3d 487 (9th Cir. 1998), for his argument that he had sufficient basis in RLC. Peracchi did hold that a C corporation's shareholder can get basis in his shares with the contribution of a note, but it also made clear that this holding does not apply to S corporations. Id.

**[\*140]** at 494 n.16. We ourselves have made completely clear that a shareholder doesn't get basis in his S corporation's stock by giving it a note until and unless he advances funds on the note. See Perry v. Commissioner, 54 T.C. 1293, 1295-96 (1970), aff'd without published opinion, 27 A.F.T.R.2d 71-1464 (8th Cir. 1971); see also Underwood v. Commissioner, 63 T.C. 468, 477 (1975), aff'd, 535 F.2d 309 (5th Cir. 1976); Oren, T.C. Memo. 2002-172.

There's no additional basis here. Ryder was just moving unfunded promissory notes and subscription agreements around and around through offsetting book entries, illusory agreements, and the loan "repayments" to RLC that matched distributions from it.

Ryder used this circular flow of funds to pay for the multiple stock subscriptions of RLC. Ryder financed his purchase of shares of RLC with promissory notes that called for monthly payments over a number of years. As we've already found, there is no evidence on the record that Ryder ever paid real cash on these notes. He instead used distributions from RLC to make payments to RLC.[58] He'd recycle these payments over and over to make it appear as if

---

[58] The distribution amounts for 2003 and 2008 are negative because of timing issues in Ryder's circular flow of funds, resulting in higher payments into RLC than there were distributions out of RLC during those years. See table supra p. 137.

[*141] principal were being paid on the notes. Then he made it more convoluted in 2004 by getting money from RLC, but writing checks in the same amount to ESR Of Counsel. ESR Of Counsel would then send those checks back to RLC to make what it called payments on two "related party loans" that were on R&A's books.

We find that none of this works.

B.      Dividend Income From Payments Made To Acquire and Operate the Ranch Properties

| Year | Amount |
|---|---|
| 2003 | $1,447,407.89 |
| 2004 | 717,140.00 |
| 2005 | 1,430,900.56 |
| 2006 | 790,299.76 |
| 2007 | 1,074,830.55 |
| 2008 | 480,112.60 |
| 2009 | 183,800.00 |
| 2010 | 396,400.00 |
| 2011 | 326,502.75 |
| Total | 6,847,394.11 |

The Commissioner next says Ryder took money out of R&A to buy ranches. We have already found that the fees stemming from the tax products are R&A's

[*142] own gross receipts.  Whenever these were used for the personal benefit of Ryder, they became distributions from R&A.  Because, according to the Commissioner, the Ryders owned 100% of the ranch entities directly or indirectly, all distributions from R&A to pay for the ranches or their expenses are taxable dividends to Ryder.

Ryder claims, though, that he built a paper dam strong enough to block this recharacterization.  On paper, Ryder Ranch Co., LLC, was the 100% owner of each of the other ranch entities--Pattern Farms, LLC; Canyon View Ranch, LLC; Ryder Red Rock Ranch, LLC; and Rodeo Holdings, LLC.  Ryder also argues that he has no equity in Ryder Ranch Co., LLC.  And the funds contributed to the ranches as capital wouldn't be classified as dividend income of the Ryders either since they did not own or control that money.  Ryder suggests that we "follow the money" to determine the true owners of Ryder Ranch Co., LLC, and the other ranch entities.

That is a good suggestion.  What we find when we adopt it is less a highway than cunning passages and contrived corridors in a wilderness of mirrors.  Along the way are multiple ESOPs, GCO accounts, blocker entities, and trusts.  Ryder attempted to paper hundreds and thousands of transactions between these entities to make them appear to be unrelated, each having different ownership and making

**[*143]** investments in each other. Consider, for example, First Counsel Capital. Ryder attempted to make it appear as if First Counsel Capital was owned by the various GCOs and other tax products sold by R&A. Money placed in the GCO products' bank accounts would be "invested" in FCC, which would then make "capital contributions" to the ranch entities. Ryder similarly argues that the four "blocker" entities--Alster, MBSP, Turnour, and Spanky--were owned by BFA, so any money moving into these blocker entities was payment on the PFA between BFA and R&A. Then some of this money in the blocker entities would become capital contributions in the ranch entities. But here we can make out a lodestar to help us navigate our way--one way or another, *all the money belonged to R&A.* We've found that the income from the sales of the tax products from which Ryder made his fortune belonged to the law firm that did the work. The money that went to the GCOs came from R&A. The money that went into Alster came from R&A. The money that went into MBSP, Turnour, and Spanky all came from R&A.

And this money, gushing from R&A and rushing through these multiple entities, all found its way to the Ryders for their own benefit.

### 1. Ryder Ranch Co., LLC

We will begin with Ryder Ranch Co., LLC. Ryder filed its original articles of organization in January 2003. They identified both Ryder and his wife as the

**[\*144]** LLC's managers, and Ryder Investment Partners, Ltd.--which they wholly owned--as the only other member with a 20% or greater interest in its capital or profits.

Ryder amended these articles of organization in February 2007 and again in June 2009. The only change that he made in February 2007 was to rename the LLC as Ryder Ranches, LLC. The June 2009 amendment changed the name back to Ryder Ranch Co., LLC, and no longer listed Ryder Investment Partners, Ltd., as an owner of a 20% interest. This amendment made sure that there were no members besides the Ryders themselves who owned such large shares.

The original operating agreement listed the Ryders' ownership percentage as 9.09%, while Ryder Investment Partners, Ltd., was listed as having a 90.91% interest. In this operating agreement, the percentage interest of Ryder Investment Partners, Ltd., "shall in all events be 90.91%," no matter the amount of future capital funding actually provided by the partnership. It also stated that "an important purpose" of Ryder Ranch Co., LLC, was to "provide a means for members of the ERNEST S. RYDER and PATRICIA A. RYDER family to acquire an interest in [the LLC's] business and/or investment activities," and the operating agreement restricted transfers of interests outside the Ryder family.

**[*145]** The agreement allocated net profits to members by their percentage of ownership. But Ryder provided that all losses were allocable to the Ryders alone and then debited to their respective income accounts, even though they were only 9.09% owners. He complicated things some more by then allocating to himself and his wife all net profits to the extent of any net losses they claimed.

Ryder's first amendment to this 2003 operating agreement stated that it was effective as of January 10, 2003. This amendment added Alster Investments, Inc.; Benefactor Funding Association, Inc.; First Counsel Capital, LLC; MBSP Investments, Inc.; Spanky Investments, Inc.; and Turnour Investments, Inc., as new members and kept the original members--the Ryders and Ryder Investment Partners, Ltd. The amendment changed how percentage interests and initial capital contributions were to be determined for the members. Each member's percentage interest in Ryder Ranch Co., LLC, was to be based on the member's total capital contribution, reduced by any capital withdrawals, and compared to the total contributions of all members, also reduced by any capital withdrawals. And a member's capital contribution was now defined as "[f]uture capital funding for Company operations, as determined by a Majority in Interest of the Members." The loss-allocation clause in the original operating agreement was changed to state that whenever net losses to Ryder Ranch Co., LLC, caused the Ryders' capital to

**[\*146]** go negative, the Ryders would have an immediate financial obligation to Ryder Ranch Co., LLC, for that amount. Ryder argues that this obligation increased his basis in Ryder Ranch Co., LLC, and allowed him and his wife to continue to claim the losses that kept flowing from the company. And yet another paragraph in the amendment stated that what was not changed by the amendment "shall remain the same," which meant that membership was still limited to only the Ryders, their descendants, and entities owned by the Ryders or their descendants. And the LLC's stated material purpose remained Ryder family estate planning.

Ryder gave a copy of this amendment to the Commissioner's counsel only a week before trial. The Commissioner now questions its true date. The amendment states its effective date is January 10, 2003--the same date as the original operating agreement--but the signatures on it are all undated. Ryder admits that this amendment was not signed that day but claims instead that it was a retroactive amendment memorializing earlier oral agreements to change the operating agreement. Besides this testimony, there is no proof of any such oral agreement. We find it odd that First Counsel Capital, LLC, and BFA became new members as of January 2003--if this amendment is to be believed--as neither was listed in Ryder Ranch's General Ledger as contributing money to it in 2003. Ryder Ranch Co., LLC's 2003 Form 1065 fails to list either First Counsel Capital,

[*147] LLC, or BFA as a member. When asked about this operating agreement at trial, Ryder suggested "look[ing] at the hard drive [to] see when that document was created." We did. The hard drive contains multiple versions of this first amendment, but the one that most closely resembles the one we have was last modified on February 13, 2007, two months before Ryder Ranch Co., LLC, finally filed its 2003 Form 1065.

Then there's the second full Amended and Restated Operating Agreement, with an effective date of January 1, 2007, but signed on April 20, 2011. This operating agreement states that is was executed to eliminate the confusion that arose surrounding true ownership of the company and the funds that had been invested in it. It purports to resolve these issues after having conducted "a complete accounting and reconciliation of the funds invested in the Company." It states the company's name is Ryder Ranch Co., LLC, and lists the Ryders and First Counsel Capital, Inc., as its members. It lacks any reference to the original's statement that its purpose was to help the Ryders plan their estate, and omits the original agreement's restrictions on transfer of ownership. The loss-allocation provision and the Ryders' supposed obligation to fund the company when their capital account balance went negative did make the move from the alleged first amendment to this second operating agreement. The Commissioner first learned

[*148] of this second operating agreement when Ryder produced it to one of the revenue agents who was auditing him, just a few days after the Ryders signed it.

Things get even curiouser with the second alleged amendment to the operating agreement, which on paper states that it was effective February 12, 2007, but whose signatures are undated. Its only major alteration was to change the name of the company to Ryder Ranches, LLC, in accordance with the amended articles of organization that were filed around that time. But the list of members matches that of the first amendment. This itself is odd since First Counsel Capital, *LLC*, didn't exist in 2007--it had been converted into a corporation, First Counsel Capital, *Inc.*, back in April 2006. And besides, Ryder Ranches, LLC's Form 1065 for 2007 lists only two members, Ryder and First Counsel Capital, Inc.

Topping it all off is Ryder Ranch's *third* operating agreement. It has an effective date of May 28, 2009, about a week before the company filed its second amendment to its articles of organization. This third operating agreement lists only the Ryders as members, each with a 50% interest and an initial contribution of "$50,000.00 Plus Future Capital Funding as Required for Company Operations." Further calling into question the reliability of the previous amendments is the fact that this version includes as an attachment the original operating agreement but makes no reference to any of the subsequent amendments.

**[\*149]**  There is an obvious reason for this operating agreement.

It was adopted less than a month after the determination of the Cochise County Farm Service Agency (FSA)[59] committee that Ryder Ranch Co., LLC, couldn't receive federal-government subsidies because each of its members did not make a contribution of active personal labor or active personal management to the farming operations.[60]  Ryder was not happy about this determination, so on June 3, 2009, he sent a letter asking for reconsideration.  In this letter, Ryder stated that the operating plan that he'd submitted with Ryder Ranch Co., LLC's request for subsidy payments had mistakenly not reflected that Ryder Investment Partners was "no longer involved in any manner whatsoever with Ryder Ranch Company, LLC."  Two days later, Ryder filed amended articles of organization, taking care

---

[59] The FSA is an agency under the U.S. Department of Agriculture with a network of national offices that provides a series of programs to farmers, ranchers, and agricultural partners.  The FSA administers farm commodity and disaster programs, as well as credit, loan, and marketing programs.  See Farm Service Agency Programs, United States Department of Agriculture (August 2016), https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/2016/farm_service_agency_programs.pdf.

[60] Ryder Investment Partners, Ltd., which up to then was identified in the operating agreement as a member of the company, could not participate in active personal labor or active personal management, as only the Ryders were managers of the company according to the articles of organization.

[*150] to state that the only members were the Ryders themselves, and "Ryder Investment Partners, Ltd. is not a member of the LLC."

This was not the first time that the Ryders were listed as the owners of Ryder Ranch Co., LLC, in the company's filings to the U.S. Department of Agriculture. On April 8, 2003, Mrs. Ryder submitted to the U.S. Department of Agriculture a form for "Farm Operating Plan for Payment Eligibility Review for Corporations, Limited Partnerships or Other Similar Entities." The form submitted listed the members of Ryder Ranch Co., LLC, as the Ryders and Ryder Investment Partners, Ltd., the same as were listed on the 2003 operating agreement. The form lists the Ryders personally as the owners of Ryder Investment Partners, Ltd. Then again on April 1, 2004, a form entitled "Member's Information" was filled out for Ryder Ranch Co., LLC, by an employee of the company who worked as its liaison with different governmental entities. This form listed the members of Ryder Ranch Co., LLC, as the Ryders and Ryder Investment Partners, Ltd. Like the Farm Operating Plan form from 2003, this form stated that the Ryders each owned 4.545% of the company, while Ryder Investment Partners, Ltd., owned 90.91%.

Another employee of Ryder Ranch Co., LLC, named Jacob Ward worked as the ranch manager from 2004 to 2009 and handled the day-to-day activities on the

[*151] ranches. Part of his job was submitting paperwork to the U.S. Department of Agriculture so Ryder Ranch Co., LLC, could receive government subsidies. Before Ward did this, he would check with the Ryders to have them verify that nothing had changed that would require changes on any forms from what had previously been submitted. Ward credibly testified that he was never told by Ryder that anything had changed, so each year he would merely recertify the forms and send them in. One such form was a "Farm Operating Plan for an Entity" for the "2009 and Subsequent Program Years" filled out on March 11, 2009. On this form, Ward listed the members of Ryder Ranch Co., LLC as the Ryders and Ryder Investment Partners, Ltd.

The picture of ownership percentages for Ryder Ranch Co., LLC, gets even muddier when one looks at the different Forms 1065 filed by Ryder. The Forms 1065 for tax years 2003-11 list the following members and their alleged ownership percentages:

[*152]

| Member | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| Ernest Ryder | 12.07 | 11.85 | 11.62 | 15.33 | 26.51 | 26.68 | 28.37 | 27.11 | 26.71 |
| Patricia Ryder | 12.07 | 11.85 | 11.62 | 15.33 | N/A | N/A | N/A | N/A | N/A |
| Alster Invs., Inc. | 9.56 | 6.30 | 3.69 | 2.97 | N/A | N/A | N/A | N/A | N/A |
| MBSP Invs., Inc. | 48.91 | 32.27 | 18.91 | 15.18 | N/A | N/A | N/A | N/A | N/A |
| Turnour Invs., Inc. | 17.28 | 12.17 | 7.15 | 5.74 | N/A | N/A | N/A | N/A | N/A |
| Ryder Inv. Partners, Ltd. | 0.12 | 0.09 | 0.36 | 0.29 | N/A | N/A | N/A | N/A | N/A |
| Spanky Invs., Inc. | N/A | 2.16 | 1.27 | 1.02 | N/A | N/A | N/A | N/A | N/A |
| First Counsel Capital, LLC/ Inc. | N/A | 23.32 | 44.55 | 43.49 | 73.49 | 73.32 | 71.63 | 72.89 | 73.29 |
| Pattern Partners | N/A | N/A | 0.84 | 0.67 | N/A | N/A | N/A | N/A | N/A |

[*153] Each and every Form 1065 was filed untimely for the 2003 through 2011 tax years because, according to Ryder, it is better to commit a misdemeanor than a felony.

| Form 1065 tax year | Date filed |
|---|---|
| 2003 | 4/5/2007 |
| 2004 | 4/5/2007 |
| 2005 | 1/21/2009 |
| 2006 | 8/18/2009 |
| 2007 | 1/26/2016 |
| 2008 | 1/26/2016 |
| 2009 | 2/11/2016 |
| 2010 | 2/24/2016 |
| 2011 | 5/27/2016 |

The late-filing issues for these forms were not the only problem. There were inconsistencies when comparing the memberships listed in the various iterations of the articles of organization to the Form 1065 K-1s. The first was that the original articles of organization and its first amendment, together effective from 2003 to 2009, listed Ryder Investment Partners, Ltd., as the only member having at least a 20% interest in Ryder Ranch Co., LLC; but the 1065s never showed it having more than a 0.4% interest, while MBSP Investments, Inc., and First Counsel Capital, LLC (later Inc.), both had more than a 20% interest during that

[*154] time.  The second was that the second amendment to the articles of organization, effective as of 2009, listed the Ryders as the only members having at least a 20% interest in the LLC; but the 1065s for 2009-11 showed First Counsel Capital, Inc., with more than a 70% interest during those years, and didn't list Mrs. Ryder as having any interest at all.

### 2. Pattern Farms, LLC

When Pattern Farms, LLC, was organized, Ryder reported himself and his wife as managers and Ryder Investment Partners, Ltd., as a member.  The operating agreement was consistent with the articles, which also reported both the Ryders and Ryder Investment Partners, Ltd., as members.  Pattern's original operating agreement, like Ryder Ranch's, had a "Family Estate Planning Objectives" section.

Documents stating the membership of Pattern Farms, LLC, were first filed with the U.S. Department of Agriculture on April 1, 2004.  This initial filing listed the Ryders and Ryder Investment Partners, Ltd., as the members in 2004.  Just as he had for Ryder Ranch Co., LLC, Jacob Ward checked with Ryder to make sure nothing had changed that would require the information on the forms to be updated.  Since he was not told that anything had changed, he certified these

[*155] documents and refiled them in 2009 using a power of attorney for Pattern Farms, LLC. This refiling listed the same membership as for 2004.

Then came another letter from the Cochise County FSA Committee in May 2009 that warned the subsidy payments to Pattern would have to stop because all of its members did not contribute active personal labor, management, or a combination of the two to the ranch's operation. Ryder amended Pattern's articles of organization to certify that the Ryders were still member-managers but that Ryder Investment Partners, Ltd., no longer was. Two years later he signed and dated an amended operating agreement, though the amendment stated it was "entered into and made effective as of January 10, 2003." It removed the "Family Estate Planning Objectives" section and stated that the only member of Pattern Farms, LLC, was Ryder Ranch Co., LLC. Then in 2013 he amended Pattern's articles of organization to conform with the amended operating agreement and remove both himself and his wife as members and make only Ryder Ranch Co., LLC, a member. Ryder also filed a new "Member's Information" form with the U.S. Department of Agriculture on May 24, 2011, that listed Ryder Ranch Co., LLC, as the 100% owner and only member of Pattern Farms, LLC. This same form listed the members of Ryder Ranch Co., LLC, as the Ryders and First

[*156] Counsel Capital, Inc., which is the same membership listed on Ryder Ranch Co., LLC's filing with the U.S. Department of Agriculture for that year.

We don't know how Pattern would have reported all these fluctuations on its tax returns for the years at issue because it didn't file any. Ryder argues that the last bit of paperwork he filed--the amended articles of organization that made Ryder Ranch the sole member of Pattern--made Pattern into a disregarded entity[61] that didn't have to file. But an amendment filed in 2013 does not change Pattern's ownership for prior tax years. Rather, we will hold the Ryders to their paperwork--the articles of organization, the operating agreements, and the filings with the U.S. Department of Agriculture--which shows that Ryder Ranch Company, LLC, was not a member until 2011, and the Ryders themselves were the only members from May 28, 2009, to 2011.

### 3. Canyon View Ranch, LLC

Canyon View Ranch, LLC's articles, filed in April 2003, listed the Ryders as managers and stated that no other members had at least a 20% interest in its capital or profits. Its operating agreement, effective that same month, listed only the Ryders and Ryder Investment Partners, Ltd., as its members. This operating

---

[61] For income tax purposes, an LLC with only one member may be treated as the member's sole proprietorship--otherwise known as a "disregarded entity." See sec. 301.7701-3, Proced. & Admin. Regs.

[*157] agreement included a "Family Estate Planning Objectives" section laying out that a material purpose of the company is to further the estate planning objectives of the Ryders.

Ryder executed in April 2011 an amended operating agreement with a purported effective date of April 2003. It removed the "Family Estate Planning Objectives" section and listed Ryder Ranch Co., LLC, as the only member of Canyon View Ranch, LLC.

### 4. Ryder Red Rock Ranch, LLC

Ryder filed Ryder Red Rock Ranch, LLC's articles of organization in April 2003. They listed Ryder as the company's registered agent and stated that the company's management is 100% vested in a manager. But they listed no specific managers or members. The company's operating agreement did state that the Ryders and Ryder Investment Partners, Ltd., were its members. This operating agreement again contained a "Family Estate Planning Objectives" section, as had the other 2003 operating agreements of Ryder Ranch Company, Pattern Farms, and Canyon View.

In 2011, Ryder began retroactively amending again. He signed an amended operating agreement that had a purported effective date of April 2003. This operating agreement no longer contained a "Family Estate Planning Objectives"

[*158] statement and listed Ryder Ranch Co., LLC, as the only member of Ryder Red Rock Ranch, LLC.

###### 5. Rodeo Holdings, LLC

Ryder filed Rodeo Holdings, LLC's articles of organization in February 2006. They did not list any managers or members. But Ryder kept tinkering. We don't have Rodeo Holdings's original operating agreement, but there is a 2011 amended operating agreement that states Ryder Ranch is the only member. It's dated April 20, 2011, but rather dubiously claims to be effective as of April 2003-- three years before Rodeo Holdings was organized. We make the same finding-- the 2011 amended operating agreement is not effective for tax years before 2011.

What can one tell from all this? First, we notice that Ryder deleted all the "Family Estate Planning Objectives" provisions in each operating agreement in 2011. By then Ryder aimed to have paperwork that showed multiple unrelated parties holding membership interests in these ranch entities. We find it more likely than not that he deleted family estate planning as an objective only because it would be so odd for supposedly unrelated companies to provide hundreds of thousands--or millions--of dollars to entities that had the stated purpose of helping the Ryder family.

[*159] Then come Ryder's assertions that all these LLCs were disregarded entities of Ryder Ranch Co., LLC, because of amendments he drafted in 2011 to papers that he had filed eight years before. This doesn't work, because these amendments were not agreed to before the due date of the partnership return for the tax year the modifications affect. See sec. 761(c).

And then there is Ryder's quest to keep open the spigot for government subsidies. The receipt of these subsidies depended on each LLC's members' making personal contributions of labor or management to the farming operations. We find it more likely than not that a desire for these subsidies was what caused Ryder to submit documents to the U.S. Department of Agriculture that said the only members of the ranch entities were the Ryders. We also find it more likely than not that Ryder amended the paperwork in 2011 to show First Counsel Capital as a member of Ryder Ranch when he wanted to make it seem there were third-party investors. Even this doesn't work--he stated that the owner of First Counsel Capital was Counselor Capital, Inc., which was owned by R&A (which was itself owned by the Ryders), and "Trust for the Interests of Ernest S. Ryder Under the Ryder Law Corporation Retirement Savings Plan," which the Ryders also owned.

Ryder's attempts to keep changing the paper ownership of Ryder Ranch-- the whole maelstrom of contradictory subsidy forms, tax forms, membership

**[*160]** agreements, and the operating agreements--don't persuade us. We find instead that the true owners of Ryder Ranch were ultimately the Ryders themselves. The evidence on the record shows its ownership for the years at issue to be:

| Dates | Members |
|---|---|
| Jan. 10, 2003, to May 27, 2009 | Ernest Ryder<br>Patricia Ryder<br>Ryder Investment Partners, Ltd. |
| May 28, 2009, to Dec. 31, 2010 | Ernest Ryder<br>Patricia Ryder |
| Jan. 1, 2011, to Dec. 31, 2011 | Ernest Ryder<br>Patricia Ryder<br>First Counsel Capital, Inc. |

We therefore hold that the Ryders owned 100% of Ryder Ranch Co., LLC, either directly or indirectly for the years at issue. They also then owned, directly or indirectly, Pattern Farms, LLC; Canyon View Ranch, LLC; Ryder Red Rock Ranch, LLC; and Rodeo Holdings, LLC. The funds being contributed to these ranch entities came from R&A and should be treated as dividend income to the Ryders for all the years at issue. See Akland v. Commissioner, 767 F.2d 618, 620-21 (9th Cir. 1985), aff'g T.C. Memo. 1983-249; Meridian Wood Prods. Co., 725 F.2d at 1191.

[*161] C.    <u>Dividend Income From Payments to American Express and Ben Leland Construction, Inc.</u>

| 2010 and 2011 | |
| --- | --- |
| Description | Amount |
| American Express Payments | $392,558.82 |
| Payments to Ben Leland Construction | 456,988.67 |
| Total | 849,547.49 |

The Commissioner asks us to find that the Ryders received constructive dividends when R&A paid their bills from American Express and a contractor who worked on their home. He argues that these payments came from the earnings and profits of R&A and were made for Ryder's personal benefit. <u>See</u> sec. 301(c)(1); <u>see also</u> <u>Akland</u>, 767 F.2d at 620; <u>Erickson v. Commissioner</u>, 598 F.2d 525, 531 (9th Cir. 1979), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1976-147.

Ryder has several counterarguments. He claims that some of the money that the Commissioner identified is traceable to an insurance payment on the Ryders' home for water damage. This money was deposited into R&A's bank account during 2010 and 2011 and used to pay for the house repairs needed. He also stated that the charges on the American Express card were included in the advances to Ryder, which were transferred from R&A to RLC as compensation for Ryder's services rendered. The accounts used in the Commissioner's BDA when

[*162] analyzing the American Express statements do not explicitly show the payments coming from R&A, but Ryder's brief admits to this. Ryder instead just claims that they still do not need to be included in his income.

Before 2010 Ryder had run similar payments from R&A through RLC and recorded them as advances on compensation to RLC for Ryder's services. Ryder claims this is what occurred for these 2010 and 2011 expenses as well, but failed to cite to any evidence in the record to back up these assertions.[62] We also find that these payments to Ben Leland Construction for the years 2010 and 2011 are dividend income to the Ryders. See Meridian Wood Prods. Co., 725 F.2d at 1191.

Ryder points to a small number of the American Express payments and claims that they were connected with his house's construction, but this claim is not supported by the record. The American Express statements on record--which the Commissioner used in computing the amount of dividend income to be included by the Ryders--show payments made for personal expenses. Some of these include grocery-store payments and charges for restaurant meals and gasoline.

---

[62] For these earlier years, these types of payments were included in the dividend income coming through RLC. But RLC's 2010 and 2011 tax returns are not in the record, so the Commissioner included these payments as dividend income to the Ryders.

[*163] The money came from R&A, and the Ryders used it to pay their personal expenses. It is dividend income to them for 2010 and 2011.

D.    Summary

We find that the Commissioner accurately traced funds through Ryder's numerous accounts and avoided double-counting the different categories of constructive dividends that Ryder received. We note especially that the Commissioner's analyses eliminated the circular flow of funds that Ryder set in motion to create the appearance that he was boosting his basis in RLC by contributing capital to it.

There is almost always some imprecision when the Commissioner conducts bank-deposit analyses. Taxpayers are free to point out to us items or categories or times or accounts that for some specific reason we should find are not taxable. Ryder's challenges, however, lacked any specificity. He argued instead at the wholesale level--that we must treat each of the many entities he breathed into life as what he labeled them and not as what they really were. Once this argument failed--as it did when we held that the income from the tax products was gross receipts of R&A--his fallback argument was that he had managed to shift ownership of the ranches away from himself and his wife. He finally challenged the amount of the dividend adjustment on the procedural ground that the

[*164] Commissioner assumed the burden of proof on the issue when he changed his calculation of this constructive dividend after trial.

This doesn't matter. We find by a preponderance of the evidence that the Ryders are liable for tax on the unreported dividend income received during the tax years 2003-11 in the following amounts:

| Year | RLC | Ranch property | AMEX/ Ben Leland | Total |
|---|---|---|---|---|
| 2003 | ($32,775.00) | $1,447,407.89 | --- | $1,414,632.89 |
| 2004 | 95,480.12 | 717,140.00 | --- | 812,620.12 |
| 2005 | 6,348,667.59 | 1,430,900.56 | --- | 7,779,568.15 |
| 2006 | 1,312,645.80 | 790,299.76 | --- | 2,102,945.56 |
| 2007 | 585,205.40 | 1,074,830.55 | --- | 1,660,035.95 |
| 2008 | (205,704.55) | 480,112.60 | --- | 274,408.05 |
| 2009 | 151,583.70 | 183,800.00 | --- | 335,383.70 |
| 2010 | --- | 396,400.00 | $260,705.75 | 657,105.75 |
| 2011 | --- | 326,502.75 | 588,841.74 | 915,344.49 |
| Total | 8,255,103.06 | 6,847,394.11 | 849,547.49 | 15,952,044.70 |

IV. Remaining Issues

A. Ryder Ranch Losses

The Ryders claimed pass-through losses from Ryder Ranch Co., LLC, for every tax year from 2003 through 2011 (with the exception, curiously, of 2008).

[*165] We must decide only whether to disallow Ryder Ranch's losses for 2003-2007. The Commissioner says that Ryder Ranch was a passive activity for the Ryders during those years and that, for 2005 and 2006, Ryder Ranch failed to substantiate its deductions. See supra pp. 76-79.

### 1. Jurisdiction

Before we can determine whether the Ryders and Ryder Ranch can claim these deductions, we must decide the threshold question of our jurisdiction. The Tax Court is a court of limited jurisdiction, sec. 7442, and may exercise jurisdiction only to the extent expressly authorized by Congress, Gray v. Commissioner, 138 T.C. 295, 298 (2012). We have jurisdiction to determine the tax liability of an individual taxpayer if and only if the Commissioner issues a valid notice of deficiency to the taxpayer and the taxpayer challenges that notice by timely filing a petition with this Court. Secs. 6212 and 6213; Freytag v. Commissioner, 110 T.C. 35, 39 (1998). "Our jurisdiction is based on the snapshot in time when [a] petitioner timely file[s] the petition." Fisher v. Commissioner, T.C. Memo. 2008-256, 2008 WL 4907205, at *2. As a general proposition, once our jurisdiction is invoked, it "remains unimpaired until the controversy is decided." Id. (citing Freytag, 110 T.C. at 39).

**[\*166]** But Ryder Ranch is not a taxpayer; it's a limited liability company that is treated as a partnership for tax purposes. Partnerships file information returns, which its partners are supposed to use to fill out their own individual returns. See secs. 6031, 6222(a). TEFRA, see supra note 39, established a "unified regulatory scheme for controlling the audit and litigation of partnership interests." See Adkison v. Commissioner, 592 F.3d 1050, 1053 (9th Cir. 2010). Rather than audit each partner's individual return, the Commissioner adjusts "partnership item[s]"--a term defined by section 6231(a)(3)--at the partnership level. See Roberts v. Commissioner, 94 T.C. 853, 859-60 (1990). Those adjustments are then binding on all partners. See id.; see also Carrino v. Commissioner, T.C. Memo. 2014-34, at \*9 n.11. As part of a partnership proceeding, the Commissioner must issue an FPAA to the partnership's tax matters partner. See sec. 6223; Gustin v. Commissioner, T.C. Memo. 2002-64, 2002 WL 359999, at \*2. The partners then have 150 days to petition this Court for readjustment, giving us jurisdiction to determine any partnership item for the year to which the FPAA relates, as well as "the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item." See sec. 6226(f); see also 436, Ltd. v. Commissioner, T.C. Memo. 2015-28, at \*28. We cannot determine "nonpartnership items"--which are

[*167] simply those items that are not partnership items--in a partnership-level proceeding. See 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49, at *46. Nor can we determine "affected items," which are nonpartnership items that are "affected by the determination of a partnership item." Id. Determinations of nonpartnership items must be made at the partner level, 436, Ltd., T.C. Memo. 2015-28, at *29, and determinations of affected items, because they depend on partnership-level determinations, cannot be made while a partnership-level proceeding is pending, see Meruelo v. Commissioner, 691 F.3d 1108, 1116 (9th Cir. 2012) (quoting Adkison, 592 F.3d at 1053). Any notice of deficiency issued while a partnership-level proceeding is pending is invalid to the extent it adjusts any affected item. Id. at 1115. The Commissioner may, however, "issue an affected-items notice of deficiency without opening and closing a partnership-level proceeding as long as the Commissioner is bound by the partnership items as reflected on the partnership's return." Maines v. Commissioner, 144 T.C. 123, 126 n.4 (2015).

Ryder Ranch Co., LLC, was a TEFRA entity at least during 2003-07. The Commissioner issued an FPAA for Ryder Ranch's 2005 and 2006 tax years on December 20, 2011. Ryder Ranch timely filed its petition for readjustment of items on that FPAA, so we have jurisdiction to determine any partnership items for

[*168] those years.  See sec. 6226.  The Commissioner also issued an FPAA for Ryder Ranch's 2007 tax year on December 19, 2018, but that case has not been consolidated here and we therefore cannot determine any partnership items for that year.  The fact that the Commissioner never issued an FPAA for 2003 or 2004 indicates that he accepts Ryder Ranch's partnership returns for those years as filed and puts the partnership items for those years beyond our jurisdiction to determine.  See Meruelo, 691 F.3d at 1116-17.

But what about the affected items?  The Commissioner issued a notice of deficiency to the Ryders for their 2002-04 tax years on March 26, 2010.  The Ryders timely filed a petition challenging that notice, so we have jurisdiction to determine any affected items for those three years.  See sec. 6213.  The Commissioner also issued a notice of deficiency to the Ryders for their 2005-07 tax years on January 17, 2012, just under one month after he issued the FPAA for 2005 and 2006, and nearly six years before he issued the FPAA for 2007.[63]  The Ryders again timely petitioned this court after they got that notice, but because there was a partnership-level proceeding pending for 2005 and 2006 when the Commissioner issued it, we lack jurisdiction to determine any affected items for

_____

[63] We don't fault the Commissioner for waiting to issue the FPAA for 2007; Ryder Ranch didn't file its partnership return for that year until 2016, shortly before the first trial for these cases began.

[*169] those years. We do have jurisdiction, though, for 2007 because the FPAA

for that year had not yet been issued when the petition was filed.

### 2. Material Participation

The first issue we'll look at is whether the Ryders materially participated in

Ryder Ranch's operations. This is potentially decisive because section 469

sharply limits a taxpayer's right to deduct the ordinary and necessary expenses of

carrying on a trade or business when the expenses are for a "passive activity". A

"passive activity" is "any activity * * * which involves the conduct of any trade or

business, and * * * in which the taxpayer does not materially participate." Sec.

469(c)(1). The question of whether a loss is due to a passive activity under section

469 is an affected item, Estate of Quick v. Commissioner, 110 T.C. 172, 188

(1998), supplemented by 110 T.C. 440 (1988), so we limit our analysis to the

Ryders' involvement in tax years 2003, 2004, and 2007.

The Code tells us that "material participation" means being "involved in the

operations of the activity" on a regular, continuous, and substantial basis. Sec.

469(h)(1). If a married couple goes into business together, we look at their

combined activity to decide if it amounts to material participation. Id. para. (5).

The regulations provide seven--and only seven--ways a taxpayer can prove that he

materially participated. See sec. 1.469-5T(a), Temporary Income Tax Regs., 53

[*170] Fed. Reg. 5725-26 (Feb. 25, 1988). The Ryders rely on paragraph (a)(1), which creates a quantitative test; that section tells us to find "material participation" if a taxpayer "participates in the activity for more than 500 hours during such year." The regulations also tell us what to count: "[A]ny work done by an individual * * * in connection with an activity in which the individual owns an interest at the time the work is done shall be treated * * * as participation of the individual in the activity." Sec. 1.469-5(f)(1), Income Tax Regs.

This is a good, clear, bright-line test, but it demands proof of the number of hours that a person spends on an activity. See sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). We normally see this in the form of activity logs. Ryder did not produce any logs during the long audits that led to these cases, but did come up with one a week before the Phoenix portion of the trial. He also had testimony from several witnesses that he met the 500-hour requirement for each year. The Commissioner questions the credibility of Ryder's logs and also claims that much of the time included cannot count toward material participation. Mrs. Ryder failed to keep any log of her activities, but she testified that she worked at the ranches on a regular, continuous, and substantial basis.

The regulations do state that "[c]ontemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be

[*171] established by other reasonable means." Id. And "[r]easonable means * * * may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services * * * based on appointment books, calendars, or narrative summaries." Id. But we have often held that "we don't have to accept unverified, undocumented testimony about how a taxpayer spent her time." Estate of Ramirez v. Commissioner, T.C. Memo. 2018-196, at *17; see also Robison v. Commissioner, T.C. Memo. 2018-88, at *26. With these standards in mind, let's look at the log.

We first notice that these logs are flawed on their face. Ryder's description of his work is often missing--e.g., on May 25, 26, and 27, 2007, the logs list 9, 8, and 8 hours of work each day, respectively, accompanied by "[no description]"-- and other times the description is a bit vague--e.g., on April 5, 6, and 7, 2007, the logs report 25 total hours with the description "Ranch matters." We find that hours described in so laconic a manner do not count toward the 500 hours that Ryder says he can prove.

Then there's the problem that Ryder's logs list many activities that are more those of an investor than a rancher. "Work done by an individual in the individual's capacity as an investor in an activity shall not be treated as participation in the activity * * * unless the individual is directly involved in the

[*172] day-to-day management or operations of the activity." Sec. 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., supra; see also Shaw v. Commissioner, T.C. Memo. 2002-35, 2002 WL 187515, at *8 (holding that a taxpayer's time spent performing "investor type activities" wasn't material performance where others managed day-to-day operations). But Ryder was not "directly involved in the day-to-day management" of the ranches--he paid a full-time day-to-day manager beginning in 2004 to do that instead. Ryder's logs include time entries working on "projections", research, reviewing records, and similar activities. The regulation tells us that this makes them investor-type activities, see sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., supra, so these hours don't count toward the 500 either.

We also have a serious problem with the logs' authenticity. They were printed on June 6, 2016. We understand that this does not prove that Ryder created them in 2016, but he provided no proof as to exactly when he did. We also understand that the Code and regs do not require contemporaneous reports, and that an individual can establish his participation by other reasonable means. Id. subpara. (4). But Ryder's logs are not reasonable. Littered through them are many entries we find hard to believe--such as Ryder's working a 21-hour day, including a 9-hour drive--or that are clearly unrelated to the ranch's operations--

[*173] such as the 1.2 hours on June 26, 2007, when Ryder "took a nap." All of this makes it extremely difficult to figure out how many hours Ryder was materially participating, and undermines our confidence in the veracity of these logs and the testimony about them.

We therefore find the passthrough losses for the years 2003, 2004, and 2007 are passive under section 469, which means the Ryders may not deduct any of them.

### 3. Substantiation

We next turn to whether Ryder Ranch can substantiate the expenses it deducted on its Forms 1065 for 2005 and 2006. This is a partnership item that we have jurisdiction to determine. See Sugarloaf Fund, LLC v. Commissioner, T.C. Memo. 2018-181, at *19, aff'd, 953 F.3d 439 (7th Cir. 2020). Just like R&A, see supra p. 131-32, Ryder Ranch failed to introduce any evidence about any of these expenses. Ryder makes a general claim that "[t]he record in [these cases] is replete with the books and records and financial statements of these entities," but fails to point us to which records specifically substantiate his claims. He also urges us to rely on the Cohan rule to estimate Ryder Ranch's expenses if we are unable to calculate their exact amounts. See Cohan, 39 F.2d at 543-44; see also supra p. 133. But this would require him to provide at least some reasonable

[*174] evidence from which to estimate a deductible amount. See Obot v.

Commissioner, T.C. Memo. 2005-195, 2005 WL 2078508, at *3. With a record of

more than 8 million pages, general references to "the record" are entirely

unhelpful and requests to estimate expenses unwarranted. Ryder's failure to

address the specific deductions in question leads us to find that he has conceded

the issue. See Mendes, 121 T.C. at 312-13; Rybak, 91 T.C. at 566.

B.    Ordinary Losses From California Pasteleria for 2003 and 2004

| Year | Share of income per return | Adjustments from disallowed deductions | Share of income per exam |
|------|------|------|------|
| 2003 | ($168,423) | $185,448.83 | $17,025.83 |
| 2004 | 6,2471 | 21,109.60 | 83,580.60 |

Mrs. Ryder's cookie business--California Pasteleria, Inc.--also came under

the Commissioner's scrutiny. He disallowed deductions for losses from the

business's 2003, 2004, and 2006 tax years. Ryder conceded this issue for the 2006

tax year--see supra note 38--which seemed to leave us to figure out the 2003 and

2004 tax years. But as with R&A and Ryder Ranch, Ryder never addressed these

deductions in his answering brief with any particularity. We again find that he has

conceded the issue. See Mendes, 121 T.C. at 312-13; Rybak, 91 T.C. at 566.

**[*175]** Even without a concession, we'd still find for the Commissioner on these deductions. Whether an expense is ordinary and necessary is generally a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). It's "ordinary" if "the transaction which gives rise to it [is] of common or frequent occurrence in the type of business involved." Deputy v. Du Pont, 308 U.S. 488, 495 (1940) (citing Welch v. Helvering, 290 U.S. 111, 114 (1933)). It's "necessary" if it is "appropriate and helpful" to the taxpayer's business. Welch, 290 U.S. at 113. Expenses must also be reasonable in amount. Boser v. Commissioner, 77 T.C. 1124, 1133 (1981). Nothing in the enormous record would help us make findings of fact about these elements for these deductions.

Ryder failed to carry his burden to show that California Pasteleria was entitled to these deductions.

C.    Investment Interest Expense for 2005 and Unreimbursed Employee Expenses for 2006 Through 2008

The Commissioner disallowed other deductions taken by Ryder for tax years 2005, 2006, 2007, and 2008. Ryder labeled the contested 2005 deduction as investment interest, and the 2006, 2007, and 2008 deductions as unreimbursed employee business expenses. In his answering brief, Ryder claimed for the first time that he should have labeled these expenses "business interest." This was the

[*176] first time he raised this issue. And there is nothing on the record showing that these amounts of "business interest" were actually paid or incurred--Ryder did not even attempt to point the Court in the right direction for where these costs could be substantiated.

We will deny the deductions.

V.    Penalties

This leaves penalties. As with most of the issues in these cases, whether R&A and the Ryders owe penalties is rather complicated.[64] We'll begin by summarizing what the Commissioner determined, then what is left after concessions. Some of the remaining penalties evaporate for the Commissioner's procedural failures, which will leave only a handful for us to discuss.

The clearest way to summarize what the Commissioner put in play is with a literal checklist of year and type of penalty:

---

[64] We have found that the money from clients is taxable income of R&A, and the Commissioner agrees that it is not taxable income of First Counsel Capital, Inc. We therefore find that First Counsel owes none of the penalties the Commissioner asserted against it.

| [*177] | R&A | | | | | |
|---|---|---|---|---|---|---|
| Tax year | Failure to file- 6651(a)(1) | Failure to pay- 6651(a)(2) | Failure to pay- 6655 | Fraud- 6663 | Fraud- 6651(f) | Accuracy-related- 6662 "Other Deductions" |
| 2003 | | | | | | |
| 2004 | | | | | | |
| 2005 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| 2006 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| 2007 | ✓ | ✓ | ✓ | ✓ | ✓ | |
| 2008 | ✓ | ✓ | ✓ | ✓ | ✓ | |
| 2009 | ✓ | ✓ | ✓ | ✓ | ✓ | |
| 2010 | | | | | | |
| 2011 | | | | | | |

| [*178] | Ryders | | | |
|---|---|---|---|---|
| Tax year | Fraud-6663 | Fraud-6651(f) | Accuracy-related-6662 | Failure to file-6651(a)(1) |
| 2002 | ✓ | ✓ | ✓ | |
| 2003 | ✓ | ✓ | ✓ | ✓ |
| 2004 | ✓ | ✓ | ✓ | ✓ |
| 2005 | ✓ | ✓ | ✓ | ✓ |
| 2006 | ✓ | ✓ | ✓ | ✓ |
| 2007 | ✓ | ✓ | ✓ | ✓ |
| 2008 | ✓ | ✓ | ✓ | ✓ |
| 2009 | ✓ | ✓ | ✓ | ✓ |
| 2010 | ✓ | ✓ | ✓ | |
| 2011 | ✓ | ✓ | ✓ | |

Ryder has conceded many of these penalties at issue by failing to discuss them in his posttrial brief. See Mendes, 121 T.C. at 312-13; Rybak, 91 T.C. at 566. These are:

- the accuracy-related penalties under section 6662 against R&A for 2005 and 2006 and against the Ryders individually for 2002 through 2011;

- the additions to tax against R&A under section 6651(a)(1) for 2005 through 2009, under section 6651(a)(2) for 2005 through 2009, and under section 6655 for 2007 through 2009;[65] and

---

[65] R&A didn't address the section 6655 additions to tax for 2005 and 2006,

(continued...)

[*179]

- the additions to tax against the Ryders under section 6651(a)(1) for 2003 through 2009.

We have also made clear that the Commissioner cannot assert a penalty in a notice of deficiency or an amended answer unless it is "personally approved (in writing) by the immediate supervisor of the individual making such determination," see Graev III, 149 T.C. at 493 (quoting section 6751(b)(1)) (citing Chai v. Commissioner, 851 F.3d 190, (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), unless the determination falls within section 6751(b)(2)'s exceptions, see Walquist v. Commissioner, 152 T.C. 61, 69 (2019).[66] The Commissioner bears the burden of production to show compliance with this requirement. See sec. 7491(c). Graev III led the Commissioner to concede the section 6663 fraud penalty against both R&A and the Ryders individually for each year at issue. He also conceded the fraud penalty against the Ryders under section 6651(f) for all years except 2009, and the accuracy-related penalty against the

---

[65](...continued)
which we deem a concession.

[66] These exceptions are for additions to tax under sections 6651, 6654, or 6655. See section 6751(b)(2)(A); Beam v. Commissioner, T.C. Memo. 2017-200, at *14 (section 6751(b)(2) means what it says).

[*180] Ryders under section 6662 for 2005 through 2009.[67]  So to update our checklist with "CR" for the issues that R&A or the Ryders conceded, and with "CC" for the issues that the Commissioner conceded:

| | R&A | | | | | |
|---|---|---|---|---|---|---|
| Tax year | Failure to file- 6651(a)(1) | Failure to pay- 6651(a)(2) | Failure to pay- 6655 | Fraud- 6663 | Fraud- 6651(f) | Accuracy- related- 6662 "Other Deductions" |
| 2003 | | | | | | |
| 2004 | | | | | | |
| 2005 | **CR** | **CR** | **CR** | **CC** | ✓ | **CR** |
| 2006 | **CR** | **CR** | **CR** | **CC** | **CC** | **CR** |
| 2007 | **CR** | **CR** | **CR** | **CC** | ✓ | |
| 2008 | **CR** | **CR** | **CR** | **CC** | ✓ | |
| 2009 | **CR** | **CR** | **CR** | **CC** | ✓ | |
| 2010 | | | | | | |
| 2011 | | | | | | |

---

[67] The Ryders also conceded the 6662 penalties, but because the Commissioner bears the burden of production, see sec. 7491(c), we will ignore the Ryders' concessions and find in their favor.

| [*181] | Ryders | | | |
|---|---|---|---|---|
| Tax year | Fraud-6663 | Fraud-6651(f) | Accuracy-related-6662 | Failure to file-6651(a)(1) |
| 2002 | **CC** | **CC** | **CR** | |
| 2003 | **CC** | **CC** | **CR** | **CR** |
| 2004 | **CC** | **CC** | **CR** | **CR** |
| 2005 | **CC** | **CC** | **CC** | **CR** |
| 2006 | **CC** | **CC** | **CC** | **CR** |
| 2007 | **CC** | **CC** | **CC** | **CR** |
| 2008 | **CC** | **CC** | **CC** | **CR** |
| 2009 | **CC** | ✓ | **CC** | **CR** |
| 2010 | **CC** | **CC** | **CR** | |
| 2011 | **CC** | **CC** | **CR** | |

The only penalties left at issue as asserted against R&A are the fraudulent failure to file penalties asserted under 6651(f) for the tax years 2005 and 2007 through 2009.[68] The only penalty left at issue against the Ryders is the fraud penalty under section 6651(f) for the tax year 2009.

The Commissioner has the burden of proof, and he has to prove fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b); Clayton, 102 T.C.

---

[68] The Commissioner asserted a 6651(f) penalty for tax year 2006, but never alleged that R&A failed to timely file its return for that year. We deem this a concession.

[*182] at 646; Mohamed v. Commissioner, T.C. Memo. 2013-255, at *18.  Fraud

for tax purposes is "an intentional wrongdoing designed to evade tax believed to

be owing," DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16

(2d Cir. 1992), and "is established by proving that a taxpayer intended to evade tax

believed to be owing by conduct intended to conceal, mislead, or otherwise

prevent the collection of such tax," Clayton, 102 T.C. at 647.

When we analyze whether a taxpayer fraudulently failed to file a tax return

under section 6651(f), we focus on his "*decision* not to file [his] return when due.

If that *decision* was made with the intent to evade tax, then the addition to tax

under section 6651(f) may properly be imposed." Enayat v. Commissioner, T.C.

Memo. 2009-257, 2009 WL 3763085, at *24 (emphasis added).

We've long had a custom of calling the bits of evidence that support a

finding of fraudulent intent "badges" of fraud, and over the years we've developed

a precinctful of them.  These badges include:

- understating income;

- maintaining inadequate records;

- failing to file tax returns;

- giving implausible or inconsistent explanations of behavior;

- concealing assets;

[*183]● failing to cooperate with tax authorities;

● engaging in illegal activities;

● attempting to conceal illegal activities;

● education and experience;

● willful blindness;

● dealing in cash;

● failing to make estimated tax payments; and

● filing false documents.

See Bradford v. Commissioner, 796 F.2d 303, 307-08 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Mohamed, T.C. Memo. 2013-255, at *32-*33; Fiore v. Commissioner, T.C. Memo. 2013-21, at *21.

A.    Mrs. Ryder

We first look at the assertion of fraud against Mrs. Ryder.  The Commissioner's argument against Mrs. Ryder centers on her alleged willful blindness to the tax-avoiding activities that were going on.  Willful blindness can indicate fraudulent intent when a taxpayer was "aware of a high probability of unreported income or improper deductions, and deliberately avoided steps to confirm this awareness."  Fiore, T.C. Memo. 2013-21, at *29.  The Commissioner points to Mrs. Ryder's luxurious lifestyle and argues that this should have tipped

**[*184]** her off that something was up when her tax returns--or lack of tax returns-- showed little to no taxable income. The Commissioner also asserts that Mrs. Ryder is a "sophisticated business woman," and this should lead us to find that her failure to file was fraudulent.

We are unpersuaded.

We do not believe the evidence on the record shows clear and convincing evidence that Mrs. Ryder was in on her husband's tax-avoidance schemes or was willfully blind to them. While Mrs. Ryder does have experience as a businesswoman, she has nowhere near the tax expertise of her husband. Her lifestyle might have been a sign to Mrs. Ryder that she should have reported some taxable income, but we find it just as likely that if she thought about it at all, she could have figured he was just as good as he told his clients he was at lowering their tax bills legitimately. Without more, we will not find that the Commissioner has shown clear and convincing evidence of her fraudulent intent in failing to file. She is not liable for a section 6651(f) penalty.

**[*185]** B.   Ryder and R&A

As for R&A and Ryder himself, things are rather different.[69]

Ryder is about as well-educated as one can be in tax law.  It was his tax expertise that brought clients into R&A, and it was his use of that expertise that made the money that we've found taxable, first to R&A and then to him.  We acknowledge his position that he did not intend to evade tax, but only to seek shelter in the gray areas in the Code.

We agree that there are gray areas in tax law.  But one area that no one should consider gray is misrepresenting facts.  Especially material facts.  And instead of listing every possible badge of fraud and finding whether it is present here, we'll start with a probe of whether there is clear and convincing evidence that Ryder misrepresented material facts to evade the filing obligations of R&A and himself.

Here are some examples.

- Although Ryder claimed that his brother-in-law, Pancheri, controlled BFA, Ryder negotiated the terms of the PFA and kept signature authority over BFA's bank account himself.

---

[69] Ryder is the 100% owner and president of R&A, see supra pp. 8-9, so we look to what he did to gauge whether R&A's failure to file was fraudulent.  See Benavides & Co., P.C. v. Commissioner, T.C. Memo. 2019-115, at *35.

[*186]● Ryder claimed that the employees of R&A became RLC employees that were leased back to it through an employee leasing agreement, but his letters to clients were sent on R&A letterhead, time was kept on R&A's books, and many R&A employees credibly testified that they were employees of R&A, not RLC.

● Ryder claimed that unrelated third parties owned interests in the ranch entities, yet the operating agreements for the ranch entities stated that a material purpose of the ranch entities was to advance the family estate planning objectives of the Ryders.

● Ryder listed Michael Goldstein as the tax matters partner for First Counsel Capital, an entity that Ryder claimed owned an interest in the ranch entities, yet Goldstein credibly testified he was unaware of the ranch entities or First Counsel Capital.

● Ryder backdated the ranch operating agreements to create appearances of different ownership of these entities and cause confusion over their true ownership.

● Ryder executed a fraudulent deed of trust against his and his wife's California personal residence in favor of Construction Funding Services, LLC, which resulted in Ryder's reporting an obligation of $2.7 million. Construction Funding Services, LLC, has never existed.

● Ryder created hundreds of ESOPs and S corporations in Wyoming with fake returns that each listed $3 in income--despite Ryder's being aware that none of these entities had engaged in economic activities-- in hopes that they would be grandfathered under amendments to section 409 and usable to sell his GCO product.

These specific examples of Ryder and R&A's material misrepresentations of fact establish a pattern of conduct that Ryder and R&A continued during the years at issue.

**[\*187]** Ryder also mischaracterized sources of income by ignoring well-established law about the assignment of income. We have already found in these cases that all the work done by R&A and Ryder was essentially one giant scheme to hide sources of income. He accomplished this through the use of multiple tax products, the creation of thousands of different entities and bank accounts, and the transfer of funds between these accounts and what he called "blocker entities." Ryder argues that he lacked fraudulent intent, and believed in good faith that none of the income at issue in these cases was actually R&A's. Ryder contradicts himself though. He admits that the Son-of-BOSS tax-shelter scheme was disapproved by the Tax Court at least as far back as Salina Partnership L.P. v. Commissioner, T.C. Memo. 2000-352, when we held that obligations to close short sales and deliver on options constitute liabilities for tax purposes. R&A and Ryder then continued to promote and sell its substantially similar short-sale product for nearly two years afterward. This hardly exhibits good faith belief that these tax products were valid under the Code. This factor strongly favors a finding of fraud for R&A and Ryder.

We have outlined in great detail in this opinion how Ryder and R&A worked to conceal the income of both R&A and the Ryders individually through the sale of tax products, creation of entities, movement of funds, and assignment

**[\*188]** of income during the years at issue. Ryder's creation of complex business structures and complicated tax-avoidance strategies was done with willful intent. We are of course not saying that every complex business structure is fraudulent, but instead emphasize how Ryder's development of the tax strategies offered to R&A clients and his use of them to avoid his own tax required a great deal of preparation and work over the course of more than 20 years. The amount of effort Ryder put into these tax strategies shows that they were created with the willful intent to prevent the collection of tax.

R&A and Ryder created these numerous tax structures and agreements to mislead the Commissioner and evade tax during the years at issue. Ryder and R&A used hundreds of entities to mimic real businesses to help produce much higher retirement incomes for the clients. R&A and Ryder profited greatly from these activities, then turned around and used many of the same techniques to mislead the Commissioner and evade tax they owed. R&A entered into a sham practice funding agreement with BFA in order to move more of its money around and avoid recognizing income. Then money was funneled through blocker entities and complicated adjusting journal entries that distanced R&A and Ryder from this income even further, all in an attempt to cause confusion as to the true source of the income.

**[\*189]** Consistently understating income is strong evidence of fraud, especially when there are other circumstances showing an intent to conceal income. See Branson v. Commissioner, T.C. Memo. 2012-124, 2012 WL 1448473, at \*8; see also Parks v. Commissioner, 94 T.C. 654, 664 (1990). R&A paid no corporate income tax for a decade. And the Ryders paid a grand total of $31,143 in individual income tax over that same ten-year period--despite the tens of millions R&A brought in and passed on to them. According to the Ninth Circuit--where these cases are appealable--"repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud." Furnish v. Commissioner, 262 F.2d 727, 728-29 (9th Cir. 1958), aff'g in part, remanding in part Funk v. Commissioner, 29 T.C. 279 (1957).

Ryder argues that his promotion of tax-avoidance schemes does not support an inference of an intent to mislead. Ryder cites Kernan v. Commissioner, T.C. Memo. 2014-228, aff'd, 670 F. App'x 944 (9th Cir. 2016), to support his contention. In Kernan, however, we stated that promoting tax-avoidance products is not evidence of *illegal activity*, a completely different badge of fraud. Id. at \*26. We have inferred an intent to mislead from the promotion of tax-avoidance schemes. See Child v. Commissioner, T.C. Memo. 2010-58, 2010 WL 1141208,

[*190] at *9 ("The sham transactions petitioner participated in were designed by Evanson to mislead the Internal Revenue Service (IRS) into treating otherwise taxable income as nontaxable"). R&A's and Ryder's creation of and participation in these schemes, coupled with the actions taken to execute them, is clear and convincing evidence of an intent to mislead.

R&A failed to file its corporate tax returns for the 2007, 2008, and 2009 tax years, and the Ryders failed to file their individual tax return for the 2009 tax year. The record in these cases includes filed tax returns of R&A for the 2005 and 2006 tax years, as well as filed tax returns of the Ryders for the 2002 through 2008 and 2010 through 2011 tax years. Nonfiling by taxpayers can weigh heavily against them when their filing history shows awareness of the requirement to file. See Castillo v. Commissioner, 84 T.C. 405, 409 (1985). But again, the decision of the taxpayers not to file must be with the intent to evade tax. If a taxpayer can establish that his failure to file was due to reasonable cause and not willful neglect, then he does not owe a section 6651(f) penalty. Mohamed v. Commissioner, T.C. Memo. 2013-255, at *22. But that's not these cases. Not only did Ryder fail to show reasonable cause; he testified that he made the choice not to file. Ryder claims that he learned during his time in NYU's LL.M. program that "where you're uncertain as to how you should respond or report, you're better

**[\*191]** off not filing than filing at all." And when discussing why he had filed other returns late in the past, Ryder stated: "[I]t's better to have a misdemeanor than a felony." It's hard to believe that Ryder's decision not to file was done with any other purpose than to evade tax.

The Commissioner wins on this one.

<u>An appropriate order will be issued</u>.